**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERSONAL REPRESENTATIVE OF THE DAWABSHEH FAMILY *et al.*, <br><br>                  Plaintiffs, <br><br>     v. <br><br> BENJAMIN NETANYAHU *et al.*, <br><br>                  Defendants. | Case No. 20-cv-555 (DLF) <br><br> **[Oral Argument Requested]** |

**MOTION TO DISMISS THE COMPLAINT BY DEFENDANTS
MIRIAM ADELSON, AIPAC, BRIAN SHANKMAN, HOWARD KOHR,
DOV HIKIND, SUSAN LEVIN-ABIR, AND WALID SHOEBAT**

Defendants Miriam Adelson, AIPAC, Brian Shankman, Howard Kohr, Dov Hikind, Susan Levin-Abir, and Walid Shoebat (the "Moving Defendants") respectfully move to dismiss the claims asserted against them in the Complaint.[1]  All Moving Defendants move for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Defendants Adelson, Hikind, Levin-Abir, and Shoebat also move to dismiss on the ground of lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

In addition, Defendants Adelson, AIPAC, Shankman, Kohr, Levin-Abir, and Shoebat move to dismiss on the ground of insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5).

Moving Defendants' motion is based on the grounds set forth in the accompanying memorandum of law and attached appendices.  A proposed order is submitted herewith.

---

[1] These claims are contained in Counts I and II of the Complaint.

Dated: August 14, 2020        Respectfully submitted,

By: */s/ Barry G. Felder*
Barry G. Felder (Bar No. 307736)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 338-3540
Fax: (212) 687-2329
bgfelder@foley.com

Michael J. Tuteur (D.D.C. Bar No. D00202)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
Tel: (617) 342-4016
Fax: (617) 342-4001
mtuteur@foley.com

*Counsel for Miriam Adelson*

By: */s/ Rachel Hirsch*
/Signature with Permission
Rachel Hirsch (Bar No. 991122)
AIPAC
251 H Street, NW
Washington, D.C. 20001
Tel: (202) 639-5248
Fax: (202) 638-6349
rhirsch@aipac.org

Philip Friedman (Bar No. 421854)
FRIEDMAN LAW OFFICES PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
Tel: (202) 293-4175
Fax: (202) 381-0395
psf@consumerlawhelp.com

*Counsel for AIPAC, Howard Kohr, and Brian Shankman*

By: _/s/ Stuart J. Roth_____
/Signature with Permission
Stuart J. Roth (Bar No. 475937)
Mark Goldfeder (D.D.C. Bar No. NY0273)
Benjamin Sisney (Bar No. 1044721)
THE AMERICAN CENTER FOR LAW AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel: (202) 546-8890
Fax: (202) 546-9309
goldfed@gmail.com
bsisney@aclj.org

*Counsel for Dov Hikind*


By: _/s/Mark D. Harris_____
/Signature with Permission
Mark D. Harris (Bar No. 445900)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
mharris@proskauer.com

Jennifer E. Tarr (D.D.C. Bar No. IL0028)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave. NW  Ste. 600 South
Washington, DC 20004-2533
Tel: (202) 416-6846
Fax: (202) 416-6899
jtarr@proskauer.com

*Counsel for Susan Levin-Abir*


By: _/s/Robert J. Tolchin_____
*/Signature with Permission*
Robert J. Tolchin (Bar No. NY0088)
THE BERKMAN LAW OFFICE, LLC
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: (718)855-3627
Fax: (718) 504-4943
rtolchin@berkmanlaw.com

Oleg Rivkin, Esq. (D.D.C. Bar No. NY236)
RIVKIN LAW GROUP PLLC
800 Third Avenue, Suite 2800
New York, New York 10022
Tel: (212) 231-9776
or@rivkinlawgroup.com

*Counsel for Walid Shoebat*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PERSONAL REPRESENTATIVE OF THE
DAWABSHEH FAMILY *et al.*,

                    Plaintiffs,                         Case No. 20-cv-555 (DLF)

          v.

BENJAMIN NETANYAHU *et al.*,                **[Oral Argument Requested]**

                    Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS THE COMPLAINT BY DEFENDANTS**
**MIRIAM ADELSON, AIPAC, BRIAN SHANKMAN, HOWARD KOHR,**
**DOV HIKIND, SUSAN LEVIN-ABIR, AND WALID SHOEBAT**

# <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................................. iv

PRELIMINARY STATEMENT ............................................................................................1

ALLEGATIONS IN THE COMPLAINT ..............................................................................4

      A.     Conduct by the Israeli Government, Israeli Military, and Israeli Settlers .............4

      B.     Plaintiffs ...............................................................................................................5

      C.     Defendants .............................................................................................................6

      D.     Plaintiffs' Claims ................................................................................................11

ARGUMENT ........................................................................................................................13

I.       LEGAL STANDARDS .............................................................................................13

II.     THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV.
        P. 8 BECAUSE THE PLEADING FAILS TO GIVE DEFENDANTS FAIR
        NOTICE OF THE CLAIMS BEING ASSERTED .........................................................15

III.    THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE
        PLAINTIFFS' CLAIMS ARE NONJUSTICIABLE UNDER THE POLITICAL
        QUESTION AND ACT OF STATE DOCTRINES .........................................................18

      A.     Plaintiffs' Claims Present Nonjusticiable Political Questions...............................18

      B.     Plaintiffs' Claims Are Nonjusticiable Under the Act of State Doctrine................28

IV.    PLAINTIFFS LACK STANDING TO BRING THIS ACTION ......................................31

      A.     Plaintiffs Fail to Allege Injuries Fairly Traceable to Defendants' Alleged
            Actions .................................................................................................................33

      B.     Plaintiffs Suing Merely as Taxpayers Fail to Allege an Injury in Fact .................36

V.     THE COURT LACKS SUBJECT MATTER JURISDICTION OVER
        PLAINTIFFS' CLAIMS UNDER THE ALIEN TORT STATUTE ................................37

      A.     Plaintiffs Fail to Overcome the Presumption Against Extraterritoriality .............38

      B.     Counts I and II for Aiding and Abetting "the Denationalization and
            Dehumanization of the Palestinian People" and "Rampant Genocide and
            Installation of an Apartheid Regime," Respectively, Fail to State a Claim
            for Primary Violations of International Law .......................................................43

C.     Plaintiffs Fail to Establish That They Have Exhausted Their Remedies ..............52

VI.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TORTURE VICTIM PROTECTION ACT ...................................................................................53

     A.     Organizational Defendants are not Subject to a TVPA Claim ............................54

     B.     The Complaint Fails to State a Claim for Torture or Extrajudicial Killing ...........54

     C.     Plaintiffs Failed to Exhaust Adequate and Available Remedies in Israel .............55

VII.     CERTAIN OF PLAINTIFFS' CLAIMS ARE TIME-BARRED .....................................55

VIII.     THIS COURT LACKS PERSONAL JURISDICTION OVER CERTAIN DEFENDANTS ........................................................................................................56

     A.     The Complaint Should Be Dismissed Because It Fails to Allege Any Facts Supporting Personal Jurisdiction Over Certain Defendants .................................56

     B.     Plaintiffs Failed to Effect Service of Process on Certain Defendants ..................62

     C.     The Court Should Not Extend Plaintiffs' Time to Serve Defendants....................66

CONCLUSION.....................................................................................................................67


**APPENDICES**

APPENDIX A: LACK OF PERSONAL JURISDICTION ...................................................... A-1

   I.   The Complaint Fails to Establish Personal Jurisdiction Over Dr. Miriam Adelson ....... A-1

   II.   The Complaint Fails to Establish Personal Jurisdiction Over Dov Hikind ................... A-2

   III. The Complaint Fails to Establish Personal Jurisdiction Over Susan Levin-Abir ........... A-3

   IV. The Complaint Fails to Establish Personal Jurisdiction Over Walid Shoebat............... A-5

APPENDIX B: INSUFFICIENT SERVICE OF PROCESS ......................................................B-1

   I.   Plaintiffs Have Failed to Serve Dr. Miriam Adelson....................................................B-1

   II.   Plaintiffs Have Failed to Serve AIPAC, Howard Kohr, or Brian Shankman .................B-1

   III. Plaintiffs Have Failed to Serve Susan Levin-Abir........................................................B-4

   IV. Plaintiffs Have Failed to Serve Walid Shoebat............................................................B-6

APPENDIX C: ADDITIONAL GROUNDS FOR DISMISSAL.................................................C-1

I.   Claims Against Walid Shoebat Are Based on Speech Protected by the
     First Amendment and Should Be Dismissed ...................................................................C-1

II.  This Court Should Dismiss the Complaint in its Entirety as Against
     Defendants AIPAC, Howard Kohr, and Brian Shankman Because
     Constitutionally Protected Speech Does Not Support a Cognizable
     Theory of Recovery Against Them.................................................................................C-4

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abulhawa v. Dep't of Treasury*,
  No. 17-5158, 2018 WL 3446699 (D.C. Cir. June 19, 2018) ...................................................35

*Achagzai v. Broad. Bd. of Governors*,
  109 F. Supp. 3d 67 (D.D.C. 2015) .......................................................................................17

*Ahmad v. Christian Friends of Israeli Cmtys.*,
  No. 13-cv-3376 (JMF), 2014 WL 1796322 (S.D.N.Y. May 5, 2014) .....................................51

*Al Shimari v. CACI Premier Tech. Inc.*,
  758 F.3d 516 (4th Cir. 2014) ...............................................................................................40

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) ........................................................................................21, 22, 31

*Anderson v. Gates*,
  20 F. Supp. 3d 114 (D.D.C. 2013) .............................................................................64, 67, B-5

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) .............................................................................................................31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................14, 15, 52

*Atlantigas Corp. v. Nisource, Inc.*,
  290 F. Supp. 2d 34 (D.D.C. 2003) ............................................................................57, 60, A-6

*Aziz v. Alcolac, Inc.*,
  658 F.3d 388 (4th Cir. 2011) ............................................................................................46, 50

*Baker v. Carr*,
  369 U.S. 186 (1962).................................................................................................. *passim*

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013)..................................................................................................42

*Balintulo v. Ford Motor Co.*,
  796 F.3d 160 (2d Cir. 2015)..................................................................................................38

*Baloco v. Drummond Co., Inc.*,
  767 F.3d 1229 (11th Cir. 2014) ............................................................................................46

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964).........................................................................................................28, 29

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)........................................................................................15, C-4, C-6

*Biton v. The Palestinian Interim Self-Government Auth.*,
   310 F. Supp. 2d 172 (D.D.C. 2004) ............................................................................28

*Biton v. The Palestinian Interim Self-Government Auth.*,
   412 F. Supp. 2d 1 (D.D.C. 2005) ................................................................................28

*Bowoto v. Chevron Corp.*,
   621 F.3d 1116 (9th Cir. 2010) ....................................................................................54

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)........................................................................................... 59, A-4

*Capel v. Capel*,
   272 F. Supp. 3d 33 (D.D.C. 2017) ..............................................................................61

*Cardona v. Chiquita Brands Int'l, Inc.*,
   760 F.3d 1185 (11th Cir. 2014) .............................................................................39, 41

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
   511 U.S. 164 (1994)....................................................................................................45

*In re Chiquita Brands Int'l, Inc.*,
   792 F. Supp. 2d 1301 (S.D. Fla. 2011) ......................................................................48

*Ciralsky v. C.I.A.*,
   355 F.3d 661 (D.C. Cir. 2004) ..............................................................................16, 17

*Collingsworth v. Drummond Co. Inc.*,
   No. 19-cv-1263 (ABJ), 2020 WL 2800612 (D.D.C. May 29, 2020)...........................57

*Colston v. First Guarantee Commercial Mortg. Corp.*,
   665 F. Supp. 2d 5 (D.D.C. 2009) ...............................................................................67

*Corrie v. Caterpillar Inc.*,
   403 F. Supp. 2d 1019 (W.D. Wash. 2005)..................................................................53

*Corrie v. Caterpillar, Inc.*,
   503 F.3d 974 (9th Cir. 2007) .................................................................................25, 26

*Crane v. N.Y. Zoological Soc'y*,
   894 F.2d 454 (D.C. Cir. 1990).....................................................................................56

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) ............................................................................................ 57, A-2

*Doe I v. Nestle USA, Inc.*,
  766 F.3d 1013 (9th Cir. 2014) .......................................................................45, 46

*Doe v. Cisco Sys. Inc.*,
  66 F. Supp. 3d 1239 (N.D. Cal. 2014) ..............................................................48, 49

*Doe v. Drummond Co. Inc.*,
  782 F.3d 576 (11th Cir. 2015) ...............................................................41, 42, 51

*Doe v. Exxon Mobil Corp.*,
  391 F. Supp. 3d 76 (D.D.C. 2019) ............................................................................45

*Doe v. Exxon Mobil Corp.*,
  527 Fed. App'x 7 (D.C. Cir. 2013) ...............................................................45, 47, 50

*Doe v. Exxon Mobil Corp.*,
  654 F.3d 11 (D.C. Cir. 2011) ....................................................................................45

*Doe v. Exxon Mobil Corp.*,
  69 F. Supp. 3d 75 (D.D.C. 2014) ........................................................................31, 51

*Doe v. Exxon Mobil Corp.*,
  No. 01-cv-1357(RCL), 2015 WL 5042118 (D.D.C. July 6, 2015) ................................. *passim*

*Doe v. Nestle, S.A.*,
  929 F.3d 623 (9th Cir. 2018), *cert. granted*, Nestle USA, Inc. v. Doe I, No. 19-
  416, 2020 WL 3578678 (U.S. Jul. 2, 2020) ....................................................................43, 46

*Doe v. State of Israel*,
  400 F. Supp. 2d 86 (D.D.C. 2005) ................................................................. *passim*

*Duarte v. Nolan*,
  190 F. Supp. 3d 8 (D.D.C. 2016) ...........................................................57, A-1, A-2

*Eastern R.R. Presidents Conference, v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...........................................................................................C-5

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) ..............................................................................................38

*Eggink v. Trump*,
  257 F. Supp. 3d 27 (D.D.C. 2017) ........................................................57, 59, A-6

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ................................................................................18

*Ellul v. Congregation of Christian Bros.*,
  774 F.3d 791 (2d Cir. 2014) ....................................................................................55

*Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C.*,
  693 F. Supp. 2d 4 (D.D.C. 2010) ........................................................................ 59, A-4

*European Cmty. v. RJR Nabisco, Inc.*,
  764 F.3d 129 (2d Cir. 2014), *rev'd on other grounds*, 136 S. Ct. 2090 .................................. 41

*FC Inv. Grp. LC v. IFX Markets, Ltd.*,
  529 F.3d 1087 (D.C. Cir. 2008) ............................................................................. 57

*First Chicago Int'l v. United Exch. Co., Ltd.*,
  836 F.2d 1375 (D.C. Cir. 1988) ........................................................................ 57, A-6

*Forras v. Rauf*,
  812 F.3d 1102 (D.C. Cir. 2016) (en banc) .................................................................. 57

*Freedom Watch, Inc. v. Org. of Petroleum Exporting Countries*,
  288 F.R.D. 230 (D.D.C.2013), *aff'd in relevant part*,
  766 F.3d 74 (D.C. Cir. 2014) .......................................................................... 64, B-3

*Fulani v. Brady*,
  935 F.2d 1324 (D.C. Cir. 1991) ............................................................................. 36

*Garlington v. D.C. Water & Sewer Auth.*,
  62 F. Supp. 3d 23 (D.D.C. 2014) ......................................................................... B-5

*GTE New Media Servs., Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ............................................................................. 59

*Gunn v. Minton*,
  568 U.S. 251 (2013) ......................................................................................... 14

*Haase v. Sessions*,
  835 F.2d 902 (D.C. Cir. 1987) ............................................................................. 31

*Haig v. Agee*,
  453 U.S. 280 (1981) ......................................................................................... 22

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ............................................................................. 46

*Harbury v. Hayden*,
  444 F. Supp. 2d 19 (D.D.C. 2006) ......................................................................... 52

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ......................................................................................... 23

*Int'l Shoe Co. v. Wash., Office of Unemployment Comp. & Placement*,
  326 U.S. 310 (1945) ......................................................................................... 59

*Interhandel (Switz v. U.S.),*
 1959 I.C.J. 6 (Mar. 21 1959) ..........................................................................52

*Jackson v. Loews Washington Cinemas, Inc.,*
 944 A.2d 1088 (D.C. 2008) .............................................................................59

*Jacobsen v. Oliver,*
 201 F. Supp. 2d 93 (D.D.C. 2002) ..................................................................61

*Jesner v. Arab Bank, PLC,*
 138 S. Ct. 1386 (2018) ............................................................................. *passim*

*Jiggets v. District of Columbia,*
 319 F.R.D. 408 (D.D.C. 2017) ........................................................................16

*H Schwartz v. CDI Japan, Ltd.,*
 938 F. Supp. 1 (D.D.C. 1996) ....................................................................... A-5

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
 896 F.3d 501 (D.C. Cir. 2018) ........................................................................37

*Kiobel v. Royal Dutch Petroleum Co.,*
 569 U.S. 108 (2013) .................................................................................. *passim*

*Kissi v. U.S. Dep't of Justice,*
 793 F. Supp. 2d 233 (D.D.C. 2011) ................................................................62

*Klayman v. Obama,*
 125 F. Supp. 3d 67 (D.D.C. 2015) ..................................................................63

*Leeke v. Timmerman,*
  454 U.S. 83 (1981) ........................................................................................62

*Licci v. Lebanese Canadian Bank, SAL,*
 834 F.3d 201 (2d Cir. 2016) ...........................................................................43

*Light v. Wolf,*
 816 F.2d 746 (D.C. Cir. 1987) ........................................................................63

*Linda R.S. v. Richard D.,*
  410 U.S. 614 (1973) ......................................................................................62

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ................................................................................34, 35

*Mahorner v. Bush,*
 224 F. Supp. 2d 48 (D.D.C. 2002) ..................................................................36

*Mann v. Castiel*,
    681 F.3d 368 (D.C. Cir. 2012) ...........................................................62, 63, 64, B-1

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ...........................................................................................C-3

*Mastafa v. Chevron Corp.*,
    759 F. Supp. 2d 297 (S.D.N.Y. 2010).......................................................................54

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d. Cir. 2014).................................................................38, 41, 42, 43

*Matar v. Dichter*,
    500 F. Supp. 2d 284 (S.D.N.Y. 2007).......................................................................26

*Ex parte McCardle*,
    74 U.S. 506 (1868)....................................................................................................57

*Meyer v. Grant*,
    486 U.S. 414 (1988).................................................................................................C-5

*Mobarez v. Kerry*,
    187 F. Supp. 3d 85 (D.D.C. 2016) ...........................................................................23

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)..................................................................................................54

*Mohamad v. Rajoub*,
    634 F.3d 604 (D.C. Cir. 2011) ..................................................................................55

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)............................................................................................38, 39

*Morton v. D.C. Housing Auth.*,
    720 F. Supp. 2d 1 (D.D.C. 2010) ..............................................................................13

*Mujica v. AirScan Inc.*,
    771 F.3d 580 (9th Cir. 2014) ....................................................................................41

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
    526 U.S. 344 (1999)..................................................................................................62

*Mwani v. Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ......................................................................................61

*Nat'l Ass'n of Soc. Workers v. Harwood*,
  860 F. Supp. 943, 950 (D.R.I. 1994), *opinion modified on
  reconsideration,* 874 F. Supp. 530 (D.R.I. 1995),
  *rev'd,* 69 F.3d 622 (1st Cir. 1995) ...........................................................................C-5

*Oetjen v. Central Leather Co.*,
  246 U.S. 297 (1918)........................................................................................30

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017), *vacated in part on other grounds,*
  285 F. Supp. 3d 240 (D.D.C. 2018).............................................................48, 51

*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*,
  484 U.S. 97 (1987)..............................................................................15, 56, 63

*Osborn v. Visa Inc.,*
  797 F.3d 1057 (D.C. Cir. 2015) .................................................................. A-5

*Owen Equip. & Erection Co. v. Kroger*,
  437 U.S. 365 (1978)........................................................................................14

*Presbyterian Church of Sudan v. Talisman Energy Inc.*,
  582 F.3d 244 (2d Cir. 2009)..................................................45, 46, 49, 50

*Prosecutor v. Perišić*,
  Case No. IT-04-81-A (U.N. App. Ch. 2013) .........................................47, 48, 49, 50

*Prosecutor v. Tadić*,
  Case No. IT-94-1-A (U.N. App. Ch. 1999) .........................................................47

*Queen v. Schmidt,*
  No. 10-cv-2017 (PLF), 2016 WL 2757359 (D.D.C. May 12, 2016) .................................... A-5

*Raines v. Byrd*,
  521 U.S. 811 (1997)........................................................................................31

*Reedy v. Obama*,
  No. 14-cv-2215 (ABJ), 2015 WL 120160 (D.D.C. Jan. 7, 2015)...........................................14

*Richards v. Duke Univ.*,
  480 F. Supp. 2d 222 (D.D.C. 2007) ..................................................................61

*RJR Nabisco, Inc. v. European Comty.*,
  136 S. Ct. 2090 (2016)....................................................................................39

*Rush v. Savchuk*,
  444 U.S. 320 (1980)........................................................................................60

*Sanchez-Espinoza v. Reagan*,
 770 F.2d. 202 (D.C. Cir. 1985) ..................................................................62

*Sarei v. Rio Tinto PLC*,
 550 F.3d 822 (9th Cir. 2008) ....................................................................52

*Sarei v. Rio Tinto, PLC*,
 671 F.3d 736 (9th Cir. 2011), *vacated on other grounds*, 569 U.S. 945 (2013)...............45, 51

*Schneider v. Kissinger*,
 310 F. Supp. 2d 251 (D.D.C. 2004) ...........................................................24

*Shaw v. District of Columbia*,
 No. 05-cv-1284 (CKK), 2006 WL 1371681 (D.D.C. May 15, 2006) ....................................66

*Siegel v. U.S. Dep't of Treasury*,
 304 F. Supp. 3d 45 (D.D.C. 2018) ..............................................34, 36, 37

*Simon v. E. Ky. Welfare Rights Org.*,
 426 U.S. 26 (1976) ..............................................................33, 34, 36

*Sinaltrainal v. Coca-Cola Co.*,
 578 F.3d 1252 (11th Cir. 2009) ................................................................55

*Sosa v. Alvarez-Machain*,
 542 U.S. 692 (2004) ......................................................................*passim*

*In re South African Apartheid Litig.*,
 617 F. Supp. 2d 228 (S.D.N.Y. 2009)...........................................................48

*Street v. New York*,
 394 U.S. 576 (1969) ........................................................................C-3

*Spokeo, Inc. v. Robins*,
 136 S. Ct. 1540 (2016) ...................................................................31, 33

*Taylor v. Howard Univ.*,
 200 F. Supp. 3d 196 (D.D.C. 2016) ..........................................................63

*Taylor v. Stanley Works*,
 No. 01-cv-120, 2002 WL 32058966 (E.D. Tenn. July 16, 2002) .........................................B-3

*Teamsters Local 639 Emp'rs, Health Trust v. Hileman*,
 988 F. Supp. 2d 18 (D.D.C. 2013) ...........................................................66

*Texas v. Johnson*,
 491 U.S. 397 (1989)........................................................................C-3

*Thompson Hine, LLP v. Taieb*,
   734 F.3d 1187 (D.C. Cir. 2013) .................................................................... 59, A-5

*Toms v. Hantman*,
   530 F. Supp. 2d 188 (D.D.C. 2008) ...........................................................................64

*Toumazou v. Turkish Republic of N. Cyprus*,
   71 F. Supp. 3d 7 (D.D.C. 2014) ................................................................................15

*Underhill v. Hernandez*,
   168 U.S. 250 (1897)....................................................................................................30

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
   493 U.S. 400 (1990)....................................................................................................28

*Warfaa v. Ali*,
   811 F.3d 653 (4th Cir. 2016) .....................................................................................40

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................................................33

*Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*,
   889 F. Supp. 2d 912 (S.D. Tex. 2012) .......................................................................54

*Williams v. Geico Corp.*,
   792 F. Supp.2d 58 (D.D.C. 2011) ............................................................................B-2

*Wilson-Greene v. Dep't of Youth Rehab. Servs.*,
   No. 06-cv-2262, 2007 WL 2007557 (D.D.C. July 9, 2007) ....................................64

*World Wide Minerals Ltd. v. Republic of Kazakhstan*,
   296 F.3d 1154 (D.C. Cir. 2002) .................................................................................28

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)....................................................................................................59

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)........................................................................................................24

**Federal Statutes**

8 U.S.C. § 1189, Immigration and Nationality Act ........................................................43

18 U.S.C. § 1961 *et seq.*, RICO .....................................................................................19

18 U.S.C. § 2331 *et seq.*, Anti-Terrorism Act ...................................................28, 45, 54

28 U.S.C. § 1350, Torture Victim Protection Act ............................................... *passim*

28 U.S.C. § 1332 .................................................................................................14

Fed. R. Civ. P.
    R. 4 ............................................................................................ *passim*
    R. 8 .....................................................................................................13, 15
    R. 12(b) ...................................................................................... *passim*

Trade Facilitation and Trade Enhancement Act of 2015 (TFTEA),
    Pub. L. No. 114-125, 130 Stat. 122 (Feb. 24, 2016)
    § 909(a) .............................................................................................25
    § 909(b) .............................................................................................25

## State Statutes

D.C. Code Ann.
    § 13-422 ............................................................................................57
    § 13-423 ............................................................................................58
    § 13-431(b) ....................................................................................B-5

D.C. Super. Ct. Rule 4 ........................................................63, B-4, B-5

Fla. Stat. Ann. § 48.031 .............................................................B-5

## Other Authorities

Brief of United States as Amicus Curiae in Support of Petitioners, *Am. Isuzu Motors, Inc. v. Ntsebeza*, No. 07-919, 2008 WL 408389 (U.S. Feb. 11, 2008) .....................46

Brief of United States as Amicus Curiae in Support of Petition for a Writ of Certiorari, *Nestle USA, Inc. v. Doe I*, Nos. 19-416 and 19-453, 2020 WL 2749081 (U.S. May 2020) ................................................46

Cong. Research Serv., U.S. Foreign Assistance to the Middle East: Historical Background, Recent Trends, and the FY2021 Request, 8 (May 5, 2020), https://crsreports.congress.gov/product/pdf/R/R46344; ........................23

Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 25, 1995) ........................27

Exec. Order No. 13,099, 63 Fed. Reg. 45167 (Aug. 25, 1998) ....................27

Exec. Order No. 13,224, 66 Fed. Reg. 49077 (Sept. 25, 2001) ....................27

Exec. Order No. 13,268, 67 Fed. Reg. 44751 (July 3, 2002) ........................27

Exec. Order No. 13,338, 69 Fed. Reg. 26749 (May 13, 2004) ....................27

Exec. Order No. 13,866, 84 Fed. Reg. 48041 (Sept. 9, 2019) ....................27

Hagar Shezaf, "Family of Duma Arson Attack Victims to Testify Ahead of
   Murderer Sentencing," HAARETZ (July 13, 2020), *available at*
   https://www.haaretz.com/middle-east-news/palestinians/.premium-child-
   survivor-of-duma-arson-attack-to-testify-ahead-of-killer-sentencing-
   1.8987394). ....................................................................................................................53

Lara Jakes & David Halbfinger, "In Shift, U.S. Says Israeli Settlements in West
   Bank Do Not Violate International Law," NY TIMES (Nov. 18, 2019),
   *available at* https://www.nytimes.com/2019/11/18/world/middleeast/trump-
   israel-west-bank-settlements.html. ..........................................................................26

Notice No. 2016-01427, 81 Fed. Reg. 3937 (Jan. 22, 2016) .........................................27

Thomas A. Shannon, Jr., Under Sec'y of State for Political Affairs, U.S. Dep't of
   State, Susan E. Rice, Nat'l Sec. Advisor, and Jacob Nagel, Israeli Acting Nat'l
   Sec. Advisor, Statements at the Signing of a Memorandum of Understanding
   between the United States and Israel on Sec. Assistance (Sept. 14, 2016),
   http://www.state.gov/p/nea/rls/rm/261928.htm .......................................................23

U.S. State Dep't Press Releases on Israel,
   https://2009-2017.state.gov/p/nea/ci/is/c5218.htm .................................................25

U.S. State Dep't, "U.S. Relations with Israel" (May 14, 2018),
   https://www.state.gov/u-s-relations-with-israel/....................................................25

Defendants Miriam Adelson, AIPAC, Brian Shankman, Howard Kohr, Dov Hikind, Susan Levin-Abir, and Walid Shoebat (collectively, the "Moving Defendants") respectfully submit this omnibus memorandum of law in support of their motions to dismiss Plaintiffs' Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5), and 12(b)(6).[1]

## PRELIMINARY STATEMENT

Through this lawsuit, Plaintiffs ask this Court to adjudicate one of the most intractable issues of the 20th, and now 21st, centuries—the Israeli-Palestinian conflict and the rights to what Plaintiffs call the "Occupied Territories" (or "OPT"). The Complaint is a rambling political screed that is so unfocused and long-winded that it fails to place any Defendant on notice of the claims against them – and alleges no actionable claims in its 175 pages. Dismissal is justified on those grounds alone.

The rights and wrongs of the parties to this conflict, including with respect to Israel's settlements, have been, and will continue to be, fiercely debated in the political arena. Whatever else the settlement dispute might be, and wherever else it might be resolved, however, that dispute is not a proper subject for adjudication by a U.S. court. This Court recognized the nonjusticiability of this conflict over a decade ago in *Doe v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) (Bates, J.) ("*Doe I*"), when it dismissed a complaint by anonymous Palestinians that, except for the identity of the defendants, was nearly identical to this one. This Court held,

---

[1] All of the listed Moving Defendants join this brief, except with respect to Section VII concerning personal jurisdiction and improper service, as to which certain Moving Defendants join, as noted *infra*, Section VII. *See also* Appendices A and B hereto. Additional arguments specific to certain Moving Defendants are set forth in Appendix C hereto.

*inter alia*, that claims similar to those asserted here regarding settlement activities in the West Bank are nonjusticiable under the political question and act of state doctrines.

Plaintiffs' Complaint suffers from the same infirmities.  Just as in *Doe I*, Plaintiffs here allege that Israel- and U.S.-based defendants, including Israel's Prime Minister, all participated in the Israeli government's alleged commission of war crimes and genocide through Israeli state policies to expand settlements.  And as in *Doe I*, Plaintiffs ask the Court to take one side, rather than the other, in a highly controversial political dispute that has gone on for years without diplomatic resolution.  This is quintessentially an issue reserved for the political branches of our Government.

Even if Plaintiffs' claims were justiciable, the Complaint must be dismissed because this Court lacks subject matter jurisdiction.  None of the Plaintiffs has alleged a non-speculative, concrete injury that is fairly traceable to any wrongdoing of any defendant, as would be necessary to establish standing under Article III.  Instead, Plaintiffs seek redress for decades of purported harm to all Palestinians, untethered to any conduct by any Moving Defendant.

Plaintiffs' attempt to invoke subject matter jurisdiction under the Alien Tort Statute ("ATS") also fails.  Plaintiffs seek $1 billion in damages from Defendants for, *inter alia*, their alleged "intentional and criminal efforts to aid and abet" (1) an apartheid regime in the OPT and (2) the "denationalization and dehumanization of the Palestinian people."  But Plaintiffs make no specific allegation that any one of the Moving Defendants did anything except to "support" Israel (and, in particular, the Israeli army, Israeli settlers, settlements, and settlement policies) through financial donations and political advocacy.  The alleged conduct does not suffice to establish subject matter jurisdiction under the ATS for multiple reasons.

First, Plaintiffs' claim is based overwhelmingly on extraterritorial conduct, failing the test set forth in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), which requires that ATS claims "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the statute.  569 U.S. at 125 (internal quotation marks omitted).  Here, Moving Defendants allegedly supported non-parties whose conduct occurred entirely in Israel, the West Bank, and Gaza.  Moreover, the injuries alleged in the Complaint occurred entirely overseas.

Second, the Complaint does not even purport to allege that any Moving Defendant directly committed any violation of international law and does not allege any facts establishing Moving Defendants' participation in any such violations.  Instead, the Complaint generally alleges that Defendants engaged in conduct – namely, the donation of funds to lawful charities, and engagement in political advocacy – that, based on settled law, neither establishes jurisdiction nor creates liability under the ATS.

Plaintiffs also fail to state a claim under the Torture Victim Protection Act ("TVPA").  The TVPA imposes liability only for "extrajudicial killing" and "torture."  No Plaintiff alleges the required non-conclusory factual support to assert a plausible claim of such conduct against any of the Moving Defendants.  Moreover, the TVPA does not cover claims for property or economic damage, which is all that certain Plaintiffs purport to allege.  For these reasons and others detailed below, the TVPA claim fails to state a cause of action.

Finally, this Court lacks personal jurisdiction over certain Moving Defendants because (1) they lack sufficient contacts with the District of Columbia and/or (2) Plaintiffs have failed to effect service of process on them.

 For all these reasons, the Complaint must be dismissed.

## ALLEGATIONS IN THE COMPLAINT

The Complaint is premised on an alleged conspiracy among the Israeli government, the Israeli military, unidentified Israeli settlers living in the OPT, and the Defendants.  As detailed below, Plaintiffs generally assert that because the Moving Defendants advocated for settlement expansion, donated funds to charitable organizations that support the settlements and the Israeli military, or spoke critically of Palestinians generally, the Moving Defendants somehow empowered Israel's government to direct its military and armed settlers to commit violence and other conduct amounting to war crimes and genocide.  Despite its length, the 175-page Complaint does not allege any facts that would explain how the conduct of any of the Moving Defendants relates in any proximate way to the purported injuries alleged by any of the named Plaintiffs.

### A.     Conduct by the Israeli Government, Israeli Military, and Israeli Settlers

Plaintiffs allege that Israeli settlers, acting in cooperation with the Israeli military, have committed a long list of misdeeds including "siblings and parents maimed and murdered," "outright theft of private property," "arrest, torture and incarceration," poisoning of water wells, and arms trafficking.  Compl. at 7, 10, ¶ 14.  Plaintiffs assert that these actions were taken at the direction of, and in furtherance of objectives devised by, defendant Prime Minister Netanyahu and his predecessor Prime Ministers going back to the 1940s, with the goal of expelling non-Jews from the OPT through a concerted effort to "dehumanize" and "denationalize" Palestinians and subject them to an "apartheid regime."  According to Plaintiffs, Prime Minister Netanyahu "authorized the Israeli Army leadership to adopt policies in the OPT designed to effectuate extra-judicial killings."  *Id.* at 6.  Similarly, Netanyahu purportedly "gave a green light to his local guerilla army, i.e., settlement militia units, to maim and murder Palestinians."  *Id.* at 7.

The Complaint does not allege that any Moving Defendant participated directly in any purported violence, theft or mistreatment, but rather alleges that Israeli soldiers and armed settlers did so at the direction of and with the assistance and protection of the Israel Defense Forces ("IDF") and the Israeli government.  *E.g.*, *id.* ¶¶ 78-79 ("state actors (Sharon, Olmsted, Netanyahu, Weisglass)" implemented measures "making sure that 'killing machines' (rogue Israeli army soldiers and ruthless settlers) were available to commit extrajudicial killings, force expansion of settlements, violently subjugate the civilian population, and ethnically cleanse the new Jewish homeland"); at 9 ("'out of control' settlers . . . if not for the immunity granted them by [Netanyahu] would have received twenty-year jail sentences and been deterred from killing any more Palestinians"); ¶¶ 93-95 (alleged violence by IDF soldiers); ¶ 272 (Netanyahu "relies on belligerent settlers to do his dirty work (ethnic cleansing and genocide) who are assisted by rogue Israeli army soldiers").

### B.   Plaintiffs

Plaintiffs in this action fall into two categories.  Seven Plaintiffs claim to be American citizens or Palestinian nationals who themselves or whose relatives or families allegedly have suffered physical injury, death, or property damage or loss as a result of "the permanent occupation of the OPT."  *Id.* ¶ 14; *see also* Compl., Caption.  Six additional Plaintiffs are listed by name only in the caption.  These Plaintiffs have addresses in the United States and presumably are the U.S. citizen taxpayers described generally in the Complaint.  They allege that, as a result of the tax exempt treatment of charities supporting Israeli settlements and contributions by donors to such charities, they (like all taxpayers, according to Plaintiffs' theory) have become complicit in "abuse of the tax code to support wanton destruction of civilian property and cluster bomb operations, ethnic cleansing, and genocide."  *See id. Caption*, ¶ 15.

Plaintiffs seek $1 billion in damages from Defendants based on injuries alleged to have been suffered by Palestinians generally as a result of "the permanent occupation of the OPT, funded, directly or indirectly, by all Defendants herein, [except for certain defendants], and the deliberate attempt by the Defendants to denationalize and dehumanize the Palestinian population and aid and abet the establishment of an apartheid regime in the OPT." *Id.* ¶ 14.  Strikingly, no attempt is made to link any *harm* suffered by a particular Plaintiff to the *conduct* of any particular Defendant.  Rather, the Complaint asserts in generic and conclusory terms injuries such as "extreme emotional distress, loss of livelihood, loss of family heritage, loss of family property, loss of Palestinian culture," and other harms to unnamed individuals and unidentified property."  *See, e.g.*, *id.* ¶ 16.

## C.     Defendants

Defendants in this case are not the unidentified settlers or IDF members who allegedly committed the wrongs alleged in the Complaint.  Rather, they are a number of U.S. individuals, a U.S. tax-exempt charity, the President of the United States, the Governor of New York, other current and former U.S. and state government officials, Israeli and other foreign individuals, and the Prime Minister of Israel.  The Complaint does not allege that any of the named Defendants engaged in any violent acts causing personal injuries in the West Bank and Gaza or elsewhere, nor does it allege that any of the named Defendants have taken, forcefully or otherwise, any property from any Plaintiff or other unidentified Palestinian.

The Moving Defendants are individuals and a non-profit organization that are alleged to have supported Israeli settlers' activities through financial donations to charities that support settlements and/or the IDF and through advocacy in favor of the expansion of settlements. Compl. ¶¶ 18-20, 36-37, 41-42, 49-50.  The Complaint alleges only that the Moving Defendants "aided and abetted" – simply by virtue of their financial or moral support – the actions of

unidentified settlers or soldiers acting pursuant to Israeli government policies.  According to the

Complaint, Defendants supposedly "know" or "should know" that such support led to the

mistreatment of Palestinians based on public statements by media, NGOs, and international

organizations.  *E.g.*, Compl. ¶ 354.  In other words, the Complaint alleges that Defendants should

be held liable either for donating or raising funds for U.S. tax-exempt charitable organizations

that, in turn, donate money to settlements and IDF veterans, advocating in support of Israeli

settlement policies.

Once such sweeping – and, as discussed below, nonjusticiable – allegations are set aside,

the Plaintiffs' specific allegations against the moving Defendants are remarkably thin:

**Dr. Miriam Adelson**.  The only non-conclusory allegations in the Complaint concerning

Dr. Adelson are: she donated money to charitable organizations such as AIPAC to support

settlements in the West Bank (Compl. at 5, 8); she, along with her husband, made substantial

donations to Donald Trump's presidential campaign (*id.* ¶ 20); she is a "dedicated Zionist" (*id.* ¶

19); and that she attended one or more annual galas held by AIPAC, where "typically," various

"pro-occupation" NGOs attend and have an opportunity to "mingle" with donors like Dr.

Adelson (*id.* ¶ 13).  Although various conclusory allegations are lodged against the other

members of the "Adelson Family," none of Dr. Adelson's family members are named as

defendants in this action.

**AIPAC**.  The Complaint alleges numerous conclusory and derogatory allegations against

Defendant AIPAC. The only non-conclusory allegation in the Complaint is that AIPAC is a

501(c)(4) entity.  *See* Compl. ¶ 18. While the Complaint alleges that AIPAC has played "a major

role in the denationalization and dehumanization of the Palestinian people in the OPT by

protecting Israel's image in the U.S," (*id*. ¶ 114), the allegations in the Complaint essentially

center on AIPAC's lobbying work. The Complaint appears to tie the various defendants to AIPAC by claiming that they donated money to AIPAC or supported its lobbying mission. *See, e.g., id.* ¶13 (describing defendants Giuliani, Huckabee, and Gingrich as AIPAC supporters); *id.* ¶ 22 (alleging that defendant Cuomo, with the support of Rabbi Hikind "signed up to be AIPAC's partner and the Israeli spokesperson on the BDS issue…."); *id.* ¶ 53 (describing defendant Weissglass as a "huge supporter of AIPAC"). Moreover, the activity in which AIPAC is alleged to have partaken constitutes protected speech. *See, e.g., id.* ¶ 99 (alleging AIPAC's involvement with anti-BDS legislation and "extensive lobbying work done by AIPAC officials"). The remainder of the Complaint against AIPAC asserts conclusory allegations, accusing the organization of violating various federal laws and criminal statutes. *See, e.g., id.* ¶ 18, 98, 107. However, Plaintiffs have not, and cannot, state any predicate or elemental facts that would support such outrageous claims.

**Brian Shankman and Howard Kohr**. In Plaintiffs' 175-page Complaint, there are only three references to Defendants Brian Shankman and Howard Kohr. The first reference is in the caption of the case itself. The second reference is in the section entitled "Jurisdiction," in which Plaintiffs do not properly plead the citizenship of each of these defendants, but rather allege that "Brian Shankman and Mr. Kohr (AIPAC employees) are either American citizens or have joint Israeli American citizenship." Compl. ¶ 4(b). The third and final reference appears with respect to allegations asserted against Defendant Andrew Cuomo. In conclusory fashion, Plaintiffs assert that "senior AIPAC officials like Brian Shankman, Howard Kohr …" provided "specific instructions" to Defendant Cuomo to promote an anti-BDS executive order in the State of New York. *See id.* ¶ 163. The Complaint is otherwise devoid of any specific allegations against

Defendants Shankman and Kohr. They are not specifically alleged to have undertaken any of the activities that purportedly support Plaintiffs' claims for relief.

**Susan Levin-Abir**.  Plaintiffs allege that Ms. Levin-Abir has "rendered 'practical assistance and encouragement' to belligerent settlers and rogue Israeli soldiers" (Compl. at 13) by "send[ing] over to the Israeli Army approximately $104 million along with her colleagues in other FDIF [*sic*] chapters."  *Id.* at 13, ¶¶ 20, 41.  Plaintiffs provide no details regarding her fundraising activities, other than to say that she "has set up numerous fundraising events in the Florida area" and that she is "very interested in having Giuliani speak . . . in order to raise funds for the Israeli Army in greater Broward county."  *Id.* at 18, ¶ 13.  Regarding the uses of that money, the Complaint makes only conclusory allegations that it is used to perpetrate war crimes, and then alleges that such fundraising somehow constitutes money-laundering, so that if Ms. Levin-Abir signed annual nonprofit tax returns, she "committed income tax fraud." *Id.* ¶ 286.

Plaintiffs also allege that Ms. Levin-Abir "has drunk the Koolaid."  *Id.* ¶ 42.  Seemingly, Plaintiffs use this bizarre turn of phrase to characterize Ms. Levin-Abir's purported views on the Israeli-Palestinian conflict: that is, "she does not apologize in any way" for the actions of the Israeli Army or settlers (*id.* at 13); she "enthusiastically supports the Israeli Army, claiming" (to unnamed people on unspecified occasions) "that it is the most moral army in the world" (*id.*); she "distribute[d]" (to unnamed people on unspecified occasions certain unidentified) "video clips extolling the virtues of the IDF" (*id.* ¶ 355); and she "adopted a pro-settlement agenda" (*id.* ¶ 41).  At the same time, Plaintiffs acknowledge the possibility that Ms. Levin-Abir "did not know" the alleged misconduct of the Army and settlers (*id.* ¶ 288) because they surmise she did not read a book that Plaintiffs consider important (*id.* ¶ 285).

**New York Assemblymember Dov Hikind**. The Plaintiffs' claims against former Assemblyman Hikind are in essence that he is an "Israeli spokesperson" and an unregistered "Israeli agent" because he is openly against the Boycott, Divestment, and Sanctions (BDS Movement), a movement that has been continuously condemned by countless members of both the Republican and Democratic Parties at the state and federal levels (Compl. at 12); and because he advocated for the State Department to officially adopt the internationally accepted definition of anti-Semitism they had already been using as a Working Definition. *Id.* ¶ 37. For good measure Plaintiffs also throw in some baseless and truly bizarre accusations against Defendant's wife, who is not even a party to this suit.

**Walid Shoebat**. The Plaintiffs' claim against Shoebat is that he is "a 'profiteer' [who] makes money by convincing American and Congressional members that Palestinians are responsible for terrorism and are not responsible for their own state." Compl. at 13. The Complaint alleges that Shoebat "has warned first responders [in the United States] about the need to profile Palestinians because they are dedicated to inflicting acts of terrorism on the American population." *Id.* Plaintiffs claim that Shoebat "is a terrorism profiteer who … has made thousands of dollars convincing responders in North and South Dakota and Iowa that they need to be on alert for Muslim terrorists." *Id.* ¶ 291. Plaintiffs also allege that Shoebat "benefits from grants awarded by the Department of Homeland Security in its never-ending war on terror." *Id.* ¶ 49. Nowhere in the Complaint is there any allegation that Shoebat has given money to any person or organization. Nowhere is there any explanation of what Shoebat has done that would be remotely actionable under any cognizable legal theory. The sum total of the Plaintiffs' charge against Shoebat is that he makes speeches in the Dakotas and Iowa to first responders and says things the Plaintiffs don't like, and gets paid for it.

In short, despite Plaintiffs' 175-page complaint, they allege no *facts* connecting any of these Defendants to the purported decades-long conspiracy by the U.S. and Israeli governments to violently expel Palestinians from the OPT.

### D.   Plaintiffs' Claims

Plaintiffs divide their Complaint into four counts, all of which are brought pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the TVPA. 28 U.S.C. § 1350 (Note to Statute). *See* Compl. at 4-5. Only Counts I and II are brought against the Moving Defendants.

Count I alleges that all Defendants aided and abetted the "denationalization and dehumanization of the Palestinian people." After a lengthy and irrelevant diatribe about the history of the Israel-Palestine conflict and equally irrelevant allegations concerning American politics, Count I essentially alleges that the Israeli government has for fifty years sought to "denationalize and dehumanize" the Palestinian people by implementing measures such as travel restrictions, curtailment of resources, and violence, which the government perpetrated with the help of IDF soldiers and settlers and with financing and moral support from the Moving Defendants. *See, e.g.*, Compl. ¶¶ 93-95 (describing alleged violence by IDF officers); ¶ 287 (alleging that, "without the support of the Israeli Army, settlers couldn't kill livestock" and commit other harassment and violence against Palestinians"); ¶ 289 (alleging in conclusory fashion that "the other Defendants named herein have similarly financed, advocated, encouraged, and implemented on U.S. soil and in Palestine [Netanyahu's] strategy to rid the West Bank of all non-Jews and permanently colonize it with Jewish-only settlers"); ¶¶ 96-100, 107-119, 146-150 (alleging that various Defendants lobby and advocate in support of settlement expansion and against the anti-Israel "boycott divestiture sanction" ("BDS") movement).[2]

---

[2] In support of their allegations, Plaintiffs misleadingly purport to attach an excerpt of the "U.S. State Department's Manual on Genocide." *See* Compl. ¶ 34, Exhibit B. The referenced exhibit,

Count II alleges that all Defendants aided and abetted "rampant genocide and the installation of an apartheid regime in the OPT."  Although separately titled, Count II does not differ materially from Count I.  It alleges, in essence, that all Palestinians were subjected to violence, discrimination, property loss, and curtailment of rights "[a]s a direct consequence of apartheid, discriminatory policies and practices, torture . . ., extended incarceration for kids . . . and other inhumane practices [that] were crafted by [Netanyahu] and Defendant Weissglas to intimidate Palestinians every day."  *Id.* ¶ 304.  As in Count I, Plaintiffs allege that the Israeli government enlisted the support of IDF officers, "who train racist settlers and supervise their conduct," and that violence against Palestinians was allowed to occur as a result of "the blanket immunity granted by Prime Minister Netanyahu and Defendant Weissglas to rogue soldiers and settlers who enjoy maiming and murdering Palestinians."  *Id.* ¶ 308; *see also* ¶ 311 (alleging Netanyahu and Weissglas "adopted all of these measures and use terrorist settlers to do their dirty work"); *see also* ¶ 353.

Plaintiffs also allege, as in Count I, that "[d]irectly or indirectly, every Defendant has encouraged, financed, or intimidated non-Jews into leaving the OPT."  *Id.* ¶ 311 (alleging Defendants provided funds to the IDF).  Plaintiffs argue that Defendants are liable because they had to know, based on public reports, that the funds they were donating would be used to commit violence.  *Id.* ¶¶ 356, 357 (alleging without basis that "all of the Defendants, directly or indirectly, have knowingly supported arms trafficking" and the purchase of weapons for use by settlers).

---

however, is not a publication of the U.S. Government, but, rather a verbatim copy of an article written by the president of the NGO Genocide Watch.

Plaintiffs do not allege how any of the conduct describe in Counts I and II caused any injury actually alleged by any named Plaintiff.  Tellingly, the "wherefore" clause following each count asserts that the injuries alleged by Plaintiffs are no different from the purported injuries suffered by all Palestinians.  *See, e.g.*, Compl. at 131, 159 (requesting judgment of $1 billion based on harms that the "Plaintiffs, like all Palestinians" allegedly incurred).

Count III seeks a declaratory judgment that Prime Minister Netanyahu is a war criminal and seeks an injunction, *inter alia*, to require defendants Netanyahu and Weissglas to take measures to prevent genocide.

Count IV, alleged against President Donald Trump, U.S. Ambassador to Israel David Friedman, and White House senior officials Jared Kushner and Jason Greenblatt, alleges that those defendants aided and abetted Netanyahu's purported "ethnic cleansing/genocide campaign, initiated against the Palestinian Population 40 years ago." *Id.* at 169.  Count IV asserts that the President's peace plan "is a subterfuge designed to" distract attention from Israel's purported ethnic cleansing campaign, and secure Netanyahu's reelection.  *Id.* ¶ 393.  Count IV seeks an injunction to "stop the land transfer component of Kushner's peace plan," and "refer the issue" (including the issue "whether Israel owes the state of Palestine $50 billion for the intentional destruction of the OPT") to the U.N. General Assembly for resolution.  *Id.* ¶ 403.

## <u>ARGUMENT</u>

## I.   **LEGAL STANDARDS**

At the threshold, a complaint must contain a "short and plain statement of the grounds for the court's jurisdiction" and "of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  Plaintiff's Complaint does not meet these basic requirements, which alone should result in its dismissal.

Further, and fundamentally, federal courts are "courts of limited jurisdiction." *Gunn v. Minton*, 568 U.S. 251, 256 (2013). They possess "only that power authorized by the Constitution and statute." *Id.* (internal quotation marks omitted). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Reedy v. Obama*, No. CV 14-2215 (ABJ), 2015 WL 120160, at *2 (D.D.C. Jan. 7, 2015) (internal quotation marks and citations omitted).[3] Plaintiffs cannot meet their burden to demonstrate subject matter jurisdiction because: (1) their claims are nonjusticiable under the political question and act of state doctrines; (2) they lack standing to assert their claims; and (3) they cannot establish jurisdiction under the ATS.[4] This Court should dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(1).

In addition, "[t]o survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (internal quotation marks and

---

[3] Thus there is no basis for Plaintiffs' allegation that this Court can hear this case under the doctrine of "universal jurisdiction," which is not provided for either in the constitution or statute. *See, e.g.*, *Osei v. Standard Chartered Bank*, 2020 WL 1277511, at *4 (D.C.C. Mar. 17, 2020) (holding United Nations resolutions against torture did not confer so-called universal jurisdiction where plaintiff alleged conspiracy by a foreign corporation for tortious conduct and failed to establish an independent statutory basis for jurisdiction under either the ATS, the Immigration and Nationality Act, or the United States Refugee Act of 1980).

[4] In addition, Plaintiffs cannot establish diversity jurisdiction. *See* Compl. ¶ 2. Under 28 U.S.C. § 1332, "diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (emphasis in original). Here, Plaintiffs allege that at least one Plaintiff, John Healy, is domiciled in the District of Columbia (Compl., *Caption*), and that at least one Defendant, AIPAC, is headquartered in the District of Columbia (*id.* ¶¶ 13, 18). Plaintiffs purportedly commit that "[i]f any of the U.S. Plaintiffs named herein are domiciled in states where the Defendants reside, the Plaintiffs will drop that Plaintiff if it becomes necessary to preserve diversity jurisdiction." *Id.* ¶ 2. Yet as their own case caption makes plain, Plaintiffs have deliberately named a D.C. Plaintiff and a D.C. Defendant. Regardless of any future plans to amend the pleadings, as of the date of this motion, there is no diversity – and therefore no subject matter jurisdiction under 28 U.S.C. § 1332.

citation omitted).  A claim is plausible when the factual content allows the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  While the Court must accept as true well-pleaded allegations of fact, it need not accept legal conclusions couched as factual allegations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 554-58 (2007).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).  Further, a complaint cannot "lump[ ] all the defendants together in each claim" without providing "each defendant with fair notice of each claim and its basis." *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (internal quotation marks omitted); *see also Morton v. D.C. Housing Auth.*, 720 F. Supp. 2d 1, 9 n.3 (D.D.C. 2010) ("group pleadings" that fail to "plead facts with the requisite specificity" do not survive a motion to dismiss) (internal quotation marks omitted).  Because Plaintiffs do not allege facts to support any plausible claim against the Moving Defendants, their claims, whether asserted under "international law" or the TVPA, must be dismissed on this ground as well.

Finally, an action cannot be maintained against a defendant unless they have been properly served with the complaint and the court can exercise personal jurisdiction over them. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); Fed. R. Civ. P. 4(k).  The Complaint must be dismissed as against certain Moving Defendants pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(5) because the Court lacks personal jurisdiction over them.

## II.    THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 8 BECAUSE THE PLEADING FAILS TO GIVE DEFENDANTS FAIR NOTICE OF THE CLAIMS BEING ASSERTED

Federal Rule of Civil Procedure 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief".  A complaint "that is

excessively long, rambling, disjointed, incoherent, or full of irrelevant and confusing material will patently fail [Rule 8(a)'s] standard, and so will a complaint that contains an untidy assortment of claims that are neither plainly nor concisely stated, nor meaningfully distinguished from bold conclusions, sharp harangues and personal comments." *Jiggets v. District of Columbia*, 319 F.R.D. 408, 420 (D.D.C. 2017) (dismissing complaint).  At a minimum, a complaint must "give fair notice of the claim being asserted" and the grounds upon which they rest, "so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense."  *Id.*; *Ciralsky v. C.I.A.*, 355 F.3d 661, 669 (D.C. Cir. 2004) (holding district court's dismissal of a complaint was an appropriate exercise of discretion where the "amended complaint [was] still prolix and burdened with a bloated mass of unnecessary detail").

Plaintiffs' 175-page complaint is a rambling political manifesto, covering events as broad-ranging as the beginnings of the Zionist movement in the 1840s, the South African Apartheid regime, and the entire history of the Israel-Palestine conflict.  Despite its length, the Complaint largely fails to tie any set of factual allegations to any specific legal cause of action, and barely mentions the named Plaintiffs (and most of the named Defendants) in other than the most general ways.  Typical of this generic and improper pleading method is the allegation that, "as a result of the policies implemented by [Prime Minister Netanyahu], the Palestinians have no country to call their own, have suffered the loss of their national heritage, their ability to procreate, their right to exist, their culture, their native (Aramaic) language spoken by Jesus, their identity, and in the process, at least 440,000 square miles of valuable private property . . ."  *Id.* at 8.  What is alleged, in short, are generalized grievances by "Palestinians" as a group, over the course of decades, which have little or nothing to do with the alleged injuries suffered by the particular Plaintiffs identified in the Complaint.  Further, Plaintiffs reference various purported

statutory bases for their claims only in the introduction to the Complaint and in a list in

Appendix A thereto, leaving the Defendants to guess the legal basis for the purported claims

against them.

"Where a complaint is insufficiently focused, it places an undue burden on the defendant

to answer or move and it invites unnecessary delay and confusion in the proceedings." *Achgzai*

*v. Broad. Bd. of Governors*, 109 F. Supp. 3d 67, 71 (D.D.C. 2015).  Plaintiffs wide-ranging and

often bizarre allegations entirely unrelated to any discernable claim render the Complaint

virtually unintelligible.[5]

Because the Complaint is "prolix and bloated with a mass of unnecessary details," and

because it fails to give Defendants fair notice of the claims against them, it should be dismissed.

*See Ciralsky v. C.I.A.*, 355 F.3d at 669 (striking an unclear complaint that "weighed in at 119

pages and 367 numbered paragraphs").

---

[5] *See, e.g.*, Compl. ¶ 43 ("Senator Mitch McConnell is not named herein as a Defendant but should be . . . He is the Senate majority leader and he wields enormous power and has spent his time and energy ensuring the demise of the two-state solution and the forced removal of non-Jews from the OPT.  . . . If he devoted himself to the welfare of his constituency (his job) and stopped soliciting AIPAC contributions, ('what do I have to do to get your money next year') Kentucky wouldn't be such a depressed state."); ¶ 113 ("[AIPAC] officials work with numerous organizations with close ties to the Israeli Government (including the clandestine Room 8200 group and the Army's special social media unit- Havlit) whose agenda is to destroy the BDS movement. It doesn't bother these officials ('what do I have to do to get your money next year') Kentucky wouldn't be such a depressed state."); ¶ 113 ("[AIPAC] officials work with numerous boycotting is legal and is a cherished American tradition, and its roots go back 250 years, *i.e.*, dumping tea in the Boston harbor."); ¶ 120 ("One hundred years ago, Mark Twain wrote about his visit to the state of Palestine, and Lowell Thomas did the same fifty years ago. If not Palestine, what was this strange country they visited and wrote about that Gingrich says never existed?"); ¶ 242 (President Trump "has maligned a Black Baltimore District as "rat and rodent infested territory," effectively destroying the reputation of deceased Elijah Cummings.").

III. **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE PLAINTIFFS' CLAIMS ARE NONJUSTICIABLE UNDER THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES**

Because this case implicates sensitive foreign policy prerogatives of the executive, it must be dismissed based on the political question doctrine and the act of state doctrine.

A. **Plaintiffs' Claims Present Nonjusticiable Political Questions**

Under the political question doctrine, federal courts may not resolve "controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (internal quotation marks omitted). The political question doctrine is rooted in the Constitutional separation of powers and recognizes that decisions clearly committed to the political branches of the Government are nonjusticiable. The seminal decision on the political question doctrine is *Baker v. Carr*, 369 U.S. 186 (1962), in which the Supreme Court held that a question is political and therefore nonjusticiable when any one of the following six factors is present:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department, or

[2] a lack of judicially discoverable and manageable standards for resolving it, or

[3] the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion, or

[4] the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government, or

[5] an unusual need for unquestioning adherence to a political decision already made, or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217. Virtually all these factors apply directly to Plaintiffs' Complaint.

1.      **The Issues Raised In The Complaint Previously Have Been Deemed Political Questions Under *Baker v. Carr***

The application of the *Baker* factors to claims like these, stemming from the decades-old conflict between Israel and the Palestinians, already has been decided in this Circuit.

In *Doe I*, this Court dismissed, on political question grounds, a remarkably similar complaint premised on the Israeli-Palestinian conflict.  *Doe v. State of Israel*, 400 F. Supp. 2d 86, 96 (D.D.C. 2005).  In that case, Palestinian plaintiffs asserted claims under the ATS, the TVPA, assorted international conventions and agreements, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and other laws, against the President and Secretary of State, the State of Israel, and a number of its officials, including several generals of the army, a number of American defense contractors and manufacturers, and so-called "settler defendants," including a New Jersey congregation and its rabbi, who allegedly raised funds for Israeli settlers in the West Bank.  In a lengthy and carefully reasoned opinion by Judge Bates, this Court dismissed the complaint as to all defendants based, *inter alia*, on the political question and act of state doctrines. *Id.* at 96.

In finding that the plaintiffs' complaint raised nonjusticiable political questions, Judge Bates wrote: "It is hard to conceive of an issue more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has raged on the world stage with devastation on both sides for decades."  *Id*. at 111-12.  Judge Bates explained that the plaintiffs' claims "would have this Court adjudicate the rights and liabilities of the Palestinian and Israeli people," requiring determinations (i) regarding "to whom the land in the West Bank actually belongs," (ii) "that Israel's self-defense policies are tantamount to terrorism," (iii) "that the Israeli settlement activities are illegal or tortious," and (iv) "characteriz[ing] the ongoing armed conflict in the West

19

Bank as either 'genocide' . . . or self-defense." *Id*. at 112.  The court found that it could not rule

on these issues:

> The Court can do none of this. Whether plaintiffs dress their claims in the garb of
> RICO or other federal statutes, or the tort laws of various states, the character of
> those claims is, at its core, the same: peculiarly volatile, undeniably political, and
> ultimately nonjusticiable. A ruling on any of these issues would draw the Court
> into the foreign affairs of the United States, thereby interfering with the sole
> province of the Executive Branch.

*Id.*  The court further held that a conclusion that Israeli settlement activities are illegal or tortious

"would also implicitly condemn American foreign policy by suggesting that support of Israel is

wrongful. Conclusions like these present a potential for discord between the branches that further

demonstrates the impropriety of a judicial decision on these quintessential political issues." *Id.*

   These findings and assessments by Judge Bates in *Doe I* are directly on point in this case.

Plaintiffs seek a U.S. judicial determination that Israeli activities in the West Bank and Gaza,

dictated by the Israeli Prime Minister and carried out through Israeli-government-directed actions

of the Israeli military, working in concert with Israeli settlers, constitute genocide (Counts I and

II).  Count III seeks a declaration that the sitting Israeli prime minister is a war criminal (Count

III).  All of these Counts rest on the notion that Israeli settlement activities have taken place on

Palestinian land as part of a policy carried out by Israel's government to achieve the "ethnic

cleansing" and "genocide" of Palestinian nationals.  *See generally* Compl. at 5-14

(Introduction/Summary).  All of Plaintiffs' alleged injuries, to the extent any injuries are alleged

at all, arise from those activities or Israeli military activities during armed conflicts in the West

Bank and Gaza.  Further, Count IV, which alleges that President Trump, his senior advisors, and

the U.S. Ambassador to Israel are, through their diplomatic efforts in the region, aiding and

abetting the same alleged genocide that underlies Counts I and II, seeks an injunction preventing

implementation of the President's proposed peace plan and a referral to the UN General Assembly for resolution.

Like the claims found nonjusticiable in *Doe I*, Plaintiffs' claims would improperly require the Court to decide "to whom the land in the West Bank actually belongs," to declare "that the Israeli settlement activities are illegal or tortious," to "characterize the ongoing armed conflict in the West Bank as [] 'genocide,'" 400 F. Supp. 2d at 112, and would require the Court to enjoin diplomatic decisions committed to the executive branch. *See also Al-Tamimi v. Adelson*, 916 F.3d 1, 11 (D.C. Cir. 2019) (the question of "who has sovereignty over the disputed territory?" is a nonjusticiable political question).  As in *Doe I*, the claims set forth in the Complaint are nonjusticiable as to all Defendants.

The D.C. Circuit's recent decision in *Al-Tamimi*, which involved similar claims and some of the same parties at issue in this case, is not to the contrary.  There, the Court reaffirmed that the question "who has sovereignty over the disputed territories [*i.e.*, the OPT]?" is nonjusticiable. 916 F.3d at 13.  The Court determined, however, that the nonjusticiable question was extricable from plaintiffs' claims because plaintiffs, on appeal, expressly waived any claims based on allegations in their complaint of wrongdoing by the Israeli army and narrowed their claims solely to the conduct of non-government Israeli settlers.  *Id.*  Here, in contrast, Plaintiffs' claims and theory of liability are inextricably based upon the conduct of the Israeli military and the policies implemented by the Israeli government as directed by its Prime Minister, as well as the U.S. government's support for those policies.  Plaintiffs in this case do not allege any misconduct by settlers that can be untethered from the concurrent conduct of the Israeli military and the directives of the Israeli government.  Thus, unlike in *Al-Tamimi*, where defendants were primarily private citizens, NGOs and private corporations, Plaintiffs here have named as

defendants the President of the United States, the Prime Minister of Israel, the U.S. Ambassador to Israel, and senior advisors to President Trump.  And the Plaintiffs' sole theory of liability against the Moving Defendants is that they aided and abetted the purported official government policy of Israel.

The *Al-Tamimi* Court observed that "great deference" was due to the expressed view of the Department of Justice "that judicial resolution of the plaintiffs' complaint could create an inter-branch conflict because, '[g]iven the level of political and military support provided Israel by the American government, a judicial finding that the Israeli armed forces had committed the alleged offenses would 'implicitly condemn American foreign policy by suggesting that the [government's] support of Israel is wrongful.'"  *Id.*  In *Al-Tamimi*, that concern was mooted because the plaintiffs could and did waive any claims based on the actions of the Israeli military. *Id.* (remanding claims asserted solely based on conduct of Israeli settlers to the District Court). But here, Plaintiffs' allegations do not distinguish between the action of settlers and the actions of the Israeli Government and military (because they are all alleged to have participated in an integrated conspiracy).  Thus, the nonjusticiable political questions at issue here are "inextricable" from the claims in the Complaint as were the claims in *Doe I*, requiring dismissal. *See id.* (citing *Baker*, 369 U.S. at 217).

> ## 2. The *Baker v. Carr* Factors Confirm That Plaintiffs' Complaint Raises Nonjusticiable Political Questions

The political climate has not changed meaningfully since the *Doe I* decision, other than to have become, if anything, even more politicized, volatile, and complicated.  Accordingly, the *Baker v. Carr* factors require that the Complaint be dismissed.

*First*, the conduct of foreign policy, which is at the heart of this case, unquestionably is committed to the political branches of the Federal Government.  *See Haig v. Agee*, 453 U.S. 280,

292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) (observing that matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"). America's policy toward the State of Israel and Israel's conflict with the Palestinians are among the most delicate and vexing foreign policy issues of our time and have been so for decades. The U.S. Government has provided over $140 billion in aid to Israel to date, nearly all of it in the form of military assistance; and in 2016, the U.S. State Department announced additional grants of $38 billion in military aid between 2019 and 2028.[6] Every President and Secretary of State during the last 40 years has tried to find a delicate balance that provides a path to peace between Israel and its neighbors and protects U.S. national interests. Recent debates concerning the United Nations Security Council's resolution on Israeli settlements further reinforce the political nature of the issues. Indeed, in 2019, President Trump declared it the policy of the United States to support Israel's expansion of settlements in the West Bank. Yet Plaintiffs ask this Court to rule that the Moving Defendants' support for Israel's expansion of settlements is a war crime, a ruling that would run headlong into U.S. policy. What

---

[6] Cong. Research Serv., U.S. Foreign Assistance to the Middle East: Historical Background, Recent Trends, and the FY2021 Request, 8 (May 5, 2020) (noting Israel is the largest recipient of U.S. foreign military financing), https://crsreports.congress.gov/product/pdf/R/R46344; Thomas A. Shannon, Jr., Under Sec'y of State for Political Affairs, U.S. Dep't of State, Susan E. Rice, Nat'l Sec. Advisor, and Jacob Nagel, Israeli Acting Nat'l Sec. Advisor, Statements at the Signing of a Memorandum of Understanding between the United States and Israel on Security Assistance (Sept. 14, 2016), http://www.state.gov/p/nea/rls/rm/261928.htm. "The D.C. Circuit has consistently treated the political-question doctrine as bearing on subject-matter jurisdiction," and courts resolving a motion to dismiss for lack of subject matter jurisdiction may consider materials outside the pleadings. *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 89 (D.D.C. 2016).

the Supreme Court recently said concerning Jerusalem in *Zivotofsky v. Kerry*, 576 U.S. 1, 5

(2015), is equally applicable to the West Bank and Gaza:

> Questions touching upon the history of the ancient city and its present legal and
> international status are among the most difficult and complex in international
> affairs. In our constitutional system those matters are committed to the Legislature
> and the Executive, not the judiciary.

Here, Plaintiffs' claims require this Court to decide whether the Israeli government's decisions

carried out through the authorized actions of the Israeli military in the OPT, constitute genocide

or war crimes.  Count IV literally seeks an injunction preventing implementation of the Trump

Administration's peace plan.  These are policy questions the Court may not answer.

*Second*, as noted above, Plaintiffs contend that the activities of Israeli settlers and the

Israeli armed forces, conducted pursuant to directives and policies issued by many of Israel's

prime ministers – and not just defendant Netanyahu – (*see* Compl. at 7-8) constitute war crimes,

crimes against humanity, and genocide.  The government of Israel and others take an opposite

view.  They advocate that the settlers' activities constitute lawful economic development, and its

military's activities constitute lawful self-defense against persons and organizations who have

publicly advocated for the destruction of Israel.  Regardless of how any litigant or this Court

might view this dispute along any point on the political spectrum, the simple fact remains that

this dispute is a political question that this forum cannot resolve: U.S. courts are simply in no

position to find "judicially discoverable and manageable standards for resolving" these disputed

issues.  *Baker*, 369 U.S. at 217.  Adjudication of these claims would require the Court "to

measure and balance a myriad of thorny foreign and domestic political considerations,"

rendering them "inherently political" questions that cannot be resolved by the law of torts or

other statutory law.  *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 262 (D.D.C. 2004); *accord*

*Doe I*, 400 F. Supp. 2d at 112-13.

*Third*, the Court cannot decide the issues raised in the Complaint without rendering "initial policy determination[s] of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217 (factor 3). To grant Plaintiffs relief, the Court would have to characterize the conflict in the West Bank and Gaza and the actions of the Israeli government as "genocide" and "ethnic cleansing." The entire Complaint depends upon the notion that each of the activities alleged to underlie Plaintiffs' claims – donations and fundraising for lawful entities that have not been sanctioned by the U.S. Government – becomes unlawful because Plaintiffs allege that any dealings with Israeli settlements, settlers, or armed forces are *ipso facto* violations of international law or otherwise inherently unlawful. It is hard to imagine a more blatant case of a court being asked to make a political judgment on matters that our legal system properly leaves to the political branches. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007) (dismissing ATS case against Caterpillar for selling to the Israeli army bulldozers used to demolish Palestinian homes because "[a]llowing this action to proceed would necessarily require the judicial branch of our government to question the political branches' decision to grant extensive military aid to Israel").

*Fourth* and *fifth*, Plaintiffs call for a judgment by this Court that, if granted, would express "a lack of the respect due coordinate branches of government" and raise "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217 (factors 4 & 6). Executive Branch officials and members of Congress consistently voice support for the Israeli government,[7] and the Trump administration has declared

---

[7] *See, e.g.*, U.S. State Dep't, "U.S. Relations with Israel" (May 14, 2018), https://www.state.gov/u-s-relations-with-israel/ ("The U.S.-Israel bilateral relationship is strong, anchored by over $3 billion in Foreign Military Financing annually."); U.S. State Dep't Press Releases on Israel, https://2009-2017.state.gov/p/nea/ci/is/c5218.htm; Trade Facilitation and Trade Enhancement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122 (Feb. 24, 2016) ("TFTEA")

that the United States does not consider the settlements to violate international law.[8]  This Court would have to declare the opposite to find in favor of Plaintiffs.  Any judgment from a U.S. court suggesting that settlement activity is unlawful, criminal, or tortious surely would serve only as a prop to be brandished by opponents of U.S. policy in the U.N. and elsewhere.[9]  Such action could only undermine coordinate branches of Government and further complicate an already very difficult and delicate political situation.

Further, each and every year, virtually since Israel's establishment as a nation, the President has requested, and Congress has authorized, financial support to the military forces of Israel.  These grants reflect a judgment that the interests of the U.S. warrant such support and that it is consistent with American values.  Plaintiffs are asking this Court to determine that alleged general financial support to those same military forces by Defendants constitutes participation in war crimes, crimes against humanity, and

---

(stating that "Israel is America's dependable, democratic ally in the Middle East – an area of paramount strategic importance to the United States," TFTEA § 909(a), and opposing as a matter of policy "politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as boycotts of, divestment from, or sanctions against Israel," TFTEA § 909(b)).

[8] Lara Jakes & David Halbfinger, "In Shift, U.S. Says Israeli Settlements in West Bank Do Not Violate International Law," NY TIMES (Nov. 18, 2019), *available at* https://www.nytimes.com/2019/11/18/world/middleeast/trump-israel-west-bank-settlements.html.

[9] "It is not the role of the courts to indirectly indict Israel for violating international law... Plaintiffs may purport to look no further than Caterpillar itself, but resolving their suit will necessarily require us to look beyond the lone defendant in this case and toward the foreign policy interests and judgments of the United States government itself."  *Corrie*, 503 F.3d at 984; *see also Matar v. Dichter*, 500 F. Supp. 2d 284, 295 (S.D.N.Y. 2007) (granting defendant's motion for dismissal and stating, in a case alleging war crimes and brought pursuant to the ATS and TVPA, that "[t]his Court cannot ignore the potential impact of this litigation on the Middle East's delicate diplomacy").

genocide.  Such a decision would implicitly condemn the consistent policy decisions of the Executive and Legislative Branches over the past several decades.

Finally, the President has exercised his power under laws enacted by Congress to deal with "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process."  Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 25, 1995).  That order prohibits donations by U.S. persons to persons or organizations specified in or pursuant to the order.  The list includes Hamas, Hezbollah, and the Popular Front for the Liberation of Palestine, but it does not include the Israeli army, Israeli settlements, or anyone claimed in the Complaint to have engaged in terrorism.[10]  The President has also empowered the Government to block the assets of and prohibit transactions with such specified terrorist organizations.  Exec. Order No. 13,224, 66 Fed. Reg. 49077 (Sept. 25, 2001).[11]  Plaintiffs make the patently false claim that a donor's financial support to IDF soldiers violates these Executive Orders.  Compl. at 10-11.  On the contrary, the orders reflect a determination by the President as to what organizations in the Middle East may not receive contributions by Americans because of their acts of terrorism, and the President has not included the organizations alleged to have received donations in this case.  In effect, Plaintiffs seek to have a court overrule the President's determination, which he is exclusively authorized to make.  Such a judicial decision would not only intrude upon the authority of the political branches to conduct foreign affairs, but would also present the final

---

[10] The order was amended to include additional terrorists by Executive Order No. 13,099 on August 20, 1998 (63 Fed. Reg. 45,167 (Aug. 25, 1998)), was continued in effect by President Obama on January 20, 2016 (Notice No. 2016-01427, 81 Fed. Reg. 3937 (Jan. 22, 2016)), and was updated and continued in effect by President Trump on September 9, 2019 (Exec. Order No. 13,866, 84 Fed. Reg. 48041 (Sept. 9, 2019)).

[11] The order was amended to include additional terrorists by Executive Order No. 13,268 on July 2, 2002 (67 Fed. Reg. 44751 (July 3, 2002)) and the Syrian government by Executive Order No. 13,338 on May 11, 2004 (69 Fed. Reg. 26749 (May 13, 2004)).

description of a political question in *Baker* – one presenting "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."  369 U.S. at 217.

The Supreme Court has stated that the existence of any one of the six *Baker* factors requires dismissal.  *Id.*  Here, where five of the six factors are clearly present, there can be no doubt that this Complaint must be dismissed under the political question doctrine.[12]

## B.      Plaintiffs' Claims Are Nonjusticiable Under the Act of State Doctrine

The act of state doctrine also precludes all of Plaintiffs' claims.  That doctrine prevents U.S. courts from inquiring into the validity of public acts committed by a foreign sovereign within its own territory.  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *accord World Wide Minerals Ltd.v. Republic of Kazakhstan*, 296 F.3d 1154, 1164-65 (D.C. Cir. 2002).  The doctrine applies "when the outcome of the case turns upon [] the effect of official action by a foreign sovereign."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 407 (1990).  Like the political question doctrine, the act of state doctrine is rooted in the Constitutional separation of powers, "reflecting 'the strong sense of the Judicial Branch that its

---

[12] The reasoning set forth in *Doe I* and the facts detailed above fundamentally distinguish the instant case from those such as *Biton v. The Palestinian Interim Self-Government Authority*, 310 F. Supp. 2d 172 (D.D.C. 2004) and 412 F. Supp. 2d 1 (D.D.C. 2005).  The court in *Biton* held justiciable a suit against the Palestinian Authority and others for a terrorist attack under the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* (the "ATA"), because it was an "ordinary tort suit" that could be judicially resolved based on the statutory definition of "international terrorism" and the common law of tort and presented no separation of powers concerns since the Executive and Legislative Branches had "'expressly endorsed'" suits against terrorist organizations by enacting the ATA.  310 F. Supp. 2d. at 175, 184.  In that case and others like it, the Israeli-Palestinian conflict was the contextual backdrop and perhaps the motivation for the defendants' alleged unlawful acts, but it was not the central issue for resolution.  By contrast, the foundation of Plaintiffs' claims here is the proposition that the Israeli Government and military support for settlements during Israel's purportedly wrongful occupation of the West Bank and Gaza violates international law.  Resolution of these issues would require the Court to directly decide the core issues that lie at the heart of the political conflict; namely, the legitimacy of Israel's self-defense and settlement policies and activities.

engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id.* at 405 (quoting *Banco Nacional de Cuba*, 376 U.S. at 423).

Here, the underlying purported wrongdoing, which Defendants are alleged to have aided and abetted, is the expansion of settlements in the West Bank and Gaza, carried out by settler militias supported by the Israeli army pursuant to policy directives issued by Israel's government over the last 40 years.

The *Doe I* court confirmed that the act of state doctrine precludes review of such Israeli activities in the West Bank and Gaza, finding that "federal courts have long recognized that the exploitation of natural resources and land within a nation's own borders is, by legal definition, an act of state." 400 F. Supp. 2d at 114. Notably, while the plaintiffs in *Doe I* disputed whether the challenged actions occurred within Israel's "borders," Judge Bates found that this argument itself "raises a political question – the court is not competent to adjudicate whether the West Bank, in dispute for decades, belongs to the Israelis or the Palestinians." *Id.* at 114 n.6. The court held that the defendants' alleged taking of land for the use of Israel and its people was an act "of the Israeli state, through individual actors carrying out the mandate of the state for its benefit." *Id.*

Plaintiffs here ask the Court to find that the alleged financial support provided to settlements and the IDF by the Defendants pursuant to policies directed by the Israeli government constitute war crimes and criminal activity (Counts I and II). Count III asks the Court to pass judgment on the sitting prime minister of a foreign nation. Deciding these claims would require the Court to "adjudicate sensitive issues of a political nature that would offend notions of international comity," which it cannot do under the act of state doctrine. *Doe I*, 400 F. Supp. 2d at 114.

Further, the acts of the military of a foreign nation within its own borders are classic acts of state.  In *Underhill v. Hernandez*, 168 U.S. 250 (1897), the plaintiff – an American citizen – sued a Venezuelan military commander who had allegedly assaulted and detained him in Venezuela.  Declaring that "the courts of one country will not sit in judgment of the acts of the government of another," *id*. at 252, the court held the damages lawsuit against the commander could not be adjudicated based on the act of state doctrine.  In *Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918), the Court reached the same conclusion where an army general in revolutionary Mexico ordered the seizure of hides from a Mexican dealer who refused to pay a tax levied for support of the army.  After the hides were sold by the army and shipped to the U.S., the plaintiff filed suit in replevin, claiming the hides were its property which had been assigned to the Mexican dealer.  Although neither Mexico nor any of its officials was a defendant in the lawsuit, the Court held the seizure "was the action, in Mexico, of the legitimate Mexican government when dealing with a Mexican citizen," and "is not subject to re-examination and modification by the courts of this country."  *Id.* at 303; *accord United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 238 (D.D.C. 2017) (holding Act of State doctrine barred relief that would have invalidated official acts of Afghan government).

While the Complaint in some instances labels the actions of the Israeli military as those of "rogue" individual soldiers, in the same breath, Plaintiffs allege that those soldiers were acting pursuant to orders and consistent with a policy implemented by the Israeli government.  *See, e.g.*, Compl. ¶ 78 ("As part of their campaign to denationalize and dehumanize the Palestinian people, state actors (Sharon, Olmstead, Netanyahu, Defendant Weissglas) implemented a number of measures" including "making sure" that "killing machines (rogue Israeli army soldiers and ruthless settlers) were available to commit extrajudicial killings, force expansion of settlements,

violently subjugate the civilian population, and ethnically cleanse the new Jewish homeland (the country of Palestine) of all non-Jews.").  It is unquestionably the Israeli army itself acting under the alleged direction of Prime Minister Netanyahu, not rogue individuals, whose activity Plaintiffs ask the Court to characterize as war crimes and genocide.  In contrast, see *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 88 (D.D.C. 2014), where plaintiffs did not claim "that Exxon's security forces, while admittedly soldiers in the Indonesian military, injured them pursuant to official policies of the GOI [government of Indonesia] or orders from military commanders."  The actions of the Israeli military are inextricable from Plaintiffs claims, rendering them nonjusticiable.  *See Al-Tamimi*, 916 F.3d at 13.

## IV.   PLAINTIFFS LACK STANDING TO BRING THIS ACTION

The Court must also dismiss the Complaint for lack of standing pursuant to Rule 12(b)(1).  *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("the defect of standing is a defect in subject matter jurisdiction").  "[S]tanding is '[o]ne element' of the Constitution's case-or-controversy limitation on federal judicial authority, expressed in Article III of the Constitution."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 779 (2015) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).

To qualify as a party with standing to litigate, each plaintiff bears the burden of showing (1) "injury in the form of invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent;'" (2) that the injury is "fairly traceable to the challenged action, and not . . . th[e] result [of] the independent action of some third party not before the court;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 779-800 (internal quotation marks and citations omitted); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545, 1548 (2016).

Despite a Complaint that extends for 175 pages, Plaintiffs have failed adequately to allege their standing to sue.  None of the Plaintiffs satisfies all three elements of the constitutionally mandated standing requirement.

Indeed, the body of the Complaint barely mentions any plaintiff by name.  The sole allegations naming any specific plaintiff are as follows:

> [T]he Defendants have financed the theft of real property owned by Palestinian-Americans Ali and Khateeb. Their combined property holdings are worth $3 million (based on Remax values) and they seek a separate monetary judgement in that amount against the Defendants for financing the trespass, pillage, and the conversion of their real property in the OPT. Compl. at 5.

> Recently, members of the Dawabsheh family tried to secure monetary redress in connection with the intentional burning down of their house, which cost three lives. *Id.* ¶ 6(a).

> All Plaintiffs have sustained injuries as a result of the permanent occupation of the OPT, funded, directly or indirectly, by all Defendants herein, EFCC and Shoebat, and the deliberate attempt by the Defendants to denationalize and dehumanize the Palestinian population and aid and abet the establishment of an apartheid regime in the OPT. These injuries include but are not limited to: (a) siblings and parents maimed and murdered (see the Dawabsheh family, see Barghouthi family); (b) outright theft of private property (Plaintiffs Khateeb and Ali Ali); (c) arrest, torture and incarceration (see both Ahed and Bassem Al-Tamimi).  *Id.* ¶ 14.

> [Defendants Friedman and Greenblatt] both view legitimate Palestinian American property owners like Plaintiff Khateeb as intruding on their precious Jewish homeland and have brought about the forceful removal of non-Jews from the OPT. *Id.* ¶ 178.

> Plaintiff Ahed Al-Tamimi lost both her aunt and uncle who were murdered while demonstrating against settlement encroachment. *Id.* ¶ 261.

> Plaintiff Al-Tamimi's sister and brother-in-law were murdered by belligerent settlers for publicly opposing the occupation.  *Id.* at 132; *see also id.* at 160 ("Plaintiff Al-Tamimi's sister and brother-in-law were murdered by revengeful IDF soldiers and belligerent settlers for publicly opposing the occupation.").

> Not protecting the civilian Palestinian population is the reason why the massacre of the Dawabsheh Family (the lead Plaintiff herein) occurred. Young settlers, funded by a number of phony U.S. based 501(c)(3)'s, received sufficient funds to purchase first class night vision goggles ($9,500 a piece) which enable them to operate in the dark.  *Id.* ¶ 337.

32

Torture, see Plaintiff Al-Tamimi and his daughter.  *Id.* ¶ 377.

The six remaining plaintiffs named in the caption are not mentioned by name anywhere in the body of Complaint.[13]

The Complaint must therefore be dismissed.

A.     **Plaintiffs Fail to Allege Injuries Fairly Traceable to Defendants' Alleged Actions**

A plaintiff bears the burden of establishing an "injury in fact" that is both "concrete *and* particularized" and that involves an invasion of a legally protected interest.  *Spokeo*, 136 S. Ct. at 1545, 1548.  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way."  *Id.* at 1548 (internal quotation marks omitted).  The injury must also be "concrete," *i.e.*, "real and not abstract."  *Id.* at 1548-49.

Further, Article III standing requires, at a "minimum" that Plaintiffs "establish that, in fact, the asserted injury was the consequence of the defendants' actions."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976).  Thus, plaintiffs resting claims on indirect causal chains must allege facts from which it "*reasonably could be inferred* that, absent the" complained-of conduct, "there is a *substantial probability*" that plaintiffs would not have suffered the alleged harm.  *Warth v. Seldin*, 422 U.S. 490, 504 (1975) (emphasis added).  Plaintiffs' reliance on the independent conduct and choices of non-parties only heightens the speculative nature of their allegations.  *Simon*, 426 U.S. at 45 & n. 25 (affirming dismissal of complaint for lack of standing because plaintiffs' theory of causation depends upon unalleged

---

[13] Plaintiffs Ebright, Healy, Gordon, Jones, Lange, and Siegel are mentioned by name only in the caption.  Although not entirely clear, these plaintiffs appear to allege standing based solely on their status as U.S. taxpayers.  As discussed *infra*, Section IV.B, these plaintiffs also lack standing.

and unknown facts about [third parties]").  The Complaint does not contain well-pleaded factual

allegations sufficient to establish any Plaintiff's standing, let alone all Plaintiffs' standing.

At the outset, the Complaint fails to allege a causal chain for any specific alleged injury

of a Plaintiff with any particularity.  In the few paragraphs alleging injury to particular plaintiffs

or their family members or property, Plaintiffs do not allege any factual basis to connect the

defendants' generally alleged financial or moral support for settlements to the particular

instances of property loss, bodily injury, arrest, or torture allegedly committed by settlers or IDF

soldiers in the West Bank and Gaza, none of whom are defendants in this action.  *See* Compl. at

5, ¶¶ 14, 337.  Needless to say, the Complaint makes it impossible to trace these Plaintiffs'

injuries to any particular Defendant.  Because the Court can only "speculate about the actual path

of the funds, the various intermediate steps, the ultimate recipients, and their relationship to . . .

Plaintiffs' property," or physical injury, the Complaint should be dismissed.  *Siegel*, 304 F. Supp.

3d at 53 (property expropriation claims by plaintiffs Khateeb and Ali (also plaintiffs here)

against U.S. government based on its provision of funding to Israel failed to satisfy causation

element of standing).

Further, even if the causal chains provided sufficient information to satisfy the

requirement that the harms are "fairly traceable" as a general matter, they cannot be traceable "to

the challenged action" when they are "th[e] result [of] the independent action of some third party

not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting

*Simon*, 426 U.S. at 41-42).  The allegations by Plaintiffs are *expressly* based on the independent

action of third parties: either settlers who are not before this Court, the Israeli military, or the

Israeli government.  *Siegel*, 304 F. Supp. 3d at 55 (claims by Palestinians of property

expropriation by settlers against U.S. government based on its provision of funding to Israel

failed because "independent decisions" that would be made by settlers and Israeli military are

"'sufficiently uncertain to break the chain of causation'"); *Abulhawa v. Dep't of Treasury*, No.

17-5158, 2018 WL 3446699, at *4 (D.C. Cir. June 19, 2018) (affirming dismissal because

plaintiffs' theory of causation "depends on a long chain of improbable assumptions").

Since Plaintiffs fail to plausibly allege secondary (*i.e.*, aiding and abetting) liability, *see*

*infra* Section V.B.2, when relying on third party conduct, "it becomes the burden of the plaintiff

to adduce facts showing that those choices have been or will be made in such a manner as to

prove causation." *Lujan*, 504 U.S. at 562.  To satisfy its burden as to standing, therefore,

Plaintiffs must demonstrate that the Defendants' financial support *caused* those third-party actors

to act.  Plaintiffs have not even attempted to make this showing.  For the most part, the

Complaint relies on speculative or conclusory statements that Defendants "must have known"

what would happen.  *See*, *e.g.*, Compl. ¶ 354.  And in those limited circumstances where a direct

causal link is alleged, the allegation itself is patently speculative and dependent entirely on

independent decisions by third parties.  For example, Plaintiffs allege: "without the annual

massive financing ($2 billion) coming from phony U.S.-based 501(c)3s, settlement leaders could

not afford to spend $150,000 every year on their local militia guerilla units."  Compl. at 9; *see*

*also id.* ¶ 67 ("[T]here are a number of genocidal stages that Defendant Weissglas and

[Netanyahu] were able to accomplish, financed by U.S.-based pro-Israel 501(c)(3)s, which

affected the conditions of life of the Palestinians."); ¶ 356 ("Without the funds supplied by US

donors, settlement leaders could not afford to spend $35,000 to buy an armored military jeep to

monitor the activities of surrounding Palestinian farmers and shoot at trespassers").

These statements make clear that the Plaintiffs' theory of causation rests on generalized

speculation that the Defendants' alleged provision of support was received by or benefitted

whichever non-Defendant actors committed the claimed wrongs, that those individual actors actually used the Defendants' purported support or resources to harm the specific plaintiffs in this case, and that the individual actors would not have committed their wrongful acts without the Defendants' provision of support or resources.  Where, as here, "speculative inferences are necessary to connect [a plaintiff's] injury to the challenged actions of [defendants]," *Simon*, 422 U.S. at 45, plaintiffs simply cannot meet their pleading burden.  This flaw is fatal to Plaintiffs' standing in this case.

**B.      Plaintiffs Suing Merely as Taxpayers Fail to Allege an Injury in Fact**

In *Siegel v. U.S. Dep't of Treasury*, 304 F. Supp. 3d 45 (D.D.C. 2018), this Court (Moss, J.) held that taxpayer plaintiffs lacked standing to sue to enjoin the United States from providing aid to Israel based on their complaints of the same alleged harms against Palestinians as are alleged in this action.  The court found that the plaintiffs, including three of the very same plaintiffs named here,[14] could not establish an injury in fact based on "concerns" about, *inter alia*, "how U.S. foreign aid is used; whether that aid violates any 'clear congressional mandates,' the Constitution, or executive orders; [or] whether the United States is supporting the commission of 'war crimes.'"  *Id.* at 50-51.  Because "[a] plaintiff's status as a taxpayer . . . cannot transform such a generalized grievance about compliance with the law into a particularized injury," the taxpayer plaintiffs fail to allege an injury in fact, and they lack standing to sue.  *See id.*; *see also Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991) (taxpayer lacks standing to challenge tax-exempt status of Commission for Presidential Debates); *Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002) (taxpayer lacks standing to bring suit to enjoin President from sending aid to Israel).

---

[14] Plaintiffs Ty Ebright, Ray Gordon, and Rich Siegel were also plaintiffs in *Siegel*.

Here, the plaintiffs suing solely as taxpayers allege a similarly generalized injury. They complain of "the use of American taxpayer funds or the abuse of the tax code to support wanton destruction of civilian property and cluster bomb operations, ethnic cleansing, and genocide" and "do not want to be accused of aiding and abetting the commission of war crimes." Compl. ¶ 15. This generalized grievance is no different than those found to be insufficient in *Siegel* and other cases, and the claims by these plaintiffs must be dismissed.

## V.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER PLAINTIFFS' CLAIMS UNDER THE ALIEN TORT STATUTE

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. "The ATS is 'strictly jurisdictional'"; it does not create any cause of action itself. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004)).[15] In addition to (a) overcoming the presumption against extraterritorial application, which Plaintiffs fail to do, and (b) establishing they are aliens, which most Plaintiffs also fail to do,[16] Plaintiffs must also establish that "(1) the complaint pleads a violation of the law of nations; . . . [(2)] customary international law recognizes [the asserted] liability [of the particular type of] defendant; and [(3)] the theory of liability alleged by plaintiffs (*i.e.*, aiding and abetting, conspiracy) is recognized by customary international law [or

---

[15] Since the ATS is purely jurisdictional, the Court can address the deficiencies in Plaintiffs' ATS claims prior to reaching the merits grounds for dismissal of the Complaint. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 516 (D.C. Cir. 2018).

[16] The ATS claims fail at this threshold, as the Complaint almost entirely fails to allege the nationality of each Plaintiff. Plaintiffs who are alleged to be U.S. nationals are obviously barred from bringing ATS claims. This precludes the claims of at least the U.S. plaintiffs who sue in their capacity as taxpayers. *See* Compl. ¶ 15. In addition, in another similar action, plaintiff Linda Khateeb alleged that she is a U.S. citizen. *See* Amended Complaint, *Al-Tamimi v. Adelson*, No. 16-cv-455 (TSC) (D.D.C. Aug. 4, 2016), ECF No. 77, ¶ 29.

'the law of nations']."  *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 165-66 (2d Cir. 2015)

(quoting *Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (2d. Cir. 2014)); *see Doe v. Exxon Mobil*

*Corp.*, No. 01-cv-1357(RCL), 2015 WL 5042118, at *2 (D.D.C. July 6, 2015).  "[A] defect in

any of these jurisdictional predicates [is] fatal to a plaintiff's claims."  *Balintulo*, 796 F.3d at 166.

Here, the Complaint's ATS claims fail several aspects of this inquiry and must therefore be

dismissed.

### A.    Plaintiffs Fail to Overcome the Presumption Against Extraterritoriality

It is a "longstanding principle of American law that legislation of Congress, unless a

contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quoting *EEOC v.*

*Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).  The Supreme Court has made clear that the

ATS must be interpreted in light of the usual "presumption that United States law governs

domestically but does not rule the world."  *Kiobel*, 569 U.S. at 115 (citation omitted).

Accordingly, the ATS does not confer jurisdiction for the claims asserted by Plaintiffs here

"seeking relief for violations of the law of nations occurring outside the United States."  *Id.* at

124.

The Court made clear in *Kiobel* that a defendant's "mere corporate presence" in the

United States is not enough to overcome the presumption against extraterritoriality.  *Id.* at 1669.

Rather, a federal court has jurisdiction under the ATS only for claims that "touch and concern

the territory of the United States . . . with sufficient force to displace the presumption against

extraterritorial application."  *Id.* (citing *Morrison*, 561 U.S. at 264-74).  Under this standard, the

Complaint fails.

1.    **The Alleged Violations of International Law Took Place Outside the United States and Therefore Cannot be the Basis of ATS Claims**

To overcome the presumption of extraterritoriality under the ATS, there must be a sufficient domestic "territorial event" that is within "the 'focus' of congressional concern." *Morrison*, 561 U.S. at 267; *Kiobel*, 569 U.S. at 124-25 (describing the need for sufficient domestic connection to overcome the presumption and citing *Morrison*).[17]  The Complaint here alleges no domestic tort that satisfies *Kiobel* or *Morrison*.

The focus of congressional concern in enacting the ATS is clear from the face of the statute: "tort[s] . . . committed in violation of the law of nations."  28 U.S.C. § 1350.  Three primary violations of international law were "[u]ppermost in the legislative mind" when Congress enacted the ATS – offenses against ambassadors, violations of safe conducts, and piracy.  *Sosa*, 542 U.S. at 716-17, 720.  Thus, the only "territorial event" capable of displacing the presumption of extraterritoriality in an ATS case is a primary violation of international law. *See Kiobel*, 569 U.S. at 124 (Alito, J., concurring) ("[A] putative ATS cause of action will fall within the scope of the presumption against extraterritoriality – and will therefore be barred – unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations.").

The ATS claim should be dismissed under this principle.  Any violations of international law are alleged to have occurred in the West Bank and Gaza, not the United States.  As in *Kiobel*, Plaintiffs' request for "relief for [alleged] violations of the law of nations occurring outside the United States is barred."  133 S. Ct. at 1669; *see also Cardona v. Chiquita Brands*

---

[17] *See also RJR Nabisco, Inc. v. European Comty.*, 136 S. Ct. 2090, 2101 (2016) (describing *Kiobel* and *Morrison* as following the same "framework" of "looking to the statute's 'focus'" to determine whether the case involves "a permissible domestic application").

*Int'l, Inc.*, 760 F.3d 1185, 1191 (11th Cir. 2014) (rejecting ATS claim where the primary

international law violations occurred in Colombia, because "[t]here is no allegation that any

torture," or "any other act constituting a tort in terms of the ATS," "occurred on U.S. territory").

### 2.      Plaintiffs Allege No Domestic Conduct Sufficient to Overcome the Presumption Against Extraterritoriality

Some courts have allowed for the possibility that significant U.S. connections could

displace the presumption, even if the primary violation of international law itself occurs

abroad.[18]  But even this more flexible view of the presumption against extraterritoriality would

not save the Complaint because the facts alleged fail to establish that the domestic conduct in

furtherance of the purported underlying violation of international law meets the significance

requirement demanded by *Kiobel*.

Absent "exceptional" circumstances, "the presumption will not be displaced without

allegations of *substantial and specific* U.S.-based conduct relevant to the ATS claims." *Exxon

Mobil*, 2015 WL 5042118, at *8 (emphasis added).  Judge Lamberth concluded that the

presumption was not displaced by "routine business practices" in the United States.  *Id.* at *13.

Neither was the presumption displaced by "generalized" allegations that funds provided to

Indonesian security forces "necessarily came from the United States."  *Id.*[19]

---

[18] *See Al Shimari v. CACI Premier Tech. Inc.*, 758 F.3d 516, 528-29 (4th Cir. 2014) (allegations of torture at a U.S. military base in Iraq by U.S. citizen employees of a U.S. corporation pursuant to a contract negotiated in the United States with the U.S. Government and U.S.-based managers who "encouraged" their employees to commit the misconduct involved "extensive 'relevant conduct' in United States territory"); *see also Warfaa v. Ali*, 811 F.3d 653, 660 (4th Cir. 2016) (describing *Al Shimari* as "the rare case to rebut the presumption").

[19] The court did, however, find "substantial and specific allegations of U.S.-based conduct" that decision-makers in the United States "knew . . . would have a substantial effect on the commission of the underlying offenses."  *Id.* at *14.  Among other actions, the plaintiffs in *Exxon Mobil* alleged that "executives in the United States 'planned and authorized the

Plaintiffs' theory is that the Defendants have assisted in the commission of international law violations by others, all of which allegedly occurred abroad, through domestic conduct. As discussed further below, the question of whether the ATS even permits aiding and abetting liability – and, if so, what standard applies for imposing such liability – is unresolved in this Circuit and is far from clear. *See infra* Section V.B.1. Even if aiding and abetting liability might be available under the ATS, specific allegations of domestic conduct would meet *Kiobel*'s requirements only "if such conduct . . . aided and abetted a violation of the law of nations." *Mastafa*, 770 F.3d at 191; *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 142 (2d Cir. 2014) (to overcome presumption in the RICO context, the domestic conduct must "satisf[y] *every essential element* to prove a violation") (emphasis added), *rev'd on other grounds*, 136 S. Ct. 2090.

Nothing of the sort is alleged here. Instead, Plaintiffs rely on the fact that the Defendants are citizens of the United States, domiciled in the United States, or are headquartered in the United States. Compl. ¶¶ 4, 11. But "mere corporate presence" is not enough. *Kiobel*, 569 U.S. at 126. While courts have divided over whether U.S. citizenship is completely irrelevant or just a minor factor in the analysis, there is broad agreement that citizenship is not even a significant factor in overcoming the presumption against extraterritoriality. *Compare Mastafa*, 770 F.3d at 189 (finding defendant's U.S. citizenship irrelevant), *and Cardona*, 760 F.3d at 1189 (same), *with Mujica v. AirScan Inc.*, 771 F.3d 580, 594 n.9 (9th Cir. 2014) (finding citizenship relevant but "not dispositive"), *and Doe. v. Drummond Co. Inc.*, 782 F.3d 576 (11th Cir. 2015) (same).

---

deployment of military security personnel'" that committed the alleged violations of international law. *Id.* Nothing approximating such domestic conduct is alleged here.

Plaintiffs' conclusory allegations that funding flowed from the U.S. to settlements and the IDF through certain tax-exempt entities fare no better.  It is telling that the most concrete allegation of domestic conduct that Plaintiffs highlight is that the Defendants "(1) participated in . . . fundraising events . . .  (2) held meetings with settlement leaders, IDF (Israeli army) representatives, and international conglomerate representatives in this judicial district and elsewhere within the United States; (3) sent money to settlements and the IDF from the United States; and/or (4) from their different locations in America, they established and maintained regular telephone, email, fax, telegraph, mail, and other communications with overseas settlement officials, including security coordinators paid for by U.S. donors."  Compl. ¶ 4(e).  Such alleged domestic activities bear no connection, let alone a "substantial and significant" one, to the acts of torture and genocide the Plaintiffs allege.  Merely providing funds to a foreign entity from within the United States does not displace the *Kiobel* presumption.  *See Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013) (rejecting ATS claim that U.S. companies circumvented sanctions against apartheid South Africa by using their subsidiaries to "continue[] to supply the South African government with their products"); *Exxon Mobil*, 2015 WL 5042118, at *13.  The *Mastafa* court, for example, found the plaintiff's claim that the defendant financed international law violations by Saddam Hussein impermissibly extraterritorial, even though "much of the decisionmaking" was "necessarily made in the United States" at the defendant's headquarters.  *Mastafa*, 770 F.3d at 190; *see also Drummond Co.*, 782 F.3d at 598 (allegations that defendants "made funding and policy decisions in the United States" related to international law violations in Colombia insufficient to displace presumption against extraterritoriality).

Indeed, the only circumstance in which Courts have found that transfers of funds through U.S. entities have sufficiently "touched and concerned" the United States are in cases that

involved transfers to entities sanctioned by the government or that were affiliated with foreign organizations designated as "terrorists" pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189. *See Licci v. Lebanese Canadian Bank*, 834 F.3d 201, 216 (2d Cir. 2016) (involving bank transfers of funds to an entity affiliated with Hezbollah, a designated foreign terrorist organization); *Doe v. Nestle, S.A.*, 929 F.3d 623, 642 (9th Cir. 2018), *cert. granted*, *Nestle USA, Inc. v. Doe I*, No. 19-416, 2020 WL 3578678 (U.S. Jul. 2, 2020).  Plaintiffs do not and cannot make such allegations here.

For the reasons discussed *infra*, Section V.B, Plaintiffs' allegations do not state a claim for aiding and abetting liability.  But even if they did, they are insufficient to plausibly allege that Defendants aided and abetted international law violations *from within the United States*.  *Cf. Mastafa*, 770 F.3d at 186 (requiring a preliminary "glimpse" at the plausibility of aiding and abetting violations before crediting alleged U.S.-based aiding-and-abetting conduct for purposes of displacing the presumption against extraterritoriality).  Thus, their ATS claim fails to allege domestic conduct sufficient to overcome the presumption against extraterritoriality, and it must, therefore, fail.

### B.    Counts I and II for Aiding and Abetting "the Denationalization and Dehumanization of the Palestinian People" and "Rampant Genocide and Installation of an Apartheid Regime," Respectively, Fail to State a Claim for Primary Violations of International Law

The Complaint also fails to allege that Defendants committed any violation of international law.  Plaintiffs allege secondary, *i.e.*, aiding and abetting, liability against all Defendants.  As a threshold matter, Plaintiffs' claims for secondary violations of international law fail to meet the requirements set out by the Supreme Court for recognizing new causes of action under the ATS.  Even if it were an established standard of international law, Plaintiffs do not come close to alleging facts necessary to establish the requisite *actus reus* or *mens rea* to

establish aiding and abetting liability.  Because Plaintiffs have failed to establish that the Moving

Defendants committed any violation of international law over which this Court could have

jurisdiction, its claims fail.

> **1.    The Court Should Not Extend ATS Liability Over Secondary
>          Liability Claims**

The Supreme Court has never recognized the availability of secondary liability under the

ATS, and the Court's reasoning in *Sosa* and *Jesner* counsels against recognizing such liability.

*See Jesner*, 138 S. Ct. at 1403 ("[F]ederal courts must exercise 'great caution' before recognizing

new forms of liability under the ATS." (quoting *Sosa*, 542 U.S. at 728)).  Under *Sosa*'s two-step

inquiry, this Court should decline to extend the ATS to claims of aiding and abetting.  *See*

*Jesner*, 138 S. Ct. at 1399 (explaining that, under the two-step inquiry set forth in *Sosa*, "[b]efore

recognizing a common-law action under the ATS," a federal court must ask, first, "whether a

plaintiff can demonstrate that the alleged violation is 'of a norm that is specific, universal, and

obligatory,'" and second, if so, "whether allowing [the] case to proceed under the ATS is a

proper exercise of judicial discretion, or instead whether caution requires the political branches

to grant specific authority before . . . liability can be imposed") (quoting *Sosa*, 542 U.S. at 732-

33).

*First*, at *Sosa* step one, it is unclear whether secondary liability is sufficiently recognized

under public international law to constitute "a norm that is 'specific, universal, and obligatory.'"

*Jesner*, 138 S. Ct. at 1399 (plurality opinion) (quoting *Sosa*, 542 U.S. at 732).  International

tribunals and courts have never come to a universal consensus on what standards should apply to

such claims.[20]  Under *Sosa*, where international law is unclear or unresolved on the standards to

---

[20] For example, following *Sosa*, but before *Jesner*, the Ninth Circuit declined to decide between
conflicting standards for secondary liability that are found in international law, but instead
applied a "purpose" standard that all scholars and sources of law agree would incur liability.  *See*

be applied, as it is here, courts should not create "new and debatable violations of the law of nations." 542 U.S. at 728.

*Second*, at *Sosa* step two, this case implicates the same separation of powers concerns articulated in *Jesner*. *See* 138 S. Ct. at 1403 (noting that "that federal courts must exercise 'great caution' before recognizing new forms of liability under the ATS") (citing *Sosa*, 542 U.S. at 728). Indeed, "Congress knew how to impose aiding and abetting liability when it chose to do so." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176 (1994). For example, in 2016, Congress amended the Anti-Terrorism Act, 18 U.S.C. § 2333, which provides a cause of action for injuries sustained through acts of international terrorism, to add a provision expressly imposing liability on "any person who aids and abets, by knowingly providing substantial assistance" to the primary actor. 18 U.S.C. § 2333(d)(2). Congress added no such provision in the ATS[21]

The U.S. government has also consistently argued against creating aiding and abetting liability under the ATS. *See, e.g.*, Brief of United States as Amicus Curiae in Support of Petition

---

*Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 765 (9th Cir. 2011) (holding that "*at least* purposive action in furtherance of a war crime constitutes aiding and abetting that crime."), *vacated on other grounds*, 569 U.S. 945 (2013); *see also Doe I v. Nestle USA, Inc.*, 766 F.3d at 1024 (same). The Second Circuit also adopted a purpose standard because there was "a sufficient international consensus for imposing liability" on that basis, in contrast to a more lenient standard that had been applied in various international tribunals but for which "no such consensus exists." *Presbyterian Church of Sudan v. Talisman Energy Inc.*, 582 F.3d 244, 259 (2d Cir. 2009).

[21] Whether aiding and abetting liability is available under the ATS is an open question in this Circuit. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 85-88 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (rejecting the "incongruous" result that aiding-and-abetting liability could apply to ATS claims brought by aliens, because such claims are not even available to U.S. citizens proceeding under the Torture Victim Protection Act). While the panel majority in *Exxon Mobil* disagreed with Judge Kavanaugh, that decision was subsequently vacated. *See* 527 Fed. App'x 7 (D.C. Cir. 2013). Moreover, Judge Lamberth subsequently recognized that *Jesner* now requires a different analysis and a different result. *Doe v. Exxon Mobil*, 391 F. Supp. 3d 76, 76 (D.D.C. 2019) (rejecting domestic corporate liability post-*Jesner*).

for a Writ of Certiorari at 13-17, *Nestle USA, Inc. v. Doe I*, Nos. 19-416 and 19-453, 2020 WL

2749081 (U.S. May 2020) (consistent with fundamental separation-of-powers principles,

whether aiders and abettors "should be subject to suit [is] 'a question for Congress, not [this

Court], to decide.'" (quoting *Jesner*, 138 S. Ct. at 1403) (alterations in original)); Brief of United

States as Amicus Curiae in Support of Petitioners at 6-16, *Am. Isuzu Motors, Inc. v. Ntsebeza*,

No. 07-919, 2008 WL 408389 (U.S. Feb 11, 2008) (stating that aiding-and-abetting liability

under the ATS interferes with foreign policy and should not be recognized).[22]

The Court should follow this reasoning and decline to recognize the availability of

secondary liability under the ATS.  Even assuming the Court were inclined to do so, it should

still dismiss the Complaint because it fails to allege facts that would support secondary liability

under the standards followed by at least the majority of courts to address the issue.

### 2.     Counts I and II Fail to State a Claim for Aiding and Abetting under the ATS

In Counts I and II, Plaintiffs purport to assert a claim for aiding and abetting the

commission of war crimes as if it were a common law claim, and cite *Halberstam v. Welch*, 705

F.2d 472 (D.C. Cir. 1983), for the elements of aiding and abetting.  Compl. at 9.  But because

Plaintiffs allege violations of the law of nations as the underlying tort, *Halberstam*'s discussion

of domestic common law principles is irrelevant.  Rather, Plaintiffs must meet the applicable

international law standards.  *See Presbyterian Church*, 582 F.3d at 244 (construing claim for

aiding and abetting war crimes under international law standards); *Aziz v. Alcolac, Inc.*, 658 F.3d

388 (4th Cir. 2011) (same); *Nestle USA*, 766 F.3d at 1024 (construing claim for aiding and

abetting slavery using international law standards); *Baloco v. Drummond Co., Inc.*, 767 F.3d

---

[22] The Supreme Court granted certiorari in *Nestle* on July 2, 2020.

1229 (11th Cir. 2014) (construing claim for aiding and abetting murder using international law standards).  Plaintiffs have made no effort to properly allege aiding and abetting claims under international law.

For such allegations of aiding and abetting, the D.C. Circuit has referred to the standards enunciated by the International Criminal Tribunal for the Former Yugoslavia (ICTFY) Appeals Chamber in *Prosecutor v. Perišić*, Case No. IT-04-81-A Judgment (U.N. App. Ch. 2013).  *See Doe v. Exxon Mobil Corp.*, 527 Fed. App'x 7 (D.C. Cir. 2013) (remanding a case for further consideration "in light of intervening changes in governing law regarding . . . the standard to be applied for aiding and abetting liability," citing *Perišić*).

In *Perišić*, the ICTFY Appeals Chamber held that "the *mens rea* required to support a conviction for aiding and abetting is knowledge that assistance aids the commission of criminal acts, along with awareness of the essential elements of these crimes."  Case No. IT-04-81-A, ¶ 48.  With regard to the *actus reus*, the Appeals Chamber found that aiders and abettors must "carr[y] out acts specifically directed to assist, encourage or lend moral support to the perpetration of a certain specific crime (murder, extermination, rape, torture, wanton destruction of civilian property, etc.), and this support has a substantial effect upon the perpetration of the crime."  *Id*. ¶ 26 (citing *Prosecutor v. Tadič*, Case No. IT-94-1-A, ¶ 229 (U.N. App. Ch. 1999)).

Importantly, the Appeals Chamber held that "in most cases, the provision of general assistance which could be used for both lawful and unlawful activities will not be sufficient" to satisfy the *actus reus* requirement.  *Id*. ¶ 44.  Instead, the prosecutor must show "evidence establishing a direct link between the aid provided by an accused individual and the relevant crimes committed by principal perpetrators."  *Id*.  The Complaint fails to satisfy these standards.

47

### a. Plaintiffs Fail to Allege that Defendants Satisfy the *Actus Reus* Requirements

Plaintiffs here have failed to demonstrate – or even allege – that Defendants satisfy the *actus reus* requirement for aiding and abetting liability under international law, which requires more than simply allegations that Defendants provided some kind of vague general assistance in the commission of war crimes. *See Doe v. Cisco Systems Inc.*, 66 F. Supp. 3d 1239, 1248 (N.D. Cal. 2014). Instead, Plaintiffs must show that Defendants specifically directed their assistance toward the violation of international law, and that Defendants' actions had a "substantial effect upon the perpetration of the crime." *Perišić*, Case No. IT-04-81-A, ¶ 26. Further, "aiding and abetting liability may only be found where assistance is provided to a criminal's human rights abuses, not simply the criminal him or herself." *Exxon Mobil Corp.*, 2015 WL 5042118, at *9 (citing *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 257 (S.D.N.Y. 2009)). "[M]erely providing financing as part of an ordinary commercial transaction does not satisfy the *actus reus* requirement" for aiding and abetting liability. *Id.* (citing *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1350 (S.D. Fla. 2011)); *see Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 109 (D.D.C. 2017), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018) (allegations that an international bank provided banking services to a state sponsor of terrorism in violation of U.S. sanctions were "too tenuous to establish liability under the ATS" for terrorist attacks allegedly supported by that state absent non-conclusory allegations that the attacks "probably would not have occurred absent [the bank's] conduct").

Here, there are no allegations that Defendants were physically present for the alleged acts. To satisfy the *actus reus* requirement, therefore, Plaintiffs would have to demonstrate, at a minimum, that Defendants engaged in acts "specifically directed to assist" specific crimes by the only remaining alleged primary violators of international law – the "armed settlers," the Israeli

army, and the Israeli Prime Minister – and that assistance had a substantial effect on those actors' commission of war crimes, genocide, or crimes against humanity.  *See Perišić*, Case No. IT-04-81-A, at ¶ 26; *see also Presbyterian Church*, 582 F.3d at 259.  A showing that Defendants had provided general assistance that could be used for any purpose, such as money, vehicles, or even military hardware, would not suffice.  *Cisco Sys. Inc.*, 66 F. Supp. 3d at 1248.  Instead, it must be the "sole reasonable interpretation" that Defendants provided the assistance specifically for the commission of international crimes rather than for any other purpose.  *Perišić*, Case No. IT-04-81-A, ¶ 47.

Plaintiffs have not made, and cannot make, any such allegations.  They allege, for example, that the Defendants donated funds to 501(c)(3) organizations, settlements, or the Israeli military.  *See, e.g.*, Compl. ¶¶ 84, 86, 98, 147.  But Plaintiffs do not allege that any Defendants earmarked those funds to purchase weapons, much less to be used for the extrajudicial killing of Palestinians.  And while Plaintiffs allege that certain Defendants advocated for the expansion of settlements (*see, e.g., id.* ¶¶ 18, 27, 36, 41), "encouraged" the expulsion of non-Jews from the OPT (*id.* ¶ 112), or purportedly curtailed pro-Palestinian speech (*id.* ¶¶ 144-45), they do not allege that any such Defendant provided assistance specifically for the commission of any violation of international law.[23]  In short, none of Plaintiffs' allegations create the direct causal link necessary to plead a claim.

Similarly, although Plaintiffs complain that the various American donors provide $2 billion per year through an unspecified number of non-profits that are distributed to an unknown number of recipients (*id.* ¶ 10), there is no way to determine from the Complaint if *any* of this

---

[23] If such allegations were deemed sufficient, it would transform ATS aiding and abetting into "an omnipresent blanket of liability that could chill a wide range of economic and First Amendment activity."  *Doe I*, 400 F. Supp. 2d at 118.

money was used in what Plaintiffs allege are international law violations, much less that these funds had a direct and substantial effect on the alleged violations.  As a result, Counts I and II should be dismissed.

### b. Plaintiffs Fail to Allege that Defendants Acted with the Requisite Mens Rea

While the international law standard for *mens rea* for secondary liability claims, if they exist at all, is unclear (which is why the Court should not recognize such a claim at all under the ATS, *see supra* Section V.B.1), the prevailing view of the cases permitting such claims requires that the Defendants must act with more than mere knowledge.  *Perišić* identified the *mens rea* required to support a conviction for aiding and abetting as being more than knowledge of crimes committed by others, but in addition, "knowledge that [the defendants'] assistance aids the commission of criminal acts, along with awareness of the essential elements of these crimes." Case No. IT-04-81-A, ¶ 48; *see Doe v. Exxon Mobil Corp.*, 527 Fed. App'x 7 (D.C. Cir. 2013) (referencing *Prosecutor v. Perišić* as potentially providing the appropriate standard in an unpublished opinion).  Most courts, however, have required the defendant to act with the purpose of assisting in the international law violation.  The leading case is the Second Circuit's *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, which holds that:

> [T]he mens rea standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone.  Even if there is a sufficient international consensus for imposing liability on individuals who *purposefully* aid and abet a violation of international law, no such consensus exists for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law.

582 F.3d at 259.  The Fourth Circuit agreed with this standard in *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 398 (4th Cir. 2011).  It held that "adopting the specific intent [*i.e.*, purpose] mens rea standard for accessorial liability explicitly embodied in the Rome Statute hews as closely as possible to the *Sosa* limits of 'requir[ing] any claim based on the present-day law of nations to

rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized.'"  658 F.3d at 400-01 (quoting *Sosa*, 542 U.S. at 725); *see also Sarei*, 671 F.3d at 765 (in the Ninth Circuit, "*at least* purposive action in furtherance of a war crime constitutes aiding and abetting that crime"); *but see Drummond Co.*, 782 F.3d at 609 (adopting a knowledge standard based on the federal common law standard without reference to international law).

Whatever the *mens rea* standard is, Plaintiffs fail to meet it.  They do not allege that Defendants acted with the purpose of facilitating international law violations, except in a conclusory fashion.  Nor do they allege (except conclusorily) that Defendants knew of such violations or knew the elements of any such violation.  They allege that Defendants "had to know" of purported violations.  Compl. ¶ 359.  Indeed, Plaintiffs' allegations even of mere knowledge are so speculative that they are phrased as a question.  *Id.* ¶ 354 ("A question this Court will eventually have to address concerns whether the Defendants herein . . . should have known of the theft of private property . . . and the extra-judicial killings authorized by Defendant PMN. In other words, did they . . . in any substantial manner, encourage, aid, abet, or finance war crimes alleged herein[?]"); *see generally id.* ¶¶ 354-360 (suggesting that Defendants must have known of the alleged violations based on publicly available information about the conditions in the OPT).  But these "had to know" allegations are insufficient as a matter of law. *See Ahmad v. Christian Friends of Israeli Cmtys.*, No. 13-cv-3376 (JMF), 2014 WL 1796322, at *4-5 (S.D.N.Y. May 5, 2014) (dismissing ATS claim in part because "the Amended Complaint [is] insufficient to establish that Defendants possessed knowledge that the funds transferred to the Settlers would be used to aid terrorist activity"); *Ofisi*, 278 F. Supp. 3d at 109 ("Allegations that [bank] 'should have known' will not suffice in [the mens rea] context.").

51

Plaintiffs also make conclusory statements that, for example, "Defendants, directly or indirectly, have knowingly supported arms trafficking, the purchase of sophisticated military equipment for use by settlement militia members and have furnished settlements with the necessary funds to provide weapons to the local militia unit to perpetrate genocide and ethnic cleansing" Compl. ¶ 356. This speculation is not backed by any factual allegations that would make this claim plausible. As a result, the Court cannot "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### C.      Plaintiffs Fail to Establish That They Have Exhausted Their Remedies

Even if the Complaint pled an ATS claim, it could not be asserted in a U.S. court before local remedies at the place of injury – Israel – had been exhausted. *Exxon Mobil Corp.*, 69 F. Supp. 3d at 89 ("Support for some form of exhaustion requirement for claims arising under the ATS has grown in recent years."); *see also Jesner*, 138 S. Ct. at 1430–31 (Sotomayor, J., dissenting) ("Courts also can dismiss ATS suits for a plaintiff's failure to exhaust the remedies available in her domestic forum . . . ."); *Kiobel*, 569 U.S. at 133 (Breyer, J., concurring) (arguing that "[f]urther limiting principles such as exhaustion" should apply to ATS claims).

"The rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law." *Sarei v. Rio Tinto PLC*, 550 F.3d 822, 829 (9th Cir. 2008) (quoting *Interhandel* (Switz v. U.S.), Preliminary Objections, 1959 I.C.J. 6, 26–27 (Mar. 21 1959)). This is particularly true "[w]here the 'nexus' to the United States is weak." *Id*. at 824.

Plaintiffs make the conclusory allegation that the remedies they seek "are not available in the OPT or Israel," but not a single Plaintiff alleges any facts concerning any attempt to pursue legal remedies in the Israeli courts or any facts showing that remedies are not available. As in *Harbury v. Hayden*, Plaintiffs "have neither alleged nor established that [they have] ever pursued

and/or exhausted [their] remedies . . . in the place in which the conduct giving rise to the claim occurred."  444 F.Supp.2d 19, 41 (D.D.C. 2006).

Plaintiffs' conclusory and unexplained claim that Israel's deputy defense minister refused the Dawabesh family access to the courts (Compl. ¶ 6(a)) is neither plausible nor accurate. Indeed, there is no question that remedies are available to Americans or Palestinians for personal injuries and property damage in the courts of Israel.  The court so held in *Corrie v. Caterpillar Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), a lawsuit by the family of a U.S. citizen killed by an Israeli army bulldozer in the Gaza Strip.  There, the court held that "Israeli tort law provides adequate remedies for plaintiffs injured as a result of tortious conduct."  *Id.* at 1025-26. Moreover, in the Israeli government's criminal case against the suspected killers of members of Dawabsheh family, the Dawabsheh family was invited to testify.[24]

Plaintiffs' ATS claims should be dismissed on this ground as well.

## VI.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE TORTURE VICTIM PROTECTION ACT

Unspecified Plaintiffs also attempt to invoke the TVPA against all Defendants in Counts I and II.  Compl. at 4-5.  The TVPA allows an action for damages against "an individual who, under actual or apparent authority, or color of law, of any foreign nation" subjects an individual to torture or extrajudicial killing.  28 U.S.C.§ 1350 note, § 2(a).  It also provides that "[a] court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  28

---

[24] *See* Hagar Shezaf, "Family of Duma Arson Attack Victims to Testify Ahead of Murderer Sentencing," *Haaretz* (July 13, 2020), *available at https://www.haaretz.com/middle-east-news/palestinians/.premium-child-survivor-of-duma-arson-attack-to-testify-ahead-of-killer-sentencing-1.8987394); see also* F.R.E. 201 (the court may take judicial notice of a fact "not subject to reasonable dispute").

53

U.S.C. § 1350 note, § 2(b).  Plaintiffs have not alleged facts sufficient to satisfy any of the

TVPA's requirements.

A.     **Organizational Defendants are not Subject to a TVPA Claim**

As a preliminary matter, this issue affects only the individual defendants.  The Supreme

Court has held that only natural persons, not organizations, can be liable under the TVPA.

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).  Accordingly, the TVPA claim must be

dismissed as against AIPAC.

B.     **The Complaint Fails to State a Claim for Torture or Extrajudicial Killing**

The Complaint also lacks allegations sufficient to state a claim for torture or extrajudicial

killing against the Moving Defendants.[25] None of the Plaintiffs alleges that any Moving

Defendant committed the complained of acts.  Rather, Plaintiffs seek to impose liability for

"aiding and abetting" a violation of the TVPA.  But nothing in the language of the TVPA

authorizes a claim for aiding and abetting a violation.  *Cf.* Anti-Terrorism Act, 18 U.S.C.

§ 2333(d)(2) (expressly providing a right of action for aiding and abetting violations); *see also*

*Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010) (rejecting plaintiffs' claim under

"the TVPA upon a theory of 'aiding and abetting'" because the "TVPA [] does not contemplate

such liability"); *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*,

889 F. Supp. 2d 912, 924–25 (S.D. Tex. 2012) (finding that the "statute does not permit liability

for aiding and abetting a primary violator"); *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 300

_____

[25] Certain Plaintiffs do not even purport to allege an actionable injury against any Defendant because the TVPA applies only to "torture" and "extrajudicial killing."  28 U.S.C. § 1350 note, § 3.  Plaintiffs Linda Khateeb and Ali Ali complain only of property loss or damage (Compl. at 5, ¶ 14); and although their identities are not entirely clear from the Complaint, several U.S. citizen taxpayer plaintiffs complain only of an amorphous disagreement with U.S. tax policy (*id.* ¶ 15).  Neither property loss or damage nor the "harm" alleged by the taxpayer plaintiffs are sufficient to establish a violation of the TVPA.

(S.D.N.Y. 2010) (dismissing TVPA claims because, among other things, the "plain language" of the statute "does not permit aiding-and-abetting liability . . . . [and] does not extend liability to parties who provide aid to individuals who commit acts of torture"); *but see Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1258 n.5 (11th Cir. 2009) ("the TVPA permits aiding and abetting liability").  Whether the TVPA permits secondary liability is unsettled in this Circuit, *see Mohamad v. Rajoub*, 634 F.3d 604, 608-09 (D.C. Cir. 2011), and this Court should not extend the principle in this case, where Plaintiffs have alleged no facts that even plausibly connect the Moving Defendants' conduct to any alleged injury.

### C.  <u>Plaintiffs Failed to Exhaust Adequate and Available Remedies in Israel</u>

Finally, any TVPA claim fails because Plaintiffs have failed to exhaust the remedies available to them in Israeli courts as expressly required by the statute.  28 U.S.C. § 1350, note § 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.").  As detailed above, Section V.C, this failure is fatal to Plaintiffs' claims.

In short, Plaintiffs fail to allege the elements of a TVPA claim and their claims, to the extent brought under the TVPA, must be dismissed.

## VII.  CERTAIN OF PLAINTIFFS' CLAIMS ARE TIME-BARRED

Although it is unclear from the Complaint during what time period Plaintiffs' purported injuries occurred, at least some of Plaintiffs' claims are time-barred.  The TVPA imposes a ten-year statute of limitations.  TVPA § 2(c).  And at least four Circuits have applied the same limitations period to claims under the ATS.  *See Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 799 (2d Cir. 2014).  Here, in many instances, Plaintiffs allege no time period for the purported injuries, making it impossible to ascertain if Plaintiffs' claims – even if properly pleaded – would be subject to the time bar.  In other instances, the Plaintiffs appear to seek

damages for injuries suffered or property allegedly lost well outside of any possible limitations period for any Count, some as long ago as 1948.  *See*, *e.g.*, Compl. at 5 (alleging "criminal activity for at least 30 years"), ¶ 364 (alleging wrongful conduct over the last 47 years).  Some of the Complaint's allegations purport to rely on accounts in books published well prior to the relevant period.[26]  Any claim that seeks damages for alleged injuries occurring outside the limitations period should be dismissed (even if it were otherwise actionable, which none of Plaintiffs' claims are).

## VIII.   THIS COURT LACKS PERSONAL JURISDICTION OVER CERTAIN DEFENDANTS

The Due Process Clause of the Fifth Amendment requires, at a minimum, that actions cannot be maintained against defendants unless they have been properly served with the complaint and the court can exercise personal jurisdiction over them.  *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); Fed. R. Civ. P. 4(k).  Here, Plaintiffs have failed to identify any cognizable basis under which this Court can exercise personal jurisdiction over certain Defendants, nor have certain Defendants ever been properly served.

### A.   The Complaint Should Be Dismissed Because It Fails to Allege Any Facts Supporting Personal Jurisdiction Over Certain Defendants[27]

Plaintiffs bear the burden of establishing personal jurisdiction over each Defendant.  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  Where a court

---

[26] *See* Compl. at 14 (citing, *inter alia*, *Memoirs of Moshe D[a]yan* (1976), *Our Harsh Logic* (subtitled, "Israeli soldiers' testimonies from the Occupied Territories, 2000 - 2010") (2013), *The Israel Lobby* (2008), *Palestine Inside Out* (2008, rev'd 2010), *Lords of the Land* (subtitled "the War Over Israel's Settlements in the Occupied Territories, 1967-2007") (2009).)

[27] Defendants Miriam Adelson, Dov Hikind, Susan Levin-Abir, and Walid Shoebat move for dismissal pursuant to Fed. R. Civ. P. 12(b)(2).  Additional reasons why this Court lacks personal jurisdiction over each of the foregoing Defendants are set forth in Appendix A hereto.

lacks jurisdiction, it "cannot proceed at all." *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir.

2016) (en banc) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

In order to survive a motion to dismiss for lack of personal jurisdiction, the "plaintiff

must make a prima facie showing of the pertinent jurisdictional facts." *First Chicago Int'l v.

United Exch. Co., Ltd.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). The plaintiff "must allege

specific acts connecting each defendant with the forum," *id.*, and "cannot rely on conclusory

allegations" to establish personal jurisdiction, *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d

34, 42 (D.D.C. 2003). Further, "the Court need not treat all of the plaintiff's jurisdictional

allegations as true," and "may receive and weigh affidavits and any other relevant matter to assist

it in determining the jurisdictional facts." *Collingsworth v. Drummond Co. Inc.*, No. CV 19-

1263 (ABJ), 2020 WL 2800612, at *5 (D.D.C. May 29, 2020) (internal quotation marks and

citations omitted).

Courts must possess either general or specific jurisdiction over a defendant. *Eggink v.

Trump*, 257 F. Supp. 3d 27, 29 (D.D.C. 2017). Here, Plaintiffs fail to establish either and fail to

allege even barely sufficient facts to give either the Defendants or "the district court fair notice"

of a proper theory of jurisdiction. *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1095–

96 (D.C. Cir. 2008). The Complaint therefore should be dismissed in its entirety as to the

Moving Defendants seeking dismissal on this ground.

### 1.     There Is No Basis for General Jurisdiction Over Many of the Defendants

Under D.C. Code § 13-422, to establish general jurisdiction, Defendants must (a) be

domiciled, incorporated, or maintain their principal place of business in the District; and (b) have

contacts with the District that "are so constant and pervasive as to render [it] essentially at home

in the forum state." *Duarte v. Nolan*, 190 F. Supp. 3d 8, 12 (D.D.C. 2016) (quoting *Daimler AG*

*v. Bauman*, 134 S. Ct. 746, 751 (2014)).  Here, these requirements are not satisfied.  (*See also* Appendix A.)

### 2.   There is No Basis for Specific Personal Jurisdiction Over Many of the Defendants

Under Rule 4(k), a federal court may exercise specific personal jurisdiction over non-resident defendants in four situations, only two of which potentially are relevant here.[28]  It may apply the forum state's jurisdictional statute.  *See* Fed. R. Civ. P. 4(k)(1)(A).  Or, it may exercise personal jurisdiction as specifically "authorized by a federal statute."  *See* Fed. R. Civ. P. 4(k)(1)(C).  Neither basis for specific jurisdiction exists here.[29]

Rule 4(k)(1)(A) allows a federal court to exercise personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Fed. R. Civ. P. 4(k)(1)(A).  The District of Columbia's long-arm statute (D.C. Code Ann. § 13-423) permits courts in the District to exercise specific jurisdiction "over a person, who acts directly or by an agent, as to a claim for relief arising from the person's … transacting any business in the District of Columbia."[30]  D.C. Code § 13-423(a)(1). "Importantly, where jurisdiction is based solely on the D.C. long-arm statute, only a claim for relief *arising from acts enumerated in this section* may be asserted against the defendants."

---

[28]  Rule 4(k)(1)(B) regarding joinder of parties under Rule 14 or 19 is inapplicable.  Nor does Rule 4(k)(2), which applies only when "the defendant is not subject to jurisdiction in any state's court of general jurisdiction."  Fed. R. Civ. P. 4(k)(2)(A).

[29] Of course, both conditions also require proper service of process.  Plaintiffs' failure to effect such service on certain Defendants is addressed in Section VIII.B, *infra*.

[30] The D.C. long-arm statute also permits jurisdiction over claims arising from a series of other circumstances, including contracting to supply services in the District and possessing real property in the District, none of which have been alleged in the Complaint.  *See* D.C. Code Ann. § 13-423(a)(2)-(7).

*Eggink*, 257 F. Supp. 3d at 29 (internal quotation marks and citation omitted).  This means that

the claims must "bear some relationship" to the defendant's acts in the forum.  *Estate of Manook*

*v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C.*, 693 F. Supp. 2d 4, 13 (D.D.C. 2010)

(quoting *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1092 (D.C. 2008)

(holding claims at issue failed to satisfy the D.C long-arm statute because the tortious acts

alleged occurred in Iraq and "[p]laintiffs have alleged no legitimate and substantial connection

between the acts that occurred in Iraq and this District to form a basis for jurisdiction").

Even if the D.C. long-arm statute is satisfied, this Court must analyze whether the

exercise of such jurisdiction comports with the Due Process Clause.  *GTE New Media Servs.,*

*Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  This requires a showing that

"there are 'minimum contacts' between the defendant and the forum 'such that he should

reasonably anticipate being haled into court'" in the forum.  *Thompson Hine, LLP v. Taieb*, 734

F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S.

286, 297 (1980); *Int'l Shoe Co. v. Wash. Office of Unemployment Comp. & Placement*, 326 U.S.

310, 316 (1945)).

Constitutionally sufficient contacts therefore exist only where a defendant "has engaged

in significant activities within a State or has created 'continuing obligations' between himself

and residents of the forum."  *Thompson Hine*, 734 F.3d at 1190 (quoting *Burger King Corp. v.*

*Rudzewicz*, 471 U.S. 462, 475-76 (1985)).  These limits ensure that the maintenance of a

particular suit "does not offend traditional notions of fair play and substantial justice."  *GTE New*

*Media Servs.*, 199 F.3d at 1347 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

The Complaint here fails to allege that Plaintiffs' claims arise from any specific business

that Defendants transacted in the District.  Instead, the Complaint alleges in conclusory fashion

that Defendants all attended meetings within the district, without providing any details of such meetings or their frequency or in many cases linking them to the alleged claims.  For example, the Complaint states that all Defendants "held meetings with settlement leaders, IDF (Israeli army) representatives, and international conglomerate representatives in this judicial district and elsewhere within the United States."  Compl. ¶ 4(e) (making allegations as to "all Defendants" without supplying any details as to the specific time, locations, or attendees at the alleged meetings).  Similarly, the Complaint claims that all of the Defendants have attended AIPAC's annual policy conference "one or more times" over the past 20 years, where they "typically" offer or ask for financing for settlement expansion and "mingle with pro-occupation advocates" including Prime Minister Netanyahu and senior Israeli army officials.  Compl. ¶ 13.  Plaintiffs come nowhere close to alleging facts showing that their claims of injuries in the West Bank or Gaza arise from Defendants' alleged attendance at galas in Washington, D.C.  Moreover, the allegations are impermissibly non-specific as to each defendant, instead making the same generalized allegations about all of them.  Vague and conclusory allegations that "aggregate factual allegations concerning multiple defendants" are insufficient to establish personal jurisdiction over any individual defendant.  *Atlantigas Corp.,* 290 F. Supp. 2d at 42 (D.D.C. 2003); *see also Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980) (rejecting aggregation of co-defendants' forum contacts in determining personal jurisdiction).

To the extent Defendants' alleged attendance at AIPAC events involved communications with government officials concerning matters of public policy, such meetings are, in all events insufficient to create specific personal jurisdiction.  It is well-settled that "[u]nder the so-called 'government contacts exception' to the long-arm statute, defendants' lobbying activities do not

amount to the transaction of any business in the District of Columbia."[31]  *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 105 n.8 (D.D.C. 2002); *see also Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 230 (D.D.C. 2007) ("[The defendant's] government relations and lobbying connections to the District of Columbia also do not form a basis for asserting personal jurisdiction because of a long-recognized 'government contacts' exception to the 'transacting business' provision of a long-arm statute to allow for petitioning the government and the redress of grievances."). Plaintiffs' jurisdictional showing fails on this ground, too.

The Complaint also fails to articulate any legal basis for this Court's jurisdiction over any of the Defendants under Rule 4(k)(1)(C), which applies where jurisdiction is authorized by a federal statute.  It is settled that the ATS does not create a basis for personal jurisdiction under Rule 4(k)(1)(C).  The ATS "contains no long-arm provision of its own" and as such does not authorize service of process that would support personal jurisdiction under Rule 4(k)(1)(C).[32]  *See Mwani v. Bin Laden*, 417 F.3d 1, 9 (D.C. Cir. 2005).

---

[31] Nor can Plaintiffs argue that personal jurisdiction is proper based on allegations of fraudulent tax returns filed with the IRS main office in Washington, D.C.  *See Capel v. Capel*, 272 F. Supp. 3d 33, 40 (D.D.C. 2017) (precluding "the assertion of personal jurisdiction over a non-resident whose only contact with the District of Columbia is with Congress or a federal agency" (quoting *Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 75 (D.D.C. 1992), *abrogated on other grounds by FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008))).

[32] To the extent that Plaintiffs attempt to rely on the Complaint's single, cursory reference to the Torture Victims Protection Act ("TVPA") as a basis for finding personal jurisdiction over the Defendants, they may not do so.  Like the ATS, the TVPA confers *subject matter* jurisdiction, not personal jurisdiction.  *See* Torture Victims Protection Act of 1991, Pub. L. No. 102–256, 106 Stat 73 (Mar. 12, 1992); *Buratai*, 318 F. Supp. 3d at 226 (applying District of Columbia's long-arm statute because the TVPA has no long-arm provision); Michael J. Stephan, *Persecution Restitution: Removing the Jurisdictional Roadblocks to Torture Victim Protection Act Claims*, 84 Brook. L. Rev. 1355, 1371 (2019).

Likewise, the two federal criminal statutes mentioned in the Complaint cannot confer personal jurisdiction because Plaintiffs do not have standing to prosecute those claims.  *See* Compl. ¶¶ 10-12 (Money Laundering Control Act, 18 U.S.C. § 1956(b)(2)), 286 (Neutrality Act, 18 U.S.C. § 960); *Prunte Universal Music Group*, 484 F.Supp.2d 32, 42 (D.D.C. 2007) ("[T]he Supreme

* * *

In short, no legally cognizable basis for personal jurisdiction has been asserted with respect to any Defendant moving on this ground, and the Complaint should be dismissed as against them on this basis alone under Rule 12(b)(2).

**B.**     **Plaintiffs Failed to Effect Service of Process on Certain Defendants**[33]

The Complaint must also be dismissed as to certain Defendants pursuant to Rule 12(b)(5) because Plaintiffs have not properly served them with the Summons and Complaint in this action.

Defendants have a constitutional right under the due process clause to be properly served. According to the Supreme Court, "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  Federal courts cannot exercise "personal jurisdiction over a defendant unless the procedural requirements of effective service of process are satisfied." *Mann v. Castiel*, 681 F.3d 368, 372 (D.C. Cir. 2012) (internal quotation marks and citations omitted).  In order for there to be personal jurisdiction, "there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum.  There also must be a basis for the defendant's amenability to service of

---

Court has refused to imply a private right of action in a bare criminal statute." (internal quotation marks omitted)); *Kissi v. U.S. Dep't of Justice*, 793 F. Supp. 2d 233, 235 (D.D.C. 2011) (holding that 18 U.S.C. § 1956 provides no private cause of action); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209-10 (D.C. Cir. 1985) (affirming motion to dismiss private damage action under the Neutrality Act); *see also Leeke v. Timmerman*, 454 U.S. 83, 85-86 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

[33] Defendants Miriam Adelson, AIPAC, Brian Shankman, Howard Kohr, Susan Levin-Abir, and Walid Shoebat move for dismissal pursuant to Fed. R. Civ. P. 12(b)(5).  Additional reasons why Plaintiffs' purported service on each of the foregoing Defendants was ineffective are set forth in Appendix B hereto.

summons.  Absent consent, this means there must be authorization for service of summons on the defendant."  *Omni Capital Int'l*, 484 U.S. at 104.

Plaintiffs must accomplish service on each defendant "within 90 days after the complaint is filed."  Fed. R. Civ. P. 4(m).  If Plaintiffs fail to do so, dismissal of the action is appropriate with respect to defendants who were not properly served.  *See Taylor v. Howard Univ.*, 200 F. Supp. 3d 196, 203 (D.D.C. 2016).  Plaintiffs bear the burden of showing proper service or good cause that would justify extending the service time.  *Klayman v. Obama*, 125 F. Supp. 3d 67, 77 (D.D.C. 2015) (citing *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) and *Mann*, 681 F.3d at 375).  Good cause exists when external factors outside the plaintiffs' control prevent service, where a plaintiff's *pro se* status justifies leniency, or when a statute of limitations would bar the refiling of the claims.  *Id.*  "Conversely, circumstances such as negligence, attorney mistake, ignorance of the rules governing service, or evidence of a plaintiff's 'inadvertence, oversight, or neglect' do not establish the requisite good cause."  *Id.* (quoting *Mann*, 681 F.3d at 376).

District of Columbia law permits service by certified or registered mail, return receipt requested. D.C. Super. Ct. Rule 4(c).  To establish service under this provision on an individual defendant, however, a plaintiff must prove either that the defendant self-signed the return receipt or that the receipt "meets the appropriate qualifications for receipt of process set out in subdivisions (e) through (j) of this Rule." D.C. Super. Ct. Rule 4(l)(2).  Subdivision (e), titled "Service upon individuals in the United States," describes the persons who "meet[] the appropriate qualifications."  In particular, service on an individual may be made on "the individual *personally* or by leaving copies thereof at the individual's *dwelling house or usual place of abode* with some person of suitable age and discretion then residing therein."  D.C. Super. Ct. Rule 4(l)(2) (emphasis added).

Here, none of the individual defendants signed the receipts.  (*See* Appendix B.)  Nor have Plaintiffs established that the persons who did sign were authorized to accept service of process for the respective individuals.  It is Plaintiffs' burden to make this showing, and their failure to do so is fatal.  *See Mann,* 681 F.3d at 372.  Further, because the mailings were sent to business addresses, not the individual Defendants' "dwelling house or usual place of abode," the exception allowing persons of suitable age and discretion to sign for the putative defendant does not apply. District of Columbia law makes clear that, under these circumstances, service is insufficient.  *See Anderson v. Gates,* 20 F. Supp. 3d 114, 122-23 (D.D.C. 2013) (holding service on individual via certified mail to a business address insufficient where plaintiff offered no proof that the defendant himself signed the return receipt); *Toms v. Hantman,* 530 F. Supp. 2d 188, 191 (D.D.C. 2008) (holding certified mail to defendant's business address insufficient where the return receipt was signed by someone other than the individual defendant); *Wilson-Greene v. Dep't of Youth Rehab. Servs.,* No. 06-cv-2262, 2007 WL 200755, at *2 (D.D.C. July 9, 2007) (holding certified mail service insufficient where mailing was directed to defendant's business address, and plaintiff offered no evidence that the individual defendants signed for the mailings or that the return receipt signatories were authorized to accept service).

Plaintiffs have also failed to allege anything about the individuals who signed the return receipts allegedly on behalf of defendants.  Even if Plaintiffs could establish that those persons who signed the return receipts were authorized to accept mail on behalf of a defendant, that would still be insufficient to establish their authorization to accept *service of process* on the defendant's behalf.  *See Freedom Watch, Inc. v. Org. of Petroleum Exporting Countries,* 288 F.R.D. 230, 231 (D.D.C.2013) (dismissing for insufficient service where plaintiff offered no

evidence that the people authorized *to receive the mail* were authorized to *accept service of process*), *aff'd in relevant part,* 766 F.3d 74 (D.C. Cir. 2014).

Here, as detailed below and in Appendix B, Plaintiffs failed to effect service within the required time and have made no effort to cure the defects.  Plaintiffs filed their complaint on February 25, 2020. ECF No. 1.  On April 28, 2020, the Court ordered Plaintiffs to serve defendants and file proof of service by May 25, 2020, the 90th day from filing of the Complaint, or face dismissal.  (Minute Order Apr. 28, 2020.)  In their status report to this Court dated May 26, 2020, ECF No. 8, Plaintiffs purported to have served the all domestic defendants by certified mail and attached a photo of the corresponding (unsent) certified mail receipts.  On June 5, noting that Plaintiffs had yet to file proof of service on any defendant, the Court ordered them to do so by June 12, 2020.  (Minute Order June 5, 2020.)  Plaintiffs filed their purported proof of service on the Defendants Adelson, AIPAC, Shankman, Kohr, Levin-Abir, and Shoebat on June 11, indicating that their certified mail packages were delivered to the listed addresses on May 29, 2020.  ECF No. 10-2.  None of the receipts were signed by the individuals to whom the mailings were addressed, and the receipt for defendant Susan Levin-Abir contains no signature at all. ECF No. 10-1.  Moreover, none of the receipts indicates that Plaintiffs attempted to serve any individual defendant at their residential address.[34]

On June 16, the Court again extended Plaintiffs' time to file proofs of service on the four remaining domestic defendants by June 19, 2020.  Minute Order June 16, 2020.  On June 24, 2020, the Court again extended Plaintiffs' time to serve four remaining domestic defendants, one final time, until July 3, 2020.  Minute Order June 24, 2020.  Plaintiffs filed an affidavit of service

---

[34] *See* Appendix B; Declaration of Barry G. Felder; Declaration of Mark Harris; Declaration of Susan Levin-Abir.

on all but two of the remaining domestic defendants on July 3, 2020.  ECF No. 34-1.  On July 6, 2020, the Court dismissed Plaintiffs' action against the two remaining unserved defendants (Rudolph Giuliani and Michael Huckabee), finding that Plaintiffs had not shown good cause for the delay.  Minute Order July 6, 2020.

As detailed in Appendix B and the declarations submitted herewith, there was insufficient service on those Defendants moving on that ground, and their motion to dismiss must be granted.

Further, the fact that those Defendants ultimately received actual notice of the lawsuit is not a justification for subjecting them to jurisdiction in this Court.  *See Shaw v. District of Columbia*, No. 05-cv-1284(CKK), 2006 WL 137168, at *5 (D.D.C. My 15, 2006) ("It is well-established that a named defendant's actual knowledge of a lawsuit is no substitute for proper service of process under Federal Rule of Civil Procedure 4."); *Teamsters Local 639 Emp'rs, Health Trust v. Hileman*, 988 F. Supp. 2d 18, 24 (D.D.C. 2013) ("Although proper service can be waived, actual notice of a lawsuit is insufficient to constitute waiver and establish personal jurisdiction.").

### C.    The Court Should Not Extend Plaintiffs' Time to Serve Defendants

This Court has already determined that Plaintiffs had ample time to complete service on the domestic defendants in this case and, as to those defendants Plaintiffs entirely failed to serve, the Court found no good cause for the delay such that any further extension should be granted.  The same applies to Plaintiffs' defective service on the moving Defendants. Plaintiffs served certain defendants at business addresses where Plaintiffs did not even have a good faith basis to believe the respective Defendants would be present.  And despite receiving return receipts that were signed by individuals other than the individual Defendants, Plaintiffs chose to ignore the obvious defects in their service.  Instead, they reported to the Court that service was complete and filed bogus affidavits of service.  Plaintiffs can show no good cause

for their failure to make proper service on Defendants, so this Court should not excuse their negligence.  They have had ample time to serve Defendants and have not done so; nor have they moved for an extension of time to serve.  Plaintiffs have no one to blame but themselves for their failure to follow the rules.

In *Colston v. First Guarantee Commercial Mortg. Corp.*, 665 F. Supp. 2d 5, 8 (D.D.C. 2009), plaintiff requested an extension of time after unsuccessfully attempting to serve the defendant by certified mail, claiming that she did not expect the defendant to contest service. The court dismissed the action, noting that plaintiff was represented by counsel, defendant was not evading service, and the failure to effect service lay "squarely with counsel for [ ] [p]laintiff." 665 F. Supp. 2d at 10; *see also Anderson*, 20 F. Supp. 3d at 122 (declining to extend plaintiff's time to serve where his sole effort at service had been a certified mailing to defendant's business address and where he "did not attempt to perfect service on defendants by other means").

Under these circumstances, no extension is warranted, and Defendants should be dismissed from this lawsuit.

## **CONCLUSION**

For all of the foregoing reasons, the Court should dismiss the Complaint, as against moving Defendants, in its entirety with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6).

Dated: August 14, 2020                     Respectfully submitted,

By: _/s/ Barry G. Felder_____
Barry G. Felder (Bar No. 307736)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 338-3540
Fax: (212) 687-2329
bgfelder@foley.com

Michael J. Tuteur (D.D.C. Bar No. D00202)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
Tel: (617) 342-4016
Fax: (617) 342-4001
mtuteur@foley.com

*Counsel for Miriam Adelson*

By: _/s/ Rachel Hirsch_____
/Signature with Permission
Rachel Hirsch (Bar No. 991122)
AIPAC
251 H Street, NW
Washington, D.C. 20001
Tel: (202) 639-5248
Fax: (202) 638-6349
rhirsch@aipac.org

Philip Friedman (Bar No. 421854)
FRIEDMAN LAW OFFICES PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
Tel: (202) 293-4175
Fax: (202) 381-0395
psf@consumerlawhelp.com

*Counsel for AIPAC, Howard Kohr, and Brian Shankman*

By: _/s/ Stuart J. Roth_____
/Signature with Permission
Stuart J. Roth (Bar No. 475937)
Mark Goldfeder (D.D.C. Bar No. NY0273)
Benjamin Sisney (Bar No. 1044721)
THE AMERICAN CENTER FOR LAW AND JUSTICE
201 Maryland Avenue, N.E.
Washington, D.C. 20002
Tel: (202) 546-8890
Fax: (202) 546-9309
goldfed@gmail.com
bsisney@aclj.org

*Counsel for Dov Hikind*


By: _/s/Mark D. Harris_____
/Signature with Permission
Mark D. Harris (Bar No. 445900)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
mharris@proskauer.com

Jennifer E. Tarr (D.D.C. Bar No. IL0028)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave. NW  Ste. 600 South
Washington, DC 20004-2533
Tel: (202) 416-6846
Fax: (202) 416-6899
jtarr@proskauer.com

*Counsel for Susan Levin-Abir*


By: _/s/Robert J. Tolchin_____
*/Signature with Permission*
Robert J. Tolchin (Bar No. NY0088)
THE BERKMAN LAW OFFICE, LLC
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
Tel: (718)855-3627
Fax: (718) 504-4943
rtolchin@berkmanlaw.com

69

Oleg Rivkin, Esq. (D.D.C. Bar No. NY236)
RIVKIN LAW GROUP PLLC
800 Third Avenue, Suite 2800
New York, New York 10022
Tel: (212) 231-9776
or@rivkinlawgroup.com

*Counsel for Walid Shoebat*