## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THE DAWABSHEH FAMILY, ET AL.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | **Case No. 1:20-cv-00555 DLF** |
| **NETANYAHU, ET AL.** | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANTS MIRIAM ADELSON, AIPAC, BRIAN SHANKMAN, HOWARD KOHR, DOV HIKIND, SUSAN LEVIN-ABIR, AND WALID SHOEBAT**

COME NOW the Plaintiffs herein and hereby oppose the motion to dismiss filed by Miriam Adelson et. al. (ECF 51) The motion should be denied because: a) based on *Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019), the political question doctrine does not bar the type of claims pled herein as Defendants argue; b) based on the South Africa *Apartheid* case[1], aiding and abetting the dehumanization of a civilian population is a viable cause of action. There are numerous allegations in the Complaint detailing how the Defendants accomplished that, e.g. Defendants AIPAC and Adelson established a $1 billion dollar money laundering scheme operating on U.S. soil today to fund ethnic cleansing, genocide and arms trafficking in the OPT; and c) with respect to Defendants' arguments re: the absence of any connection to acts committed on U.S. soil, obviously the

---

[1] *Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.)*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009)

Defendants have ignored the relevant caselaw. In *Doe v. Exxon Mobil Corp.*, 2015 U.S. Dist. LEXIS 91107*,* Judge Royce Lamberth discusses the doctrine at length. Plaintiffs submit that they satisfy Judge Lamberth's test, i.e. soliciting funds on U. S soil to finance violence aboard and fund war crimes. The Plaintiffs address the other arguments proffered by the Defendants on pp. 2 through 36.

The Defendants want this court to view this case solely in the context of Israeli government conduct. However, this case illustrates the epitome of settler violence and gross intimidation of a civilian population, (See definition of "international terrorism." 18 U.S.C. 2331)

Moreover, the Israeli government has never issued a policy statement approving ethnic cleansing, genocide, or wanton destruction of property—all war crimes. The sworn confessions of Israel Army soldiers reveal (See <u>Our Harsh Logic</u> pg. 79, 288 and Intro. Pages 1-5), that their job in the OPT was, and is today, to protect settlers when they go out on rampages looking for Palestinians to maim and murder.  Even Prime Minister Netanyahu viewed the fire-bombing of the Dawabsheh home [see description of the lead Plaintiff's injuries] as a terrorist act that was not planned and carried out by the Israeli Army, but by nearby violent settlers intent on committing a revenge killing. These are the same settlers who the Defendants have been bankrolling for the past 20 years.

I.      **Contrary to one of Defendants' major arguments, the Complaint repeatedly informed the Defendants of the nature of Plaintiffs' claims**

Defendants argue that the Complaint is incomprehensible and should be dismissed pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6). They are wrong.

The Complaint repeatedly informs the Defendants of the nature of Plaintiffs' claims.[2] First, the caption summary recites that they have aided and abetted the dehumanization of the Palestinian people for decades, e.g. the Adelson family started funding the Ariel settlement [conceded to be totally built on Palestinian property], and its militia unit at least 50 years ago. That is criminal activity which violates 18 U.S.C. 960 (funding foreign militia units) and 18 U.S.C. 1956 (money laundering). 49,000 Palestinian homes have been destroyed and 400,000 Palestinians no longer live in the OPT. Dehumanization is a war crime. Defendants don't dispute that. UN records document the destruction of homes, and the Defendants' role in dehumanization is spelled out in detail (See Complaint p. 8 and p. 9). They have encouraged, financed, ratified, and approved the commission of war crimes, i.e. they have provided "practical assistance" for approximately 20 years. Those allegations are more than sufficient to meet Plaintiffs' pleading burden, according to Judge Shira A. Scheindlin's analysis in the classic apartheid case, *Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.)*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009).

According to a New York Times report[3], the Defendants provided "substantial assistance"[4] to settlers in the OPT, things like bulletproof vests, sniper scopes, armored jeeps, and guard dogs (see Complaint p. 10). What is curious is that there is not a single affidavit from any Defendant claiming he or she has not financed arms trafficking, ethnic cleansing, and genocide. The offense of arms trafficking alone carries a 20-year prison sentence. AIPAC's role is also spelled out in the Complaint on p. 10. AIPAC officials and the Adelson family set up a $2 billion dollar money laundering scheme on U.S. soil,  identical to Mr. Stephen Bannon's [senior Trump administration official] 501(C)(3) criminal conduct disclosed in an indictment recently

---

[2] These are the identical criminal charges listed in the indictment handed down in Boston, MA charging wealthy parents for abusing 501(c)(3) non-profit rules and regulations.
[3] N.Y. Times, July 5, 2010, Tax exempt funds aid settlements in West Bank.
[4] Id. At 297

handed down in the Southern District of New York (hereinafter S.D.N.Y.) Given the specificity of the "substantial assistance"[5] rendered by the Defendants, the specific timeframe involved, and the results thereof, (for example 400,000 Palestinians were forcibly removed from the OPT) it is difficult to accept Defendants' arguments that they remain in the dark as to why they have been sued.

Moreover, at numerous publications including the Washington Post, Haaretz, United Nations reports, Freedom House and Amnesty International have described this criminal activity in detail. The Washington Post and Haaretz have even explained it and detailed the way the pro-settler Defendants charities are abusing the United States tax code to promote settlement expansion in the OPT and its attendant results—ethnic cleansing and genocide.

II.     **This Court has subject matter jurisdiction over these claims and all of these Defendants.**

Defendants have resurrected an argument rejected in *Al Tamimi v. Adelson*, (supra) i.e. that this Court lacks subject matter jurisdiction because Plaintiffs' claims are nonjusticiable under the "political question" and "act of state" doctrines. Once again, they are wrong.

It appears the Defendants have intentionally distorted the nature of the Plaintiffs' claims in an effort to shoehorn this case into a political question case (a tactic used before, see *Al-Tamimi v. Adelson*.)[6] The Defendants allege that the Plaintiffs are relying on policies advocated and pursued by the Israeli government (see Miriam Adelson Motion to Dismiss (ECF 51) p. 20). However, as already explained herein, these policies have always been associated with the Defendants, including their partners-in-crime living abroad, i.e. the 700,000 settlers now living in the OPT.

---

[5] *Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.*), 617 F. Supp. 2d 228, 297 (S.D.N.Y. 2009)
[6] *Al Tamimi v. Adelson,* 916 F.3d 1 (D.C. Cir. 2019)

These are individuals who have either engaged in criminal activity or are the beneficiaries of war crimes--ethnic cleansing, genocide, and wanton destruction of private property. According to former Israeli Defense Minister Mofaz, "they [the settlers] are stealing private and government property" (See *Al-Tamimi* Amended Complaint (ECF 77) Page 91. AIPAC and the Adelson family--*not the Israeli government*- founded the settlement expansion money laundering scheme operating on U.S. soil.

In fact, no Israeli government has ever supported the theft or wanton destruction of private property (a most despicable crime as described in the Old testament) or genocide, ethnic cleansing, or money laundering. Hence, it is a gross distortion of Plaintiffs' position that the Complaint is a product of Israeli government policy, as approved by the U.S. Congress. The Adelson, Kushner, and Ambassador Friedman families' private sector policy [as recently confirmed by Defendant Kushner[7]] is to remove all non-Jews from the OPT and to use the U.S. tax code to defraud The United States Treasury. With respect to injuries alleged, except for targeted extrajudicial killings authorized by Defendant Netanyahu, the settlers, not the Israeli army, inflicted these injuries. (See the lead Plaintiff's claim, e.g. settlers living nearby the Dawabsheh home were armed with expensive chemical materials commonly used in arson attacks. They burned down the Dawabsheh home and murdered a Palestinian Mom and Dad and an 18-month-old infant.)[8] They were able to purchase expensive detonator caps and accelerants because they had received funding from US based doors and 501(c)(3) officials. That type of activity was never was Israeli government policy, according to Shin bet [the well-known Israeli domestic intelligence agency similar to the FBI]. It's a policy, of course, devised by settlement leaders --a terrorist act designed to intimidate Palestinian neighbors. That is the classic definition of "terrorism" (See 28 U.S.C. section 2331).

---

[7] Times of Israel, September 10, 2020 Kushner: Our Plan is bid to save 2-state solution; Israel was eating up the land.
[8] Complaint paragraph 32.

With respect to theft of private property, as former Defense Minister Mofaz pointed out 40 years ago, settlers used funds provided by the Adelson, Kushner, and Ambassador Friedman families and illegal charities to steal private property in the OPT. They hired professional forgers to create and record phony deeds. ( See The General's Son, page 142.) That is not and never was Israeli government policy, nor has the Israeli government ever sanctioned fraudulent land transfers made possible by bribing senior military leaders in the OPT.

### III.    The Act of State Doctrine Does Not Bar these claims

Defendants argue that Plaintiffs' claims are barred by the Act of State Doctrine. They are wrong.

The Act of State Doctrine has been extensively examined and decided by Judge Tanya Chutkan. See *Al-Tamimi* Memorandum Opinion*, ECF 120 August 29, 2017  at Pages 21-22. After five months of studying the Complaint, the Defendants' still assert that the Plaintiffs do not allege criminal conduct independent of Israeli government policies. The Defendants apparently have not yet discovered what the settlers have done in terms of destroying livestock and maiming and murdering Palestinians in the OPT. As repeatedly reported in the Haaretz newspaper, settlers leave behind lamb carcasses on  a Palestinian family's front yard as a "calling card."  They also devised the plan to use forged deeds. They could afford to hire professional forgers, courtesy of the Adelson, Kushner, and Ambassador Friedman funds (See The General's Son, p. 197.) They burned down the Dawabsheh home. They have maimed and murdered Palestinians in the Hebron community and continued to inflict a reign of terror there. (See Complaint paragraph 32, p. 29). See also exhibit D in *Al Tamimi (supra)*. They halt ambulances so wounded Palestinians will bleed out, and they molest Palestinian women at Israeli checkpoints (See Witness in Palestine, p. 47). They murder Palestinians kids knowing they will serve at most 30 days in jail and receive a small monetary fine. (See Lords of the Land, p. 447). They built firing ranges and sniper schools,

according to the Israeli Government's Third Report on Settlement Activity, i.e. <u>The Spitzer Report</u>. According to Israeli soldiers' sworn accounts in <u>Our Harsh Logic</u>[9], it was only when the settlers first arrived in the OPT, 40 years ago, that violence became an everyday occurrence in the OPT. The Jewish-only settlers, not Israeli soldiers, urinated and defecated in Palestinian Village water wells and burned down olive groves and mosques. And just as was alleged in *Al-Tamimi v. Adelson*, (supra) the Defendants, for the most part, are U.S. private citizens abusing the IRS tax code, just like Steven Bannon did as described in the S.D.N.Y. indictment.

What the Defendants never inform the Court is that, with respect to the massive Congressional aid provided to Israel, *that aid has never been provided to settlers to enable them to maim and murder Palestinians*. Providing funds to protecting Israel from missile attacks by Iran is one thing. Buying sniper scopes, stun grenades, and M16's which constitutes classic arms trafficking in order to maim and murder a civilian population, is a war crime, plain and simple. No United States Senator, not even Israel-first advocates,  has ever endorsed that kind of military spending as part of a foreign aid package.

Another important consideration that the Court should take notice of is that the Defendants don't really spell out the consequences of letting this case go forward, i.e. the crimes of fraudulent land transfers, arms trafficking and income tax fraud would be exposed. The Justice Department prosecutes people like the Defendants every day, e.g. the recently indicted Trump adviser Stephen Bannon [S.D.N.Y.] and the movie stars who bought collegiate admissions through donations made to illegal 501(C)(3)s [Boston MA U. S. District Court]. These schemes involving 501(c)(3)s are heavily dependent on establishing and operating money-laundering schemes disguised as charitable endeavors.

---

[9] Our Harsh Logic, page 79

Prosecuting illegal 501(C)(3)s is a valuable law enforcement tool used by the IRS, the Justice Department, and the Treasury Department. Those agencies would not be offended in the least by revoking the non-profit status of 501(C)(3)s which are defrauding the United States government out of millions of tax dollars every year.

Finally, Plaintiffs have not asked the Treasury Department to designate a particular settlement as a terrorist entity. The reason--it's the individual Defendants who they have named herein, like Kushner, Adelson, and Ambassador Friedman, e.g. they, like Mr. Bannon and the parents who made the large illegal donations to phony charities to secure admission into elite schools for their kids, made similar illegal donations to Friends of Ariel or Friends of the Israeli Army [otherwise known as IDF].[10] The Friends of the Israeli Army, operating on U.S. soil does not have a soup kitchen or even a homeless shelter, despite the fact that they raised $900 million on U.S. soil. They are known as classic funnels. They, just like Kushner and Adelson and Ambassador Friedman, took advantage of the tax code and wrote off contributions as "charitable donations." They, and other pro-settlement family foundations, have failed to disclose on their IRS form 990 that some donations were used to buy M16s, military jeeps and stun grenades, all claimed to a "charitable endeavor" (See Complaint p. 29). The absurdity is obvious—they would have the U.S. taxpayer support their criminal activities because they are deemed to be charitable activities on the 990 form, i.e. outfitting a standing army.

### IV.   Plaintiffs Have Standing To Bring This Action

Defendants argue that Plaintiffs lack standing pursuant to Rule 12(b)(1).

To qualify as a party with standing to litigate, each Plaintiff bears the burden of showing (1) "injury in the form of 'invasion of a legally protected interest' that is 'concrete

---

[10] This charity raised $132 million in 2018.

and particularized' and 'actual or imminent;'" (2) that the injury is "fairly traceable to the challenged action . . . and not th[e] result [of] the independent action of some third party not before the court;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Arizona State Legislature*, 135 S. Ct. at 2663 (internal quotation marks omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted).

A Plaintiff bears the burden of establishing an "injury in fact" that is both "concrete *and* particularized" and that involves an invasion of a legally protected interest. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545, 1548 (2016). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 1548 (citation omitted). The injury must also be "concrete," *i.e.*, "'real,' and not 'abstract." *Id.* at 1548.

Plaintiffs have no difficulty meeting all three requirements: 1) Real concrete particularized injury, 2) Causation link tracing the injury to the actions of Defendants and 3) Redressability.

There is no question about real injury. Over the course of the last few decades 400,000 to 500,000 Palestinians have been driven out of the Occupied Territories by belligerent settlers.  What's more, an untold number of them have been murdered and tortured. They have been subjected to systematic genocide and ethnic cleansing. Few things are more "personal and individual") *Id.* at 1528 than being murdered, tortured, and driven out of your home and having your livelihood destroyed.

The second requirement can also be satisfied.  Plaintiffs allege that approximately 50,000 homes were destroyed by the settlers, who are funded by the U.S. based non-profits, which are encouraged and financed by the Defendants herein and the leaders of the anti-

Boycott Disinvestment and Sanctions (BDS) movement like Ambassador Freidman.[11] The tragic effect:  ethnic cleansing, genocide, and wanton destruction of property for nearly 65 years.

As alleged in the first and second causes of action, these Defendants have aided and abetted the commission of numerous war crimes and crimes against humanity i.e. the denationalization and dehumanization of the Palestinian people and aiding and abetting the establishment of an apartheid regime in the OPT.

The extraordinary ongoing financial assistance provided by U.S. tax-exempt entities and their donors has now mushroomed into a significant problem—*total contributions to Israeli NGOs in 2007 were $1.729 billion*. ( see *Al Tamimi* supra)

The actions of these Defendants have had devastating consequences for the Palestinian population. One hundred and ninety villages out of 250 villages in northern Palestine have been emptied—and more will definitely follow. ( See *Al Tamimi* Amend Complaint, ECF 77, page 180). Homeowners were forcibly evicted by armed settlers. The result—220,000 Palestinians became refugees. Forced expulsion and ethnic cleansing also occurred in the Palestinian village of Kirbet Yerza on a major scale. For one hundred years before the settlers arrived, that village had hundreds of Palestinian inhabitants. Now there are only 20 families left. The remaining inhabitants have all been served with a demolition order citing bogus "security" reasons based on false affidavits signed by settlement officials desirous of confiscating more Palestinian property. A routine practice involves false deeds being fabricated based upon false affidavits to justify the illegal confiscation of Palestinians' property. This is a "real" and "particularized" injury.

---

[11] One of the defendants, Gov. Cuomo enacted an anti-BDS edict which was funded by the Netanyahu administration.

That injury can be directly tied to the actions of these Defendants. The Defendants named in the Complaint are U.S. and Israeli-based entities and individuals who have each played a role in the denationalization and dehumanization of the Palestinian population in the OPT. These individuals and entities include AIPAC officials, donors Adelson and Gilbert, Attorney Gustav Cardelius, Governor Andrew Cuomo, U.S. Ambassador Friedman, White House Advisor Jason Greenblatt, Former U.S. House leader Newt Gingrich, Donald Hikind, former Governor Huckabee, Jared Kushner, Susan Levin-Abir [Executive Director Friends of the Israeli Army], Bibi Netanyahu, Walid Shoebat, President Trump and Dov Weissglas.

The causal link can be further illustrated by the effect of the massive funding going to the settlers from Defendant charities. In *Karunamunige Chamila Krishanthi v. Rajakumara Rajaratnam*, Civil Action No. 09-CV-05395 (DMC-JAD), 2010 U.S. Dist. LEXIS 88788 (D.N.J. Aug. 26, 2010), the N. J. District Court addressed the connection between funding and the violent acts the funds paid for. While that was a terrorism case, the similarities are stark.

The Court cited the <u>International Convention for the Suppression of the Financing of Terrorism</u>, adopted by the General Assembly of the United Nations in resolution 54/109 of December 9, 1999.

It states in Article 2:

"Any person commits an offence within the meaning of this Convention if that p**erson by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out: (emphasis added)**

1. (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or

(b) **Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict,** when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

This of course is an exact description of the actions of the Defendants, whose funds were used to "intimidate a population" such as the Palestinians in the OPT.

The Convention explains its applicability:

"For an act to constitute an offence set forth in paragraph 1, it shall not be necessary that the **funds** were actually used to carry out an offence referred to in paragraph 1, subparagraphs (a) or (b).

"*Any person also commits an offence if that person attempts to commit an offence*[12] as set forth in paragraph 1 of this article. (emphasis added)

"Any person also commits an offence if that person:

(a) Participates as an accomplice in an offence as set forth in paragraph 1 or 4 of this article;

(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 4 of this article;

(c) Contributes to the commission of one or more offences as set forth in paragraphs 1 or 4 of this article by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

---

[12] That means anyone associated with the one hundred plus pro-settlement 501c3s operating in American who sends out a solicitation letter has violated the terries statute.

(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of an offence as set forth in paragraph 1 of this article; or

(ii) Be made in the knowledge of the intention of the group to commit an offence as set forth in paragraph 1 of this article. *Karunamunige Chamila Krishanthi v. Rajakumara Rajaratnam,* Civil Action No. 09-CV-05395 (DMC-JAD), 2010 U.S. Dist. LEXIS 88788, at *37-39 (D.N.J. Aug. 26, 2010).

The record evidence is overwhelming( See Vanity Fair 1990 article: Kids are Killed for Sport). Discovery will further detail the connection between the funding of the Defendant charities and the war crimes they financed in the OPT.

The redressability requirement can obviously be fulfilled. This Court has the power to award the Plaintiffs millions of dollars in damages as compensation for the injuries inflicted on the Palestinian victims. That award alone should deter pro-settlement wealthy individuals and 501 (c)(3) officials from continuing to fund war crimes in the OPT.

## V.      Plaintiffs have expressly Overcome the Presumption Against Extraterritoriality

Defendants' arguments that the Complaint doesn't contain allegations necessary to satisfy the "touch and concern" elements required to gain jurisdiction under the Alien Tort Statute (ATS) should be rejected for good cause shown.

 Defendants cite *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010), which states that it is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation marks omitted) (quoting *EEOC v. Arabian Am. Oil Co.*,

499 U.S. 244, 248 (1991)).

They also cite *Kiobel*, quoting The Supreme Court saying that ATS must be interpreted in light of the usual "presumption that United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 115 (2013) (internal quotation marks and citation omitted).

The Defendants' have argued that the Court made clear in *Kiobel* that a Defendant's "mere corporate presence" in the United States is not enough to overcome the presumption against extraterritoriality. *Id.* at 125. And that a federal court has jurisdiction under the ATS only for claims that "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124-25 (citing *Morrison*, 561 U.S. at 264-72).

The Defendants are wrong, and they have conveniently misstated the Court's rationale on the concept of extraterritoriality. The Complaint is replete with facts and details of the Defendants' actions inside the United States, actions that go far beyond the "mere corporate presence" cited and discussed in *Kiobel*. For example, soliciting funds on U.S. soil to be sent overseas to promote violence, and setting up phony 501(c)3s as a result of fraudulent IRS filings, constitutes criminal activity which can be the subject of a criminal indictment. That activity also fits into the definition of international terrorism. See 19 USC 2331, (see Boston and SDNY criminal proceeding cited herein)

Plaintiffs' position is also buttressed by the language of the D.C. District Court in  *United States v. Ali*, 885 F. Supp. 2d 17, 23-24 (D.D.C. 2012) which stated that the presumption against extraterritoriality does not apply to the federal statutes establishing aiding and abetting and conspiratorial liability where the statute setting forth the underlying substantive

14

offense applies outside U.S. borders. *See United States v. Yakou*, 428 F.3d 241, 252, 368 U.S. App. D.C. 162 (D.C. Cir. 2005)."

More importantly, in *Sosa* [13] the Court limited federal courts to recognizing causes of action only for alleged violations of international law norms that are "'specific, universal, and obligatory.'" *Id.,* at 732, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (quoting *In re Estate of Marcos*, *Human Rights Litigation*, 25 F.3d 1467, 1475 (CA9 1994)). As Judge Shindlin[14] observed in the Apartheid case, the war crime of apartheid and lesser offenses involved are "specific, universal, and obligatory." They include extrajudicial killing, genocide, ethnic cleaning wanton destruction of property,  and dehumanization, the very crimes contemplated in *Marcos* and *Ali.*

Plaintiffs' claim that there are substantial U. S. connections, as pled herein, is also supported by the holding in *Doe v. Exxon Mobil Corp.*, where the Court's decision was based on a finding of "substantial connections' between the United States and the unlawful conduct occurring in Iraq: the torture was committed by American citizens employed by a U.S. corporation. In *Doe*, the torture was committed pursuant to a contract with a U.S. government agency at a U.S. military facility, and the CACI employees were required to obtain security clearances from the U.S. Department of Defense. *Id*. at 528-29. Furthermore, the case involved domestic conduct as well— Defendant's "managers located in the United States were aware of reports of misconduct abroad, attempted to 'cover up' the misconduct, and 'implicitly, if not expressly, encouraged' it." *Id*. **at** 529. *Doe v. Exxon Mobil Corp.,* 69 F. Supp. 3d 75, 95 (D.D.C. 2014)

These Defendants, just like those in *Doe*, although located in the United States are well aware  at all relevant times of reports of misconduct abroad, courtesy of numerous Haaretz articles

---

[13] *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)
[14] *Ntsebeza v. Daimler AG (In re S. African Apartheid Litig.*), 617 F. Supp. 2d 228 (S.D.N.Y. 2009)

and visits to the OPT, they "implicitly, if not expressly, encouraged it." *Id*. at 529. *Doe v. Exxon Mobil Corp.,* 69 F. Supp. 3d 75, 95 (D.D.C. 2014). They encouraged it by continuing to fund this activity.

All U.S.-based Defendants named herein have conspired for at least 20 years with U.S. tax-exempt entity officials to expand Israeli settlements in the OPT and engaged  in arms trafficking, wholesale violence and ethnic cleansing. The Adelson family and individual members have been funding arms trafficking, ethnic cleansing, wanton destruction of property and settlement expansion for at least 40 years. Their favorite settlement is Ariel which has received approximately $50 million from the Adelson family in the last 40 years.

Examples of acts of specific Defendants detailed in the Complaint:

>**Defendant Miriam Adelson** is an Israeli army veteran, dedicated to financing the criminal activity in the OPT. As a dedicated IDF veteran, she despises members of "Breaking the Silence Movement" (See Our Harsh Logic, pg. 1); because they have admitted to committing war crimes. Defendants Adelson, and her husband Sheldon Adelson, have sent their Israeli partners approximately $50 million during the last twenty years to Ariel settlement to make Ben Gurion's dream a reality, i.e. "take over all of Palestine." Ambassador Friedman has repeatedly told Israeli officials to expand settlement and should ignore international law, including the Law of Nations in the U.S. Constitution. These Defendants were not at all interested in halting the development of an apartheid regime in the OPT. Working with Israeli based partners in crime, they were actually promoting, financing, and encouraging an apartheid regime in the OPT- "We must destroy any vestige of the Palestinians presence" --former PM Golda Meir (See Witness in Palestine Appendix.) This was made possible by the funding coming from their pro-Israel partners in the U.S., i.e., the heads of phony pro-Israel 501(c)(3) charities which have been funding ethnic cleansing, genocide, apartheid, and theft of private property in the OPT for at

least twenty years. They are "funnels," i.e. charitable organization in name only. While they solicit charitable donations on US soil, they do not operate any soup kitchens or homeless shelters for deprived populations living in crowded urban centers.

There are classic signs that: (a) rampant genocide, as explained in US State Department Manual on Genocide[15], is already in place in the OPT, i.e. 49,000 Palestinian homes have been either confiscated or destroyed, (b) ethnic cleansing has occurred on a grand scale, i.e. 400,000 – 500,000 Palestinians have been forcibly removed from the OPT, and (c) an organized apartheid regime with a Jewish only population now exists in the OPT funded by pro-settlement donors and 501(c)(3)s based in the U.S., e.g., the Friends of the Israeli Army (Defendant's Susan Levin-Abir's phony 501(c)(3) funnel) or Friends of the Beit-El settlement (the first illegal settlement set up by Defendant Ambassador Friedman 40 years ago). These "Jewish-only" settlements, as was the case in South Africa, are linked up by "Jewish only" New Jersey Turnpike style highways. As repeatedly reported on by newspapers like Harrtez, Palestinians have been shot while travelling on these highways.

For diversity purposes Defendant Adelson is domiciled in Las Vegas, Nevada, and like her husband Sheldon Adelson, is a dedicated Zionist. She is an Israeli and U.S. citizen. She and her family have donated millions of dollars to support AIPAC's mission which is to forcibly remove all non-Jews from the OPT. She and her husband bribed President Trump (via a $50 million-dollar campaign contribution) to, *inter alia,* move the U.S. Embassy to Jerusalem and announce it as the capital of Israel. That decision confirmed the death of the two-state solution in the process. A two-state solution and giving property back to the Palestinians has always been anathema for AIPAC officials, donor Gilbert, Ambassador Friedman, and the Adelson and Kushner families.

---

[15] Sees Federal Rules of Evidence 201 on judicial notice.

>**Defendant Susan Levin-Abir** is domiciled in Florida and is the Executive Director of

Friends of the Israeli Army [Defense Forces] for the Palm Beach/Broward community in Florida.

Her main job is to raise lots of money every year and ship $104 million overseas to the

Israeli Army[16] so they can continue to maim and murder Palestinians. See *Boim v. Holy Land*

*Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008). She has adopted a

pro-settlement agenda and an attitude that the Israeli Army is the most moral military

entity in the world. She doesn't hide the respect and affection she has for the Israeli

Army.

For the Court's edification, the Army's name was cleverly changed by PMN  to Defense

Forces so that they could stress the defensive nature of the occupation. It is intended to convey

the impression not that young Israeli sons and daughters are defending their homeland against

roving Palestinian gangs, armed with butter knives or pitchforks, who are raping female Jewish

settlers and injuring innocent Jewish homeowners trying to eke out a living on barren land. She

helped send over one million dollars last year to the Israeli Army, and consistent with the *Boim*

authority *supra*, has therefore, augmented the Israeli Army's ability to comply with settlers'

demands that they do nothing while the settlers maim and murder innocent Palestinian civilians

in the OPT.

As alleged herein, the war crimes that the settlers have demanded the Army soldiers to

commit in the in the OPT since 1990, courtesy of all Defendants' fundraising efforts, are detailed

in the "Aiding and Abetting" section of the Complaint, including ethnic cleansing, genocide, and

theft of Palestinian property. Seven hundred Israeli Army veterans, per sworn statements, have

confessed to committing war crimes in the OPT in an effort to placate the settlers' demands. (see

Our Harsh Logic, Intro. P1-6). That is the reason why Defendants Adelson and Levin-Abir

---

[16] That was the figure in 2014

despise these veterans--they have tried to educate the Israeli population about what is really going on in the OPT.

>**AIPAC, SHANKMAN AND KOHR**: One of AIPAC's main roles is to make sure that Jewish Americans and Evangelical Christians who support belligerent settlers and rogue Israeli soldiers are immune from criminal prosecution, even if they have violated approximately 8 separate federal criminal statutes. The average American is indicted and prosecuted if he or she  violates any of the federal criminal statutes violated by AIPAC. That is not the case with wealthy Jews like Defendant Adelson and protected Evangelicals who finance and support Defendant's PMN ethnic cleansing and genocide campaigns. They are immune from criminal prosecution. The Complaint, pages 55 to 69 contains 37 paragraphs (paragraphs 96 to 131) detailing the actions of AIPAC and Defendants Kohr and Shankman in support of the war crimes inflicted on these Plaintiffs which have been financed by the Defendants named herein.

>**Defendant Hikind** has been a New York State Assemblyman (Brooklyn Borough District 48) for over twenty years. At all relevant times, he has pursued an Israel-first agenda. That agenda is consistent with PMN's plan to forcibly remove, or exterminate, all non-Jews from Palestine. He has taken upon himself an obligation to secure termination of New York state employees who have criticized Israel. Recently, he has stepped into the forefront of the anti-BDS battle. Along with Defendant Cuomo, he has convinced Secretary of State Pompeo to expand the definition of anti-Semitism. *The reason- individuals like Congresswoman Omar had been comparing conditions in the OPT with conditions in the Nazi regime and receiving favorable reviews and attention.*

At all relevant times, Defendant Hikind was more than a cheerleader for apartheid and was, along with Defendants Cuomo and Giuliani, an unofficial Israeli spokesperson whose job

was to kill the BDS movement and promote the disingenuous message that the sixty-year

occupation  is legitimate. As a review of the table comparing conditions in the OPT to Nazi,

Germany, (See table below from the Complaint page 41) it is rather obvious that there are

substantial similarities between the way Polish Jews were treated and how Palestinians are

treated today by the Israeli army. That's the direct result of establishing an apartheid regime in

the OPT – the government can do whatever it wants and target a segment of the civilian

population for extinction, if necessary, as was the case in German-occupied Poland.

| STATE CONDUCT | NAZI REGIME | NETANYAHU REGIME |
|---|---|---|
| National Registration | Yellow star | National ID card |
| Vehicle state sponsored regulation | Special Nazi designated license plates | Specially designated yellow license plates |
| Sterile only highways | Yes | Yes |
| Sterile only hospitals | Yes | Yes |
| No access to civil courts | Yes | Yes |
| Racial and religious confinement | Ghettos, concentration camps | Ghettos, Bantustans |
| Militia units | Storm troopers | Belligerent settlers |
| Starvation diet | Yes | Yes |
| Arbitrary arrest and incarceration | Yes | Yes |
| Ethnic cleansing and genocide | Yes | Yes |
| Prohibition of pro-creation | Yes | Yes |
| Discriminatory laws | Yes | Yes |
| Destruction or closure of retail shops | Yes | Yes, closing of Palestinian shops only and closure of main commercial thoroughfare |

>**Defendant Walid Shoebat** benefits from grants awarded by the Department of Homeland

Security in its never-ending war on terror. Recipients of these grants are encouraged to hire

individuals like Defendant Shoebat in an effort to educate first responders about the dangers

posed by Palestinian terrorists. The problem is that Defendant Shoebat has no basis to claim that

he is an expert in terrorism. For example, he claimed that he fire-bombed a branch of Bank Leumi while he was a member of a terrorist organization—that is not true, as a review of pertinent records would reveal. He also claims that he was arrested, incarcerated, and tortured by Israeli security forces, also untrue. He charges approximately $6,000 for every speech he delivers pertaining to alleged Palestinian terrorists. His mission in life appears to portray Palestinians as "savages" who are not deserving of their own country, and who deserve to be profiled.

All Defendant's actions mirror those of the examples above and are detailed in the Complaint. The allegations provide the Court with ample evidence of criminal conduct taking place within the United States, financed by the Defendants. Although they have an opportunity every year when they file their form 990 annual tax return, they have never informed the IRS or the Treasury department of the crucial fact that they have been financing war crimes being conducted in the OPT for the last 20 years (see forms 990s submitted by the charities). And, in a similar manner, ever year they have an opportunity to clean the slate with state tax authorities, they never do.

Those actions, clearly engaged in on U.S. soil, fit the Judge Lamberth's formula[17] as to the type of activity engaged inside the United States that can be relied upon in evaluating the extraterritoriality issue.

VI.    **Plaintiffs have no other remedies**

Defendants do not proffer any Israeli legislation [Basic Laws 1 and 2] or case law to support their claim that Plaintiffs have not exhausted their remedies in Israeli courts. The reasons—there are none.

---

[17] *See Doe v. Exxon, supra.*

For the court's edification, such remedies simply do not exist.  Citing Doe v. *Exxon Mobil Corp.*, 69 F. Supp. 3d at 89 (D.D.C 2014), Defendants claim these Plaintiffs had an obligation to have their grievances heard in Israeli courts before they are eligible for ATS relief. The problem is that the Defendants do not identify these Israeli court which the Palestinians Plaintiffs named herein can actually access.

The Court should consider the circumstances at bar. These Plaintiffs are all Palestinians who have been driven out of their homes, been tortured, and murdered, and had their livelihoods destroyed by the violent conduct of the irate settlers who are taking over the OPT. Their homeland has been pockmarked by Jewish-only schools, Jewish-only highways, and Jewish-only bus routes. Defendants argue that these Plaintiffs' remedy should be the based upon an Israeli justice system. However, that system has its own "Jewish only" requirements and biases. For example, Palestinians cannot file any claim under Israel's infamous Nazi war crime statute which Israeli authorities used to execute Adolf Eichmann as a war criminal.

Palestinians are only allowed to use military courts to air their grievances, something these Defendants should be well aware of due to the nature of their close relationships with Israel. These are courts controlled by senior Israeli army staff officials who have been appointed by PMN and they dispense "justice." But their justice is limited to violations of the Israeli military code. They can, for example, hear some claims pertaining to harassment of Palestinians, and Palestinians can be arrested and tried in those courts for resistance to arrest. For example, Bassem Al Tamimi's daughter, Plaintiff Ahed Al Tamimi, was sentenced to 6 months in jail for slapping an Israeli soldier.

The Ninth Circuit recognized the potential "futility" of seeking local remedies in *Sarei v. Rio Tinto*[18], holding that the "codification of the exhaustion requirement…is not in absolute terms. International law--both private and public--has long anticipated that local **remedies** might not always be adequate, and that justice may be denied if claimants are forced to exhaust before being heard in an international forum." *Restatement (Third)* §§ 703 cmt. d, 713, cmt. f.

The Court continued: "A core element of the exhaustion rule is its futility, or denial of justice exception, which excuses exhaustion of local **remedies** where they are unavailable or inadequate." *Id*. "United States courts have also recognized the futility exception with regard to human rights claims" *see, e.g., Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996). This case is a classic example of the futility of the local remedies rule.

In *Sarei* the 9th Circuit considered the requirements for exhaustion of remedies. The Court stated:

*"Exhaustion under the ATS should be approached consistently with exhaustion principles in other domestic contexts. The defendant bears the **burden** to plead and justify an exhaustion requirement, including the availability of local remedies. *See Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 919, 166 L. Ed. 2d 798 (2007) ('[T]he usual practice under the Federal Rules is to regard exhaustion as an affirmative defense.'). Although the plaintiff may rebut this showing with a demonstration of the futility of exhaustion, the ultimate **burden** remains with the defendant." *See, e.g., Honig v. Doe*, 484 U.S. 305, 325-29, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988) (allowing plaintiffs to by-pass administrative process where exhaustion would be futile or inadequate). *Sarei* supra  (emphasis in original)

---

[18] *Sarei v. Rio Tinto*, PLC, 550 F.3d 822 (9th Cir. 2008)

The bottom line--there is little question that exhaustion of judicial remedies by these Plaintiffs, and similarly situated Palestinians, would be a futile exercise in Israel.

## VII.   The Complaint Clearly States A Claim under the TVPA

Defendants  argue that the TVPA cannot be used for claims of aiding and abetting torture and extrajudicial killing.

However, the law is not clear on that. The cases they cite are from different circuits[19], and buried in their argument is the real substance of their argument: "…this Court should not extend the principle in this case, where Plaintiffs have alleged no facts that even plausibly connect the Moving Defendants' conduct to any alleged injury." Miriam Adelson MTD  ECF 51, page 51.

Plaintiffs ask this Court to look to the language of  TVPA as discussed by the D.C. Circuit Court. The TVPA "explicitly creates a cause of action for claims of **torture** and extrajudicial killing. *See* 28 U.S.C. § 1350 note § 2(a). Plaintiffs are entitled to bring separate TVPA claims based on the same underlying events as any claims simultaneously brought under the ATS; the TVPA provides an independent action for claims of extrajudicial killing and **torture**. *See Romero Drummond Co.*, 552 F.3d 1303 at 1315 (11th Cir. 2008), (permitting plaintiffs to seek relief for claims of extrajudicial killing under both statutes); See also *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242 at 1250—51 (finding that the TVPA provides a separate but not exclusive remedy for claims of **torture**). As such, even when claims brought under the ATS are unsuccessful, Plaintiffs' TVPA claims may potentially proceed on their own merit. *Doe v. Drummond Co.*, 782 F.3d 576, 601 (11th Cir. 2015).

---

[19] 9th circuit *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1128 (9th Cir. 2010); the District Court on the S.D. of Texas: *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d 912, 924–25 (S.D. Tex. 2012); and the District Court for the S.D.N.Y: *Mastafa v. Chevron Corp.*, 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010)

Furthermore, the *Doe* Court said: "we hold now that the TVPA applies extraterritorially," *Doe* at 601. "The text of the TVPA itself indicates that actions may arise from conduct occurring outside the United States. The **Act** provides for the liability of any individual who **acts** "under actual or apparent authority, or color of law, *of any foreign nation…" Id.*

The Plaintiffs herein have suffered tremendous losses as a result of the action—and inactions-- of these Defendants. They have suffered torture and extrajudicial killing (See Complaint paragraph 32[20], where the story of the killing of members of Plaintiff Dawabsheh's family is recounted in detail.

Based upon the circumstances that have been detailed herein, this Court should allow the Plaintiffs in this case to secure appropriate relief under the TVPA.

## VIII.  Contrary to one of Defendants' major arguments, Plaintiffs' claims are not time barred

Defendants argue that some of the Claims in the Complaint are time barred by the 10-year Statute of limitations of the TVPA and the ruling of four circuits[21] which applied the same statute of limitations to ATS claims. First of all, Plaintiffs would submit that deciding this issue, given that it is fact intensive, would be entirely premature at this stage. In any case, it is difficult for the Court to award the interim relief Defendants seek because they do not identify,  or state precisely, which claims, in their viewpoint, are time barred and why.

Even assuming *arguendo* that the Court will decide to apply the Defendants' 10-year statute of limitation theory to all claims herein, the actions of the Israeli based Defendants over

---

[20] …[T]he revenge killing of the Dawabsheh family. The husband, wife, and 18-month infant were incinerated. Young settlers coming from the Beit-El settlement, founded by Ambassador Friedman and others, crept up on the house at 2AM and placed fire accelerants in the cellar to burn down the building. They were able to do so because U.S. donors bought them very expensive night vision goggles. They were taught how to do this by IDF specialists…"
[21] Sixth Circuit, 11th Circuit, 10th Circuit and the Eastern District of NY, which is in the Second Circuit.

the last 10 years alone would justify each one of these claims. For example, the Courts have long recognized the concept of a continuing injury and the ability of an occupation army to possess and maintain incriminating documents. In other words, as explained in *Simon (Simon v. Republic of Hungary*, 439 U.S. App. D.C. 147, 911 F.3d 1172 (2018)) the Hungarian Plaintiffs could not access records to establish how when and why they were injured. Like the Hungarians, the Palestinian Plaintiffs do not have any records necessary to prove each and every one of the Plaintiffs' claims. The problem they have is that Israeli border guards  consistently maintain that whoever is murdered, for example, had a knife, The remedy here it to afford the Plaintiffs broad discovery. And after that broad discovery, the Plaintiffs would have burden at the summary judgment stage to convince this Court that there is a rational basis for concluding that Defendants 10-year statute of limitations theory has no application.

Defendants cite  *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 796 (2d Cir. 2014) as authority for the claim that the events alleged in the Complaint are time barred. Consistent with their approach to framing issues for the Court to decide in their favor, *Ellul* says nothing of the sort, in fact the *Ellul* Court chose NOT to consider the statute of limitations issue: "We have not decided whether the TVPA's ten-year statute of limitations applies to all or any specific claims under the ATS, and we need not decide that question here. Because the parties agree that a ten-year statute of limitations applies to Plaintiffs' ATS claims…we assume without deciding that the limitations period for the human trafficking claim is ten years. *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 799 (2d Cir. 2014).

This Court, of course, is not located in any of the three Circuits that have chosen to apply the TVPA statute of limitation to the ATS. As a result, the holdings of those Circuits do not have the persuasive authority to affect this Court's analysis as the Defendants wish..

Just like Defendants' arguments in the above section concerning a continuing injury doctrine, the bottom line here is that none of the claims in this Complaint are time barred-- at least based upon the authorities proffered by the Defendants. Again, this is fact intensive issue which is more suited for disposition at the summary judgment stage.

### IX.   Based on Congressional legislation, this Court can exercise both personal and subject matter jurisdiction over all  Defendants based upon the ATS

Defendants argue that this Court does not have jurisdiction to hear this case. Apparently they do not understand  the concept of jurisdiction under the Alien Tort Statute. The ATS, passed in 1789, provides that the federal district Courts "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Act has been "read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time" of passage. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004).

The Supreme Court has instructed, however, that Courts may, proceeding cautiously, recognize ATS claims for violations of "the present-day law of nations" so long as the claims "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [that the Court has] recognized." Id. at 725 *Ellul v. Congregation of Christian Bros*., 774 F.3d 791, 796 (2d Cir. 2014)

As this Court knows, the ATS provides that "[T]he district courts shall have original jurisdiction of any civil action by an **alien** for a **tort** only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS confers federal subject

matter jurisdiction when three independent conditions are satisfied: (1) an **alien** sues, (2) for

a **tort**, (3) committed in violation of the law of nations or a treaty ratified by the United

States. *See Filartiga v. Pena-Irala*, 630 F.2d 876, 887-88 (2d Cir.1980). *Estate of Manook v.*

*Research Triangle Inst., Int'l*, 693 F. Supp. 2d 4, 18 (D.D.C. 2010)

      This is precisely what is alleged in this Complaint. As alleged in the first and second

causes of action, the Defendants have aided and abetted the commission of numerous war crimes

and crimes against humanity i.e. the denationalization and dehumanization of the Palestinian

people and aiding and abetting the establishment of an apartheid regime in the OPT.

      As defined in the Nuremburg Charter, and the U.N. Charter, and  the Law of Nations war

crimes are identified as: "violations of the laws or customs of war which include, but are not

limited to, murder, ill-treatment, or deportation to slave labor or for any other purpose of civilian

population of or in occupied territory, murder, or ill-treatment of prisoners of war or persons on

the seas, killing of hostages, plunder of public or private property, wanton destruction of cities,

towns, or villages, or devastation not justified by military necessity." Belligerent settlers,

financed by Defendants like Adelson, Gilbert, and Levin-Abir, and protected by rogue Israeli

soldiers, have been engaging in this type of criminal activity for at  least 30 years in the OPT.

Destroying 49,000 homes can be deemed to be wanton destruction of cities and "wanton

devastation not justified any  military necessity."

      As also alleged in those causes of action, the Defendants have financed the theft of real

property owned by Palestinian-Americans Ali and Khateeb. Their combined property holdings

are worth $3 million (based on Remax values) and they seek a separate monetary judgment in

that amount against the Defendants for financing the trespass, pillage, and the conversion of their

real property in the OPT. Pillage is a separate war crime in and of itself and is only one war

crime that has been authorized and implemented by Defendant PMN in Palestine. Extrajudicial killings and pillage often go hand in hand with the theft of real property owned by members of the occupied population.  For a good reason, i.e. forged deeds can't be challenged by a dead person, nor can a property boundary measuring.

### X.   Defendants were properly served

Defendants argue that the Complaint should be dismissed because Plaintiffs have failed to properly serve certain Defendants, to wit: Miriam Adelson, AIPAC, Howard Kohr and Brian Shankman, Susan Levin-Abir and Walid Shoebat.

This Court has considered past objections to effective service on a very practical basis. This Court has found that the measure of effective service should be based upon the very reason service is required—to let a Defendant know he is being sued. This Court made that clear in *Ali v. Mid-Atlantic Settlement Servs*., 233 F.R.D. 32, 35-36 (D.D.C. 2006) saying that the effectiveness of service depends on the "facts and circumstances of each case."  The Court continued:  "The rules governing service of process are not designed to create an obstacle course for plaintiffs to navigate, or a cat-and-mouse game for defendants who are otherwise subject to the court's jurisdiction." *TRW, Inc. v. Derbyshire*, 157 F.R.D. 59, 60 (D. Col. 1994). Rather, "the rules governing service of process are utilized for the purpose of providing a likelihood of bringing actual notice to the intended recipient," *Minnesota Mining & Mfr'g Co. v. Kirkevold*, 87 F.R.D. 317, 324 (D. Minn. 1980), and actual notice satisfies the due process notice requirement and provides the Court with personal jurisdiction. *Frank Keevan & Son, Inc. v. Callier Steel Pipe & Tube, Inc.*, 107 F.R.D. 665, 671 (S.D. Fla. 1985).  "Where service complies precisely with the requirements of Rule 4(e), it will be effective for personal jurisdiction, even if the individual did not receive actual notice. *Smith v. Kincaid*, 249 F.2d 243, 244 (6th Cir. 1957); *Capitol Life Ins. Co. v. Rosen*, 69 F.R.D. 83, 88 n.3 (E.D. Pa. 1975).

"On the other hand," the Court stated, "where the defendant has received actual notice of the action, the provisions of Rule 4(e) should be liberally construed to effectuate service and uphold the jurisdiction of the court." *Karlsson v. Rabinowitz*, 318 F.2d 666 (4th Cir. 1963); *Rovinski v. Rowe*, 131 F.2d 687, 689 (6th Cir. 1942).

Furthermore, the Court stated, "where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the federal rule, service of process has been effective. *Id.* Good faith efforts at service are effective  particularly where the defendant has engaged in evasion, deception, or trickery to avoid being served."   *Ali* at 35-36. Under the circumstances at bar we do not know if any of these defendants have engaged in evasion, deception or trickery, therefore Plaintiffs should have the right to conduct limited discovery on this issue and the circumstances whereby an individual signed for this Complaint.

In *Ali,* the Court considered whether the Defendant's mother's receipt of the papers was sufficient to effectuate service. Citing the fact that the Defendant's mother "accepted the papers from the process server…In the absence of any claim that he never received actual notice, the rules of service are to be liberally construed. Accordingly, [service]…was effective under Rule 4(e)(2)." *Ali* at 32, 37.

This is not unlike the present case, where the circumstances of notice are far less ambiguous than in *Ali*. While Defendants argue that they were not properly served, it is clear that they were well aware of the existence of the lawsuit as illustrated by their retention of a bevy of lawyers to attempt to have this case dismissed.

Defendants maintain that the Plaintiffs in this case didn't meet every specific requirement of the service rules. To make their case, they cited the Postal Service documents which show that the Complaint and summonses were indeed delivered to, and reached, the Defendants.  They claim

that the deliveries were incorrect because each of the green cards showing receipt of the certified mail was not signed by the Defendant.

However, based upon the holding in *Ali*, Defendants had actual notice of the lawsuit, and the service can be deemed by the Court to be "effective under Rule 4(e)(2)." Id.

In the event the Court rules otherwise, in the interest of the justice and judicial economy Plaintiffs would ask the Court for leave to correct any service deficiency and, if necessary, serve by overnight FedEx to the address designated by the Defendants.

**XI.     Defendants' conduct does not constitute free speech and is therefore not protected because it was intended to incite violence:**

Defendants argue that all claims against Walid Shoebat and AIPAC and its officials Howard Kohr and Brian Shankman should be dismissed because their actions are Constitutionally protected free speech. Nothing could be further from the truth.

As this Court knows there are limits on what constitutes protected speech. There are few limits, but the Supreme Court has drawn a clear line between speech that is protected and that speech which is definitely not protected.

One of the elements that delineates the distinction between protected speech and unprotected speech is the effect of the speech. If its benign speech, it is protected. But if it is speech that incites violence it is not.

"Exceptions to the **First Amendment's** protection of **expression** exist in the case of a **small number** of "**well-defined** and **narrowly limited classes** of **speech**…" *United States v. Stevens*, 559 U.S. 460, 468-469, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010)(quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571-72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)).

"Two of these **classes** are relevant here -- "**true threats**," see *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), and "**speech integral** to **criminal**

**conduct**," see *United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 183 L. Ed. 2d 574

(2012) (citing *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 498, 69 S. Ct. 684, 93 L. Ed.

834 (1949).

 The Court continued: "**True threats' encompass** those statements where

the **speaker** means to **communicate** a **serious expression** of an **intent to commit** an act

of **unlawful violence** to a **particular individual** or **group** of individuals." *Black*, 538 U.S. at

359. **Speech** "**integral** to **criminal conduct**" is **precisely** what it **sounds like**, and it is not

protected on First Amendment grounds "merely because the conduct was **in**

**part initiated**, **evidenced**, or **carried out** by means of language, either **spoken**, written,

or **printed**." *Giboney*, 336 U.S. at 502. *United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018)

(emphasis in original)

 In this case, Defendants Shoebat, AIPAC, and its officials, mimicked the actions—and

words—of the organizers of the Unite the Right Rally in Charlottesville, Virginia in 2017. There,

the Charlottesville organizers, and financiers of violence, formed a conspiracy to commit racial

violence (See *Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018). While the goal of the

conspiracy detailed herein is different, i.e. force 400,000 Palestinian homeowners out of the

OPT, it was based on racial violence as well. Different groups, of course, were targeted, but that

is irrelevant. Defendants herein intentionally and repeatedly encouraged, enabled, and supported

the settlement expansion and funded racial violence and ethnic cleansing.

 And, like the Charlottesville promoters of violence, all Defendant herein knew that their

mission—and that promotion and encouragement and enablement of that mission to rid the OPT

of Palestinians--would promote violence in the OPT.

 Plaintiffs agree with the legal analysis that holds that you cannot ban speech that is an

expression of ideas that *merely offend*s. For example, Defendants hired advertising agencies to

buy Washington, DC bus advertisements calling Palestinians "savages": they were expressing their feelings and wanted the DC population to understand that. While that conduct in and of itself is offensive, it does necessarily incite violence.

However, the Court should keep in mind that these Defendants did much more than simply express their feelings about hating Palestinians and removing them from the OPT.

They:

    a) Financed the purchase of firearms in violation 18 U.S.C. 1956 to outfit foreign militia units, 18 U.S.C. 960 and bought sniper scopes and stun grenades;

    b) Hired professional forgers to prepare fraudulent deeds (See <u>The General's Son, p. 166</u>);

    c) Bribed military officials to issue illegal land confiscation orders,  see Complaint pp. 72, 77, 93, 124;...

    d) Blocked ambulances so that wounded Palestinians would bleed out;

    e) Killed Palestinian children for sport, knowing they'd get just 30 days of jail time and a fine, and;

    f) Financed land theft. According to Israeli Defense Minister Mofaz, "they're (the settlers) stealing private property, including property owned by the state."

With respect to Defendant Shoebat, he progressed from using mere harassment tactics and curtailing free speech to open displays of criminal intent to incite violence. This makes Defendant Shoebat different from other Defendants because he has literally confessed to having targeted a specific class of individuals—Palestinians "terrorists." The reason: his preferred audience are senior officials working in the Department of Homeland Security. With a single

phone call these official can pick up a Palestinian identified by Shoebat and have him summarily deported. Defendant Shoebat knows the tragic consequences of inciting and encouraging violence against members of the Muslim faith, based on the plan devised by White House senior adviser Steven Miller. The Trump administration plan is to deport all non-Americans by accusing them of promoting international terrorism. That is the definition of "international terrorism" (See 18 U.S.C. 2331)  and such activity is not only barred by legislative mandate, it is also barred by Executive Orders of Presidents Clinton and Bush.

Defendant Shoebat knows and intends that the immigration records of these Muslim individuals will be scrutinized, and they can be deported because of a missed comma or middle name--that's ethnic cleansing. That is the Trump/Miller game plan to turn the USA into a White enclave. He knows that his efforts at racial profiling will bring the immediate attention of officials at Homeland Security, i.e. phony terrorist charges, quick snatch and arrest, and 10 years in jail. Loss of citizenship after waiting 20 years is certainly an injury.

Defendant Shoebat has aided and abetted the dehumanization of each of the Palestinians, which is a war crime in itself.  The 1946 Nuremburg Principles which have now been codified in the United Nations Charter were adopted to prosecute those individuals like Defendant Shoebat who did not themselves pull the proverbial trigger or manufacture the cyanide gas. [See Judge Shira A. Scheindlin's discussion in *Apartheid* case]. However, those individuals encouraged and promoted the Nazi agenda, just as Defendant Shoebat has encouraged and promoted ethnic cleansing and genocide. He has repeatedly violated the US State Department Manual on Genocide, as well as the Law of Nations Clause on the U.S. Constitution, which the court can take judicial notice of under Fed. Rule of Evidence  201.

Courtesy of numerous visits to the United States by IDF personnel, fundraisers, articles published in the New York Times and Washington Post, the Gaza Diary, [published in Vanity

Fair in 1990], the Sasson Israeli Government Report, Amnesty International reports, IDF personnel sworn testimonies, (see <u>Our Harsh Logic</u>, as described on page 79)  UN reports, four different official Israeli government reports, the <u>Spiegel Report</u> (that was the fourth government report on settlement activity), sworn statements made in "<u>Our Harsh Logic</u>, p. 288" personal visits to Israel, donation appeal literature, and online fund solicitation, it is obvious that the Defendants herein fashioned their rhetoric to support and encourage settlement expansion through violence, i.e. more ethnic cleansing, genocide, wanton destruction of property, and theft of private property (See Defense Minister Mofaz's admission re: stealing private property).

These Defendants should not be able to the First Amendment as a shield to absolve them of liability for their dangerous conduct and inflammatory speech.

**NOTE**

**In the interest of judicial economy and fundamental principles of international law, this Court should stay disposition of Counts three and four, or in the alternative, dismiss them without prejudice.**

Plaintiffs would suggest that the Third and Fourth causes of action be stayed until such time that difficult issues are resolved, including those which were litigated in the *Yallon litigation.* In that case, a senior Israeli commander in charge of the Lebanon invasion was dismissed because of an affidavit submitted by the Israeli Ambassador which convinced the Court that his activity was simply part and parcel of the strategy employed by the State of Israel.

Normally, based on *Yallon*, it is relatively easy to dispose of similar claims filed against a sitting Prime Minister. However, due to the serious problems [see Complaint footnote 1] it is difficult to ascertain whether Defendant Prime Minister can remain in power and function as a "sitting PM." Any day now he could be ousted because he is facing three different indictments. As reported in Haaretz he will have to confront over 100 witnesses.

And if his alleged co-equal partner bows out, where does that leave PMN? The facts involving PMN are far different than those analyzed in the *Yallon* authority. For example, there no affidavit from the Israeli Ambassador or any other government figure who recites that it was perfectly legitimate for Prime Minister Netanyahu to be involved in three separate acts of criminal fraud. The obvious question is: Will he even have time to act as a Prime Minister?

Plaintiffs suggest for the same reasons why the third and fourth causes of actions should be stayed or dismissed without prejudice. The stark reality is that once the UN takes up the issue of the appropriate boundaries of the State of Israel vis-a-vis Palestine this Court would lose jurisdiction over the matter. The parties would hopefully agree, under the circumstances, to let the UN resolve this thorny international disagreement. In any case, in the interest of the judicial economy, Plaintiffs suggest a wait and see posture. This will not prejudice the Defendants in any manner.

## CONCLUSION

For all the reasons described above, Defendants' Motion to Dismiss should be denied. It would be travesty if these Defendants are allowed to take substantial and illegal tax write-offs and promote war crimes as a result. That would be the effect of dismissing this Complaint.

Respectfully submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon
1717 K Street NW – Suite 900
Washington, DC 20006
202-862-4343
mm@martinmcmahonlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 11, 2020, I filed the foregoing with the Clerk of Court using the ECF filing system, which will send notice of this filing to all parties registered to receive such notice, including defense counsel.

*/s/ Martin F. McMahon*
Martin F. McMahon, Esq.
